**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DENISE LOHNN, Executor of the Estate of Jorgen Lohnn, Deceased | Civil Action No. 1:21-cv-06379 |
| Plaintiff, | |
| v. | |
| INTERNATIONAL BUSINESS MACHINES CORP. | |
| Defendant. | |

<u>**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**</u>

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................... 1

II.   FACTUAL AND PROCEDURAL BACKGROUND ...................................... 6

      A.    Overview ..................................................................................... 6

      B.    The Rusis Named Plaintiffs' EEOC Charges ............................... 7

      C.    The Timeliness Dispute in Plaintiff's Arbitration ......................... 8

      D.    The Impact of the Confidentiality Provision in IBM's Arbitration
            Agreement ................................................................................... 9

III.  ARGUMENT ....................................................................................... 10

      A.    Summary Judgment Standard .................................................. 10

      B.    The Provision in IBM's Arbitration Agreement Purporting to Waive
            the Piggybacking Rule is Unenforceable ................................... 11

      C.    The Confidentiality Provision within IBM's Arbitration Agreement is
            Also Unenforceable ................................................................... 21

IV.   CONCLUSION .................................................................................... 30

## TABLE OF AUTHORITIES

**Cases**

Adams v. Philip Morris, Inc.,
   67 F.3d 580 (6th Cir. 1995) ..................................................................... 19

American Family Life Assurance Co. of New York v. Baker,
   778 Fed. App'x 24 (2d Cir. 2019) ................................................. 21, 25, 29

Anderson v. Liberty Lobby, Inc.,
   477 U.S. 242 (1986) ............................................................................... 11

AT & T Mobility LLC v. Concepcion,
   563 U.S. 333 (2011) ............................................................................ 4, 23

Balan v. Tesla Motors Inc.,
   2019 WL 2635903 (W.D. Wash. June 27, 2019) ...................................... 24

Bogacz v. MTD Products, Inc.,
   694 F. Supp. 2d 400 (W.D. Pa. 2010) ..................................................... 20

Butcher v. Gerber Prods. Co.,
   8 F. Supp. 2d 307 (S.D.N.Y. 1998) ......................................................... 18

Castellanos v. Raymours Furniture Co., Inc.,
   291 F. Supp. 3d 294 (E.D.N.Y. March 12, 2018) ..................................... 17

Cerjanec v. FCA US, LLC,
   2017 WL 6407337 (E.D. Mich. Dec. 15, 2017) ........................................ 17

Cole v. Convergys Customer Mgmt. Grp., Inc.
   2012 WL 6047741 (D. Kan. Dec. 5, 2012) ............................................... 18

Collins v. New York City Transit Authority,
   305 F.3d 113 (2d. Cir. 2002) .................................................................. 29

Cronas v. Willis Group Holdings Ltd.,
   2007 WL 2739769 (S.D.N.Y. Sept. 17, 2007) ............................... 13, 15, 20

Davis v. Mills
   194 U.S. 451 (1904) ............................................................................... 16

DeGraff v. Perkins Coie LLP,
   2012 WL 3074982 (N.D. Cal. July 30, 2012) ........................................... 22

EEOC v. Comm. Office Prods. Co.,
    486 U.S. 107 (1988) .................................................................................... 16

Estle v. International Business Machines Corp.
    2020 WL 5633154 (S.D.N.Y. Sept. 21, 2020) ......................................... 21

Estle v. International Business Machines Corp.,
    No. 20-3372 (2d Cir.) .................................................................................. 21

Fed. Exp. Corp. v. Holowecki
    552 U.S. 389 (2008) .................................................................................... 16

Friedmann v. Raymour Furniture Co., Inc.
    2012 WL 4976124 (E.D.N.Y. Oct. 16, 2012) .......................................... 17

Gilmer v. Interstate/Johnson Lane Corp.
    500 U.S. 20 (1991) .......................................................................... 1, 12, 15, 25

Graham Oil v. Arco Products Co.
    43 F.3d 1244 (9th Cir. 1994) ..................................................................... 18

Grayson v. K Mart Corp.
    79 F.3d 1086 (11th Cir. April 9, 1996) .................................................... 13

Guyden v. Aetna, Inc.,
    544 F.3d 376 (2d Cir. 2008) ................................................................ 24, 25

Hagan v. Katz Communications, Inc.,
    200 F. Supp. 3d 435 (S.D.N.Y. 2016) ..................................................... 17

Hammaker v. Brown & Brown, Inc.
    214 F. Supp. 2d 575 (E.D. Va. 2002) ...................................................... 20

Hollander v. American Cyanamid Co.,
    895 F.2d 80 (2d Cir. 1990) ............................................................ 4, 5, 21, 26

Holowecki v. Federal Exp. Corp.
    440 F.3d 558 (2d Cir. 2006) .................................................................. 3, 12

Hoober v. Movement Mortgage, LLC,
    382 F. Supp. 3d 1148 (W.D. Wash. 2019) .............................................. 24

Johnson v. Killian,
    680 F.3d 234 (2d Cir. 2012) ...................................................................... 11

Jones v. American Postal Workers Union
    192 F.3d 417 (4th Cir. 1999) ..................................................................... 16

Kinkel v. Cingular Wireless LLC,
    223 Ill.2d 1 (Ill. 2006) ................................................................ 24

Kruchowski v. Weyerhaeuser Co.,
    446 F.3d 1090 (10th Cir. 2006) .................................................. 18

Larsen v. Citibank FSB,
    871 F.3d 1295 (11th Cir. 2017) ........................................... 2, 4, 22

Lewis v. Harper Hosp.
    241 F.Supp.2d 769 (E.D. Mich. 2002) ....................................... 18

Livingston v. City of Chicago
    2019 WL 194848 (N.D. Ill. Jan. 14, 2019) ................................. 12

Logan v. MGM Grand Detroit Casino,
    939 F.3d 824 (6th Cir. 2019) ................................................ 16, 20

Loksen v. Columbia Univ.,
    2013 WL 5549780 (S.D.N.Y. Oct. 14, 2013) .............................. 18

Luna v. Household Finance Corp. III,
    236 F. Supp. 2d 1166 (W.D. Wash. 2002) ................................. 23

Mabry v. W. & S. Life Ins. Co.
    2005 WL 1167002 (M.D.N.C. Apr. 19, 2005) ............................. 18

Mazurkiewicz v. Clayton Homes, Inc.
    971 F.Supp.2d 682 (S.D. Tex.2013) .......................................... 18

McKee v. AT & T Corp.,
    164 Wash. 2d 372, 191 P.3d 845 (2008) ......................... 4, 23, 24

Narayan v. The Ritz-Carolton Development Co., Inc.,
    140 Hawai'i 343 (2017) .............................................................. 24

O'Phelan v. Fed. Express Corp.
    2005 WL 2387647 (N.D. Ill. Sept. 27, 2005) ............................. 18

Oubre v. Entergy Operations, Inc.,
    522 U.S. 422 (1998) .............................................................. 2, 18

Ragone v. Atlantic Video at Manhattan Center,
    595 F.3d 115 (2d Cir. 2010) .................................................. 2, 17

Ramos v. Superior Ct.,
    28 Cal. App. 5th 1042 (2018) ............................................. 22, 24

Rupert v. PPG Industries, Inc.,
    2009 WL 596014 (W.D. Pa. Feb. 26, 2009)............................................................ 20

Rusis v. International Business Machines Corp.,
    --- F. Supp. 3d ---, 2021 WL 116469 (S.D.N.Y. March 26, 2021).......................... 4, 9

Rusis v. International Business Machines Corp.,
    Civ. Act. No. 1:18-cv-08434 (S.D.N.Y.).............................................................. 3, 6

Salisbury v. Art Van Furniture
    938 F. Supp. 435 (W.D. Mich. 1996)....................................................................... 18

Sanford v. Quicken Loans
    2014 WL 266410 (E.D. Mich. Jan. 24, 2014) ......................................................... 18

Schnuerle v. Insight Commc'ns Co., L.P.,
    376 S.W.3d 561 (Ky. 2012).................................................................................... 23

Smithson v. Hamlin Pub, Inc.,
    2016 WL 465564 (E.D. Mich. Feb. 8, 2016)........................................................... 17

Snell v. Suffolk County
    782 F.2d 1094 (2d Cir. 1986).................................................................................. 12

Spell v. United Parcel Service,
    WL 2012 4447385 (E.D.N.Y. 2012) ...................................................................... 29

Sprague v. Houseld Intern.,
    473 F. Supp. 2d 966 (W.D. Mo. 2005) ................................................................... 23

Syverson v. International Business Machines Corp.,
    472 F.3d 1072 (9th Cir. 2007)................................................................................. 20

Thiele v. Merrill Lynch, Pierce, Fenner & Smith
    59 F. Supp. 3d 1060 (S.D. Cal. 1999)..................................................................... 21

Thomforde v. International Business Machines Corp.,
    406 F.3d 500 (8th Cir. 2005)................................................................................... 20

Thompson v. Fresh Products, LLC,
    985 F.3d 509 (6th Cir. 2021)............................................................... 15, 16, 17, 19

Thompson v. Fresh Products, LLC,
    EEOC Brief, 2020 WL 1160190 (6th Cir. March 2, 2020) ........................ 4, 16, 17, 19

Tolliver v. Xerox Corp.
    918 F.2d 1052 (2d Cir. 1990)..........................................................................passim

Travers v. FSS,
   737 F.3d 144 (1st Cir. 2013) ................................................................. 27

Viola v. Philips Med. Sys. of N. Am.,
   42 F.3d 712 (2d Cir. 1994) .................................................................... 11

Wineman v. Durkee Lakes Hunting & Fishing Club, Inc.
   352 F. Supp. 2d 815 (E.D. Mich. Jan. 13, 2005) ................................... 18

Zuver v. Airtouch Communications, Inc.,
   153 Wash. 2d 293 (2004) ......................................................... 3, 5, 22, 24

**Statutes**

29 C.F.R. § 1625.22(b)(3) ............................................................................. 20

29 C.F.R. § 1625.22(f) ................................................................................... 18

29 U.S.C. § 626(d) ........................................................................................ 12

29 U.S.C. § 633(b) ........................................................................................ 12

42 U.S.C. § 2000e-5(e)(1) ............................................................................. 12

Age Discrimination in Employment Act ("ADEA"),
   29 U.S.C. § 621 *et seq*. ................................................................... passim

Older Workers' Benefits Protections Act ("OWBPA"),
   29 U.S.C. § 626(f) ...................................................................... 2, 18, 19

**Other Authorities**

Peter Gosselin and Ariana Tobin,
   *Cutting 'Old Heads' at IBM*, ProPublica (March 22, 2018),
   https://features.propublica.org/ibm/ibm-age-discrimination-american-workers/ ......... 6

## I.   INTRODUCTION

Plaintiff Denise Lohnn, the executor of the estate of her deceased husband, Jorgen Lohnn, seeks a declaratory judgment, pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, that two provisions of an arbitration agreement that Mr. Lohnn entered into with IBM are not enforceable, as they undermine or extinguish her ability to pursue Mr. Lohnn's claims against IBM under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*[1]

As described in Plaintiff's accompanying statement of material facts, upon Mr. Lohnn's separation from employment at IBM, he entered into an arbitration agreement with IBM that released (in exchange for a small severance payment) almost all claims he may have against IBM, but not claims under the ADEA.  Under this agreement, Mr. Lohnn was permitted to pursue claims against IBM under the ADEA, but the claim had to be brought in individual arbitration.

However, as set forth below, two provisions of IBM's arbitration agreement prevent Plaintiff from pursuing Mr. Lohnn's ADEA claim in arbitration, a claim that Plaintiff would have been able to pursue in court (had Mr. Lohnn not signed an arbitration agreement).  As the Supreme Court recognized in Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 28 (1991), statutory claims "are appropriate for arbitration" only "[s]o long as the prospectively litigant effectively may vindicate [his or her] statutory cause of action in the arbitral forum . . . ." (internal quotation omitted). Here, given that IBM did not provide disclosures to Plaintiff regarding the ages of the employees terminated in mass layoffs and those not terminated, IBM

---

[1]    Other courts in this district are also deciding the issues presented in this motion. For example, twenty-five plaintiffs in the consolidated matter In Re: IBM Arbitration Agreement Litigation, C.A. No. 21-CV-6296 (JMF), also filed the same motion for summary judgment before Judge Jesse M. Furman raising these same issues (Dkt. 27). The same day, plaintiff William Chandler likewise filed the same motion for summary judgment before Judge John G. Koeltl in Chandler v. International Business Machines Corp., C.A. No. 21-CV-6319-JGK (Dkt. 14).

could not obtain a release of her claims under the ADEA.[2] The arbitration agreement may not serve as a substitute release. The agreement is thus only enforceable insofar as Plaintiff is able to pursue Mr. Lohnn's claims in arbitration, just as she would be able to pursue them in court.

Plaintiff has not challenged the overall enforceability of IBM's arbitration agreement.  However, in arbitration, she cannot be prevented from pursuing Mr. Lohnn's claims that she would have otherwise been able to pursue in court.  This Court has the power and duty to hold unenforceable those provisions of IBM's arbitration agreement that block or undermine Plaintiff's ability to pursue Mr. Lohnn's ADEA claims (that have not been released) in arbitration.[3]

Indeed, courts have regularly ordered cases to arbitration, but first excising provisions of arbitration agreements they have found to be unenforceable.  See, e.g., Ragone v. Atlantic Video at Manhattan Center, 595 F.3d 115, 125-26 (2d Cir. 2010) ("[T]he appropriate remedy when a court is faced with a plainly unconscionable provision of an arbitration agreement—one which by itself would actually preclude a plaintiff from pursuing her statutory rights—is to sever the improper provision of the arbitration agreement, rather than void the entire agreement.") (citation omitted); Larsen v. Citibank FSB, 871 F.3d 1295, 1319 (11th Cir. 2017) (severing confidentiality provision within an arbitration agreement); Zuver v. Airtouch Communications, Inc., 153 Wash. 2d

---

[2]     Such disclosures are required under the Older Workers' Benefits Protections Act ("OWBPA"), 29 U.S.C. § 626(f) in order for an employer to obtain releases under the ADEA when employees are terminated as part of a group layoff. See Oubre v. Entergy Operations, Inc., 522 U.S. 422, 427 (1998).

[3]     Indeed, when other arbitration claimants have raised these issues to arbitrators, IBM has consistently cited a provision in its arbitration agreement that it contends requires that any challenges to the enforceability of any portions of its arbitration agreement be heard by a court, rather than an arbitrator.  See Arbitration Agreement, at p. 25, Exhibit 2 to Declaration of Shannon Liss-Riordan.  The arbitrators in these cases have generally agreed that such a challenge would need to be brought before a court. (Collected Arbitration Decisions, filed in In Re: IBM Arbitration Agreement Litigation, Dkt. 29-4.)

293, 312-21 (2004) (severing unconscionable confidentiality provision and provision precluding punitive damages from arbitration agreement).[4]

The first provision that Plaintiff challenges is a timing provision, which purports to waive the "piggybacking" rule that excuses plaintiffs from filing administrative charges of discrimination when a similar charge has already been filed with the EEOC, alleging classwide discrimination (or similar enough allegations of discrimination) that would encompass the plaintiff's own claim of discrimination.  Under this rule, plaintiffs may file claims of discrimination years after they suffered discrimination by "piggybacking" onto earlier-filed claims, which put the company on notice of allegations that it engaged in illegal discrimination that affected a broad class of workers. See Tolliver v. Xerox Corp., 918 F.2d 1052, 1057-59 (2d Cir. 1990); Holowecki v. Federal Exp. Corp., 440 F.3d 558, 565-70 (2d Cir. 2006). This rule thus effectively extends the statute of limitations for plaintiffs bringing discrimination claims, where earlier classwide charges of discrimination have been filed against the company.  While in court Plaintiff would have been able to "piggyback" Mr. Lohnn's claim onto an earlier-filed class action age discrimination case against IBM (without any concern regarding timeliness of his claim),[5] in arbitration IBM has argued (and persuaded the arbitrators in a number of

---

[4]     This case is somewhat unusual in that, here, Plaintiff has not contested the overall enforceability of IBM's arbitration agreement.  Typically, courts have excised unenforceable provisions in arbitration agreements after considering plaintiffs' arguments that the arbitration agreement is itself not enforceable, as explained above. The courts have then compelled arbitration, with those provisions ruled unenforceable. Here, however, Plaintiff should not be penalized for not contesting the overall enforceability of the arbitration agreement itself.  The Court still has the power to excise unenforceable provisions, as IBM has argued to various arbitrators (who have agreed with the argument) that only a court could address Plaintiff's claims that these provisions are unenforceable. (Collected Arbitration Decisions, filed in In Re: IBM Arbitration Agreement Litigation, Dkt. 29-4.)

[5]     See SOF ¶ 14.   As explained there, Plaintiff would have been able to opt in to a class and collective action that Plaintiff's counsel have against IBM.  See Rusis v. International Business Machines Corp., Civ. Act. No. 1:18-cv-08434 (S.D.N.Y.). Indeed Plaintiff did opt in to Rusis in order to challenge the provision of IBM's arbitration agreement that purports to waive the "piggybacking" rule.  The court there held that Plaintiff and others raising this argument could not participate in a class or collective action, due to the class waiver in IBM's arbitration agreement, and ordered that any

other cases, see note 10, *infra*) that its arbitration agreement does not allow for such "piggybacking," effectively truncating the ADEA limitations period for those individuals. Plaintiff here contends that, as "piggybacking" is an ADEA statute of limitations doctrine – and the ADEA statute of limitations is a substantive right – IBM's arbitration agreement cannot be used to have waived this right for Mr. Lohnn.[6]

The second provision that Plaintiff challenges is a confidentiality provision in IBM's arbitration agreement, which IBM has aggressively wielded in order to block employees pursuing discrimination cases against IBM in arbitration from using evidence in support of their claims that Plaintiff's counsel have obtained in other arbitration cases raising the same issues.  A number of courts have recognized the importance to employees pursuing discrimination claims, particularly in "pattern and practice" cases, of being able to build off of evidence obtained by other employees with similar claims.[7] And courts have recognized that confidentiality provisions in arbitration agreements can give unfair advantage to corporate defendants, preventing plaintiffs from sharing information obtained in their separate cases.  Thus, a number of courts have held such confidentiality provisions to be unenforceable.  See, e.g., Larsen, 871 F.3d at 1319 (holding that a confidentiality provision in an arbitration agreement was unconscionable, because it provided the defendant with an obvious informational advantage); McKee v. AT & T Corp., 164 Wash. 2d 372, 398, 191 P.3d 845, 858 (2008), abrogated on other grounds by AT & T Mobility LLC v. Concepcion, 563 U.S. 333 (2011) (finding

---

such challenge would have to be filed individually. See Rusis v. International Business Machines Corp., --- F. Supp. 3d ---, 2021 WL 116469, at *4-7 (S.D.N.Y. March 26, 2021). Plaintiff thereafter filed this case individually (as did nearly 30 other individuals in this district).

[6]    As discussed below, the EEOC has taken the position that the ADEA limitations period is a substantive, non-waivable right. See Thompson v. Fresh Products, LLC, EEOC Brief, 2020 WL 1160190, at *19-23 (6th Cir. March 2, 2020).

[7]    Even in individual discrimination cases, pattern and practice evidence is widely recognized as an important tool for plaintiffs to prove discriminatory intent by employers. See Hollander v. American Cyanamid Co., 895 F.2d 80, 84-85 (2d Cir. 1990).

confidentiality clause unenforceable because it advantaged repeat players and hampered claimants' ability to demonstrate patterns of unlawful or abusive conduct); Zuver, 153 Wash. 2d at 312-15 (striking unconscionable confidentiality provision in employment discrimination case because it prevented the plaintiff from demonstrating a pattern or practice of unlawful behavior and from benefiting from previous arbitral decisions).

As discussed below, and demonstrated through Plaintiff's accompanying statement of facts, a number of former employees have pursued ADEA claims against IBM in arbitration and have amassed a great deal of highly relevant, incriminating, and indeed shocking evidence, showing the extent of IBM's systemic plan to force out older workers and increase the proportion of younger "millennial" workers, in order to build a young workforce, which IBM leaders believed would help it better compete against its newer, younger, hipper competitors, such as Google, Facebook, and Amazon. However, IBM has wielded its confidentiality provision in its arbitration agreement aggressively to block these employees at every turn from using this highly relevant and damning evidence in each other's cases.  Plaintiff has set forth in her statement of facts numerous examples of the types of evidence her counsel have obtained in various arbitration cases against IBM, as well as examples of employees whose cases have been dismissed or lost at hearing, after not being able to present such evidence to the arbitrators.  These examples illustrate how IBM is using the confidentiality provision in its arbitration agreement to – not just require these employees to pursue their claims individually in arbitration – but to severely undermine their ability to build and prove their case in arbitration. As the Second Circuit has explained, "[b]ecause employers rarely leave a paper trail – or 'smoking gun' – attesting to a discriminatory intent, disparate treatment plaintiffs must often build their cases from pieces of circumstantial evidence," which includes "[e]vidence relating to company-wide practices." See Hollander, 895 F.2d at 84-85. IBM has even moved for sanctions against Plaintiff's counsel in various

arbitrations for daring to file documents from those arbitrations in court under seal in support of their challenge to the confidentiality provision in In Re: IBM Arbitration Litigation and Chandler, even though IBM has taken the position that its arbitration agreement requires that such challenges be made before a court rather than an arbitrator. See note 3, supra. Since IBM has used the confidentiality provision in its arbitration agreement to prevent employees from building their cases in arbitration as they would be allowed to in court – by building them from accumulation of circumstantial evidence and evidence of companywide practices obtained by other employees – this Court should also enter an order holding the confidentiality provision in IBM's arbitration agreement to be unenforceable.[8]

## II.   FACTUAL AND PROCEDURAL BACKGROUND

### A. Overview

In this lawsuit, Plaintiff alleges that Mr. Lohnn lost his job as the result of IBM's discriminatory efforts to systematically reduce its employment of older workers in order to build a younger workforce, pushing out thousands of older workers while hiring younger workers (which IBM often refers to as "Early Professional Hires" or "New Collar" workers), in order to better compete with newer technology companies, such as Google, Facebook, Amazon, and others. (SOF ¶ 3.)[9]  This discriminatory scheme is detailed in the Second Amended Complaint in Rusis, Civ. Act. No. 18-cv-08434 (Dkt.

---

[8]     At the very least, Plaintiff requests that the Court order that the confidentiality provision may not be used to stop employees from using information gained in other arbitration cases in their own cases.  The question of whether the confidentiality provision can stop the information from becoming publicly available is a separate matter that the Court need not specifically address here.

[9]     Indeed, in an article published by ProPublica following an investigation of IBM"s hiring practices, ProPublica reported that it estimates that "in the past five years alone, IBM has eliminated more than 20,000 American employees ages 40 and over, about 60 percent of its estimated total U.S. job cuts during those years." Peter Gosselin and Ariana Tobin, *Cutting 'Old Heads' at IBM*, ProPublica (March 22, 2018), https://features.propublica.org/ibm/ibm-age-discrimination-american-workers/.

179) (attached as Exhibit 1 to the Liss-Riordan Declaration).

Although IBM has sought – both through its arbitration process and in the <u>Rusis</u> case - to cabin each employee's separation as if it existed in a vacuum, the EEOC issued a letter of determination on August 31, 2020, that found otherwise. (SOF ¶¶ 49-55.)  Following a two year investigation of allegations of classwide discrimination against IBM, the EEOC found that reasonable cause exists to believe that IBM has been engaged in an aggressive campaign over a five-year period to reduce the number of its older workers and replace them with younger workers, thereby discriminating against its older workers in violation of the ADEA. (SOF ¶¶ 49-55.)  The EEOC's determination pertained to fifty-eight (58) charging parties "and a class of similarly situated parties" who alleged that they were discharged based on their age and was based on data from IBM terminations between 2013 and 2018.  (SOF ¶¶ 49-55.)

**B.  The <u>Rusis</u> Named Plaintiffs' EEOC Charges**

As a predicate to filing the <u>Rusis</u> lawsuit, lead plaintiff Edvin Rusis filed a class EEOC charge on May 10, 2018, which states:

> IBM is discriminating against its older workers, both by laying them off disproportionately to younger workers and not hiring them for open positions. Indeed, over the last several years, IBM has been in the process of systematically laying off its older employees in order to build a younger workforce. IBM has laid off at least 20,000 employees over the age of forty in the last five years. I am 59 years old, and I am being laid off by IBM effective June 27, 2018. Since receiving notice of my layoff, I have applied for several other open positions within IBM, for which I am eminently qualified, but I have not been hired for any of these positions, despite my lengthy service and successful experience as an employee for IBM. I believe that I and thousands of other employees have been discriminated against by IBM on the basis of age.

(SOF ¶ 14 n.4.) Other <u>Rusis</u> plaintiffs (Henry Gerrits and Phil McGonegal) subsequently filed class charges with similar language on July 2, 2018 (SOF ¶ 14 n.4.).

Additionally, on July 22, 2021, the <u>Rusis</u> plaintiffs submitted a second amended complaint, adding Sally Gehring (and various others) as a named plaintiff. (SOF ¶ 14 n.4.) Ms. Gehring was a charging party in the EEOC's Letter of Determination, and she

had filed a classwide EEOC charge back on November 14, 2016. (SOF ¶¶ 14 n.4, 51.)
Ms. Gehring's charge states:

> I was forced to train a new employee who was outside my protected statuses. I was subjected to a hostile work environment when training others to do my job duties. Particularly, I trained workers who were male, under age of 40, non American national origin and a different race to do my duties. After which, I was terminated and my job duties were taken over by workers outside all of my protected statuses. Many employees in my protected statuses have been terminated and are not being hired.

(SOF ¶ 14 n.4.)

### C.  The Timeliness Dispute in Plaintiff's Arbitration

When Mr. Lohnn was terminated, he signed an arbitration agreement in exchange for a modest severance payment. (SOF ¶¶ 4-5.) Mr. Lohnn did not receive OWBPA disclosures from IBM in connection with signing his arbitration agreements. (SOF ¶ 7 n.2.)

With respect to the time limit for filing an arbitration demand, the arbitration agreement states:

> To initiate arbitration, you must submit a written demand for arbitration to the IBM Arbitration Coordinator no later than the expiration of the statute of limitations (deadline for filing) that the law prescribes for the claim that you are making or, if the claim is one which must first be brought before a government agency, no later than the deadline for the filing of such a claim. If the demand for arbitration is not timely submitted, the claim shall be deemed waived. The filing of a charge or complaint with a government agency or the presentation of a concern though the IBM Open Door Program shall not substitute for or extend the time for submitting a demand for arbitration.

(SOF ¶ 13.)

Plaintiff initially asserted Mr. Lohnn's claim in the <u>Rusis</u> case, as Plaintiff's counsel was aware that in a number of other arbitrations, the arbitrators agreed with IBM's argument that its agreement did not allow for the "piggybacking rule", which the claimants had argued should render their claims timely as they should be allowed to "piggyback" off an earlier filed charge alleging the same discrimination.[10]

---

[10]    <u>See</u> Collected Arbitration Decisions, filed in <u>In Re: IBM Arbitration Agreement</u>

Thus, Plaintiff opted in to <u>Rusis</u> in order to challenge before a court the validity of the purported waiver of piggybacking in the arbitration agreement. (SOF ¶ 10.) The <u>Rusis</u> court dismissed Plaintiff (and nearly 30 other individuals raising the same challenge) due to the class action waiver in the agreement they signed, holding that they could not bring this challenge as a part of a class action.  <u>See Rusis</u>, 2021 WL 116469, at *4-7.  Plaintiff thereafter filed this challenge in an individual case.

### D.  The Impact of the Confidentiality Provision in IBM's Arbitration Agreement

IBM's arbitration agreement includes a broad confidentiality provision. That provision states:

> Privacy and confidentiality are important aspects of arbitration. Only parties, their representatives, witnesses and necessary administrative staff of the arbitration forum may attend the arbitration hearing. The arbitrator may exclude any non-party from any part of a hearing.

> To protect the confidentiality of proprietary information, trade secrets or other sensitive information, the parties shall maintain the confidential nature of the arbitration proceeding and the award. The parties agree that any information related to the proceeding, such as documents produced, filings, witness statements or testimony, expert reports and hearing transcripts is confidential information which shall not be disclosed, except as may be necessary to prepare for or conduct the arbitration hearing on the merits, or except as may be necessary in connection with a court application for a preliminary remedy, a judicial challenge to an award or its enforcement, or unless otherwise required by law or judicial decision by reason of this paragraph.

(SOF ¶ 16.)

As is set forth at length in Plaintiff's Statement of Material Facts ¶¶ 16-101, and

---

<u>Litigation</u>, Dkt. 29-4. Arbitrators addressing this issue have generally ruled that the arbitration agreement waived the piggybacking rule and that it would be up to a court to decide if that was enforceable, given this provision in IBM's arbitration agreement:

> ***Any issue concerning the validity or enforceability of this Agreement***, including the class action or collective action waivers contained in this section, ***shall be decided only by a court of competent jurisdiction.*** Any issue concerning the arbitrability of a particular issue or claim pursuant to this section (except for issues concerning the enforceability of the class action or collective action waivers) must be resolved by an arbitrator and not a court.

(Collected Arbitration Decisions, filed in <u>In Re: IBM Arbitration Agreement Litigation</u>, Dkt. 29-4; SOF ¶ 15 n.5.)

in Section III.C *infra*, IBM has aggressively invoked this confidentiality provision in the dozens of arbitrations that Plaintiff's counsel have pursued on behalf of former employees suing the company for age discrimination.  IBM has used the confidentiality provision to severely undermine and hamper the ability of these former employees to prove their cases under the ADEA.

For instance, IBM has used its confidentiality provision to block employees in arbitration from using evidence obtained in similar cases, including shockingly incriminating emails between IBM's ███ and top executives confirming Plaintiff's theory of a companywide plan to oust older employees in order to make room for younger employees, high-level strategic planning documents that discuss hiring goals and workforce composition at a high level (including a focus on hiring "Early Professional Hires" and "correcting seniority mix"), demographic data demonstrating that older workers were far more likely to be considered and selected for layoff than younger workers, evidence IBM provided to the EEOC that led the EEOC to issue its Letter of Determination finding reasonable cause that IBM discriminated against older workers on a classwide basis, crucial testimony by high level IBM witnesses in various arbitrations, and rulings and opinions issued by arbitrators in other employees' cases. (SOF ¶¶ 16-99.)

Given IBM's aggressive use of the confidentiality provision in its arbitration agreement to date, there can be no doubt that Plaintiff here as well will face enormous obstacles to pursuing Mr. Lohnn's case in arbitration, should this Court not hold IBM's confidentiality provision unenforceable.

## III.   ARGUMENT

### A.  Summary Judgment Standard

Summary judgment under Rule 56 is appropriate where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates the

absence of a genuine issue of material fact, and one party's entitlement to judgment as a matter of law.  See Viola v. Philips Med. Sys. of N. Am., 42 F.3d 712, 716 (2d Cir. 1994). The relevant governing law in each case determines which facts are material: "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor.  Johnson v. Killian, 680 F.3d 234, 236 (2d Cir. 2012).

Here, there are no material questions of fact to be decided.  Indeed, the parties agreed that this case could be decided on summary judgment without the need for discovery.  This case raises pure questions of law (on what Plaintiff does not expect to be a disputed factual record), which this Court can determine on summary judgment.

### B.  The Provision in IBM's Arbitration Agreement Purporting to Waive the Piggybacking Rule is Unenforceable

This Court should rule the provision in IBM's arbitration agreement that purports to waive the piggybacking rule is unenforceable.  Otherwise, Plaintiff will be left in an untenable position that she would *not* be in if Mr. Lohnn's ADEA claim was to be adjudicated in court rather than arbitration.  Even though Mr. Lohnn's claim would be deemed timely to participate in the Rusis lawsuit (or even an individual lawsuit) under the piggybacking rule in court, if the piggybacking rule were permitted to be waived in arbitration, then that would mean that Plaintiff could not advance Mr. Lohnn's age discrimination claim against IBM **at all**.  That result cannot stand.

Again, the Supreme Court has recognized that arbitration is an acceptable alternative forum to pursuing discrimination claims, but only so long as an employee can pursue his or her claims there just as they would be able to in court – and not sacrifice

11

any substantive rights.  See Gilmer, 500 U.S. at 28.  This Court must therefore hold the purported piggybacking waiver in IBM's arbitration agreement to be invalid.[11]  It is unenforceable because the ADEA's timing scheme is a non-waivable substantive right under the ADEA, and the purported waiver would impermissibly prevent the effective vindication of Plaintiffs' claims in arbitration.  Id.

Pursuant to the ADEA, individuals are required to file a charge with the EEOC within 300 days of the date of the alleged discriminatory act (or within 180 days in non-deferral jurisdictions).  42 U.S.C. § 2000e-5(e)(1); 29 U.S.C. §§ 626(d), 633(b).[12] However, this statutory period can be tolled by the filing of a classwide EEOC charge by a similarly situated individual under the "piggybacking" or "single filing" rule.  As the Second Circuit explained it, "[a]ccording to the piggybacking rule, 'where one plaintiff has filed a timely EEOC complaint, other non-filing plaintiffs may join in the action if their individual claims aris[e] out of similar discriminatory treatment in the same time frame." Holowecki, 440 F.3d at 564 (quoting Snell v. Suffolk County, 782 F.2d 1094, 1100 (2d Cir. 1986)); see also Livingston v. City of Chicago, 2019 WL 194848, *3 (N.D. Ill. Jan. 14, 2019).

The purpose of the EEOC charge filing requirement is not to limit the time for suit, but instead to afford the EEOC a prompt "opportunity to 'seek to eliminate any alleged unlawful practice by informal methods of conciliation, conference, and persuasion.'" Tolliver v. Xerox Corp., 918 F.2d 1052, 1057, 1059 (2d Cir. 1990). The EEOC "has interpreted the ADEA filing requirements to be satisfied 'so long as the matter complained of was within the scope of [a] previously filed charge, regardless of who filed.'" Id. Additionally, courts have found that the administrative prerequisites of

---

[11]    Otherwise, the arbitration agreement itself is invalid, and Plaintiff would then be able to pursue Mr. Lohnn's claim in court.

[12]    The non-deferral states are Alabama, Arkansas, Georgia, Mississippi, and North Carolina, as well as the territories American Samoa, Guam, Wake Island, and the Commonwealth of the Northern Mariana Islands.  See Individual Field Office Webpages, available at http://www.eeoc.gov/field/.

discrimination statutes such as the ADEA and Title VII "must be interpreted liberally to effectuate [their] purpose of eradicating employment discrimination," and courts must look to "fairness, and not excessive technicality" in addressing such issues. Cronas v. Willis Group Holdings Ltd., 2007 WL 2739769, at *2 (S.D.N.Y. Sept. 17, 2007).

As such, the Second Circuit has adopted the piggybacking rule to excuse the administrative charge filing requirement where an individual falls within the scope of a timely filed administrative charge that describes similar discrimination. See Tolliver, 918 F.2d at 1057. As the Eleventh Circuit has described, the "principle behind the piggybacking rule is to give effect to the remedial purposes of the ADEA and to not exclude otherwise suitable plaintiffs from an ADEA class action simply because they have not performed the 'useless act of filing a charge.'" Grayson v. K Mart Corp., 79 F.3d 1086, 1103 (11th Cir. 1996).

In Tolliver, the Second Circuit held that the piggybacking rule applies, not only in ADEA collective actions, but also in individual ADEA cases (where the plaintiffs piggyback off of other individuals who filed similar EEOC charges but then pursued their claims in separate cases from the plaintiffs).  The court reasoned that "[t]he purpose of the charge filing requirement is fully served by an administrative claim that alerts the EEOC to the nature and scope of the grievance, regardless of whether those with a similar grievance elect to join a preexisting suit **or initiate their own.**" 918 F.2d at 1057 (emphasis added). See also Cronas, 2007 WL 2739769, at *6 (permitting a plaintiff to proceed with an individual Title VII claim even though the plaintiff had not timely filed his own EEOC charge, because he could take advantage of piggybacking from an earlier class EEOC charge).[13]  Moreover, in Tolliver, the Second Circuit acknowledged that the

---

[13]     IBM may argue that Plaintiff worked in Connecticut, and thus that the Second Circuit's piggybacking interpretation is inapplicable. However, the arbitration agreement does not mandate application of the law of the circuit in which the individual works or resides. Instead, the agreement reads: "The Arbitrator shall apply the substantive law (and the law of remedies, if applicable) of the state in which the claim arose, or federal law, or both, as applicable to the claim(s) asserted." Liss-Riordan Decl., Exhibit 2.

impact of the piggybacking rule was to permit individuals to institute lawsuits outside the ADEA's 300 (or 180 day) window, but explained that "[t]he charge filing requirement . . . sets a time limit, not for the purpose of limiting time for suit, but for the purpose of affording a prompt opportunity to attempt conciliation." <u>Tolliver</u>, 918 F.2d at 1059.[14]

Here, Plaintiff should be permitted to piggyback Mr. Lohnn's claim on the EEOC charges filed by <u>Rusis</u> named plaintiff Sally Gehring[15] (or even earlier-filed age discrimination charges filed against IBM[16]). Thus, the piggybacking rule would toll the time that Plaintiff had to file the arbitration demand. Those charges alleged that IBM engaged in class-wide age discrimination, and Mr. Lohn was terminated in the manner described in those charges (and no more than 300 days before the filing of those charges); thus, Mr. Lohn's claims fall within the scope of those discrimination charges.

Indeed, in light of the EEOC's determination finding "reasonable cause to believe that [IBM] has discriminated against [58 charging parties] and others a [a nationwide class of those similarly situated] on account of their age," the EEOC has obviously had the opportunity to investigate the claims alleged in the <u>Rusis</u> plaintiffs' charges on a

---

Plaintiff contends that her claim arose in New York, as IBM's headquarters are in Armonk, New York.

In any event, it does not matter what other courts or jurisdictions may have to say on this issue. Plaintiff brings this challenge before this Court, which has the authority to address the enforceability of IBM's purported waiver of the piggybacking rule. This Court, which has jurisdiction over IBM (which is headquartered here), is bound by the Second Circuit.

[14]     In the Second Circuit, piggybacking is available regardless of whether the employee has unsuccessfully attempted to join a collective action, and in any event, Plaintiff did unsuccessfully attempt to join a collective action. See <u>Tolliver</u>, 918 F.2d at 1057.

[15]     The <u>Rusis</u> plaintiffs filed EEOC charges on May 10, 2018 (Edvin Rusis); July 2, 2018 (Henry Gerrits and Phil McGonegal), and November 14, 2016 (Sally Gehring). (SOF ¶ 14 n.4.) Plaintiff was terminated mid-2016, and claim would be timely under the piggybacking rule, in light of Gehring's charge. (SOF ¶ 14 n.4.)

[16]     The EEOC Letter of Determination indicates that there were charges alleging age discrimination against IBM going back to 2014, and its investigation covered the time period 2013-18. (SOF ¶¶ 49-55.)

14

classwide basis.[17] (SOF ¶¶ 49-55.) The EEOC has had ample ability to investigate and conciliate these claims, and IBM has been put on notice of the discrimination allegation. Under the piggybacking rule, the <u>Rusis</u> plaintiff Sally Gehring's charge thus should toll Mr. Lohnn's statutory limitations period under the ADEA. <u>See Tolliver</u>, 918 F.2d at 1057; <u>Cronas</u>, 2007 WL 2739769, at *6. In order for the arbitration agreement to be enforceable, this purported waiver of the piggybacking rule cannot not enforceable.

The Supreme Court made clear in <u>Gilmer</u>, 500 U.S. at 28, that even though a statutory claim (there, also an ADEA claim) may be subject to arbitration generally, "the prospective litigant [must be able to] effectively . . . vindicate his or her statutory cause of action in the [specific] arbitral forum." Here, IBM insists that Plaintiff cannot pursue Mr. Lohnn's ADEA claims **at all** in arbitration, even though, absent the arbitration agreement, there is no question that she could pursue the claims in court by relying on the piggybacking rule.

Moreover, courts have routinely found provisions of arbitration agreements or contracts shortening the time to file discrimination claims (which is effectively what a waiver of the piggybacking rule is) to be unenforceable. The Sixth Circuit, for example, recently held that an employer cannot contractually shorten the limitations period of the ADEA.  <u>See</u> <u>Thompson v. Fresh Products, LLC</u>, 985 F.3d 509, 521 (6th Cir. 2021). The court explained that the timing provisions contained in the ADEA "are part of the **substantive law** of the cause of action created by the ADEA" and that "the limitations period[] in the . . . ADEA give[s] rise to substantive, non-waivable rights." <u>Id.</u> (emphasis added). Moreover, the court proceeded to explain that "like Title VII, the ADEA emphasizes the importance of the pre-suit cooperative process, outlining the EEOC's obligation upon receiving a charge to 'seek to eliminate any alleged unlawful practice by

---

[17]     Several of the <u>Rusis</u> plaintiffs, including Plaintiff Sally Gehring and opt-in Plaintiffs Mark Johnson, Robert Gasiorowski, and Andrew Peavy, were three of the charging parties included in the EEOC's determination. (SOF ¶ 51.)

informal methods of conciliation, conference, and persuasion . . . " and "[a]ltering the time limitations surrounding these processes risks undermining the statute's uniform application and frustrating efforts to foster employer cooperation." Id.

The Sixth Circuit relied on an earlier case, Logan v. MGM Grand Detroit Casino, 939 F.3d 824, 833 (6th Cir. 2019), where the court had held that an employer could not abrogate the limitations period for a Title VII claim by contract. As the court reasoned, although statutes of limitations are traditionally regarded as procedural mechanisms, there are exceptions to this general rule where statutes that "create rights and remedies contain their own limitation periods." Id. (citing Davis v. Mills, 194 U.S. 451, 454 (1904)). In such instances, the statute of limitations is considered a "substantive right" that "generally is not waivable in advance by employees." Id. at 829. In Thompson, the court extended this ruling to the ADEA. See Thompson, 985 F.3d at 521.

Importantly, the EEOC submitted an amicus brief in Thompson, also taking the position that the ADEA's limitations period is a substantive, non-waivable right that an employer can abridge by contract. See Thompson, EEOC Brief, 2020 WL 1160190, at *19-23.[18]  As the EEOC explained, "the ADEA's statutory limitations period is a substantive right and prospective waivers of its limitations period are unenforceable." Id. at *19. The EEOC explained further:

> Thus, while Title VII and the ADEA may differ in a few ways with respect to pre-suit procedures, they are extremely similar in every way material to the question before the Court here and in *Logan*: whether the ADEA's statutory limitations periods, like Title VII's, are substantive rights not waivable in advance. As this Court observed regarding Title VII, ADEA "enforcement relies on a combination of public and private action and mandates that the EEOC . . . must afford non-

---

[18]    The EEOC's reasonable interpretation of the ADEA is entitled to deference. See EEOC v. Comm. Office Prods. Co., 486 U.S. 107, 115 (1988) ("[I]t is axiomatic that the EEOC's interpretation of [the ADEA], for which it has primary enforcement responsibility, need . . . only be reasonable to be entitled to deference."). The EEOC's interpretations of the ADEA reflect "a body of experience and informed judgment to which courts and litigants may properly resort for guidance." Fed. Exp. Corp. v. Holowecki, 552 U.S. 389, 399 (2008) (quoting Bragdon v. Abbott, 524 U.S. 624, 642 (1998)). See also Jones v. American Postal Workers Union, 192 F.3d 417, 427 (4th Cir. 1999) (holding that an EEOC interpretation in an amicus brief was entitled to deference).

compliant employers the chance to voluntarily cure their violations before . . . litigation may be brought against them." *Logan*, 939 F.3d at 827. Like Title VII, the ADEA sets out a "pre-suit process" that serves the Congressional purpose of "cooperation and voluntary compliance . . . as the preferred means of eradicating workplace discrimination." *Id.* at 828. Accordingly, through the ADEA's pre-suit process, "Congress 'established a procedure whereby ... the [EEOC] would have an opportunity to investigate individual charges of discrimination, to promote voluntary compliance with the requirements of [the statute].'" *Id.*

Of particular importance here, both statutes provide similar limitations periods with "important implications for an employee who has suffered workplace discrimination." *Logan*, 939 F.3d at 829. As described above, the limitations period under the ADEA does differ somewhat from Title VII, in that the former permits the charging party to file suit once the initial sixty-day post-charge-filing period has passed and without requiring a right-to-sue notice. But this distinction is not a material difference for purposes of determining whether the ADEA's statutory limitations period is a substantive right not waivable in advance.

Id. at *23. While some courts have attempted to distinguish between Title VII and the

ADEA with respect to whether their timing schemes were procedural or substantive,[19]

such distinctions are no longer viable in light of Thompson and the EEOC's position set

forth in its amicus brief in that case.

Numerous courts in the Second Circuit and elsewhere have likewise refused to

enforce contractual limitations periods in cases concerning the ADEA, Title VII, and

similar statutes. See Castellanos v. Raymours Furniture Co., Inc., 291 F. Supp. 3d 294,

298 (E.D.N.Y. March 12, 2018) (striking an arbitration agreement's shortening of the

limitations period for a Fair Labor Standards Act claim); Friedmann v. Raymour

Furniture Co., Inc., 2012 WL 4976124 (E.D.N.Y. Oct. 16, 2012) (refusing to enforce a

shortening of an employee's limitations period to pursue claims under the ADEA and

Americans with Disabilities Act); see also Ragone v. Atlantic Video at Manhattan

---

[19]     For example, IBM may cite to Cerjanec v. FCA US, LLC, 2017 WL 6407337, *7-10 (E.D. Mich. Dec. 15, 2017), and Smithson v. Hamlin Pub, Inc., 2016 WL 465564, *2-3 (E.D. Mich. Feb. 8, 2016), in which the court found that a contractual shortening of the ADEA limitations period from 300 days to 180 days was permissible because the ADEA was distinguishable from Title VII.  But those cases have now been overturned by Thompson. See Thompson, 985 F.3d at 521.  Likewise, IBM may cite to Hagan v. Katz Communications, Inc., 200 F. Supp. 3d 435, 444-45 (S.D.N.Y. 2016), but in that case there was no argument that the ADEA's timing scheme had been abridged in any way – the plaintiff simply argued that the ADEA's limitations period should not have been incorporated into the arbitration agreement at all.

*Center*, 595 F.3d 115, 125-26 (2d Cir. 2010) (indicating that if the employer had not waived a shortened statute of limitations for a Title VII claim, the court may well have invalidated the arbitration agreement in question).[20]  Simply put, by purporting to waive Mr. Lohnn's right to rely on the piggybacking rule, the agreement abridges a substantive, non-waivable right.  This provision in the arbitration agreement therefore cannot be enforced.

As noted earlier, IBM's agreement cannot waive Mr. Lohnn's claims under the ADEA, since IBM did not provide the disclosures required under the OWBPA (disclosures regarding the ages of employees selected and not selected for layoff).  The OWBPA mandates strict requirements that employers must meet in order to obtain a valid waiver from an employee of "any right or claim" under the ADEA. See 29 U.S.C. § 626 (f)(1)(H); 29 C.F.R. § 1625.22(f); see also Oubre, 522 U.S. at 427.[21]  Importantly,

---

[20]    See also Graham Oil v. Arco Products Co., 43 F.3d 1244, 1248-49 (9th Cir. 1994) (effort to truncate the limitations period was unenforceable, because it "expressly forfeits [the plaintiff's] statutorily-mandated right to a one-year statute of limitations."); Sanford v. Quicken Loans, 2014 WL 266410 (E.D. Mich. Jan. 24, 2014) (refusing to enforce shortening of Title VII limitations period); Mazurkiewicz v. Clayton Homes, Inc., 971 F.Supp.2d 682 (S.D. Tex.2013) (same); Cole v. Convergys Customer Mgmt. Grp., Inc., 2012 WL 6047741 (D. Kan. Dec. 5, 2012) (same); O'Phelan v. Fed. Express Corp., 2005 WL 2387647 (N.D. Ill. Sept. 27, 2005) (same); Mabry v. W. & S. Life Ins. Co., 2005 WL 1167002 (M.D.N.C. Apr. 19, 2005) (same); Wineman v. Durkee Lakes Hunting & Fishing Club, Inc., 352 F. Supp. 2d 815, 821 (E.D. Mich. Jan. 13, 2005) (holding that an arbitration provision shortening the limitations period for a claim under the Fair Labor Standards Act could not be enforced because "[a] contractual agreement that limits an employee's enforcement rights can have public policy implications beyond those affecting the private parties to the contract"); Lewis v. Harper Hosp., 241 F.Supp.2d 769 (E.D. Mich. 2002) (refusing to enforce shortening of Title VII limitations period); Salisbury v. Art Van Furniture, 938 F. Supp. 435 (W.D. Mich. 1996) (same).

[21]    The OWBPA's requirements have been enforced strictly. See, e.g., Kruchowski v. Weyerhaeuser Co., 446 F.3d 1090, 1093-96 (10th Cir. 2006) (finding waiver invalid where OWBPA disclosures did not include entire decisional unit); Loksen v. Columbia Univ., 2013 WL 5549780, at *7-8 (S.D.N.Y. Oct. 14, 2013) (finding substantial compliance not enough; omission of even one person from group of 17 considered, although probably immaterial, invalidated waiver); Butcher v. Gerber Prods. Co., 8 F. Supp. 2d 307, 314 (S.D.N.Y. 1998) (holding that releases that did not contain all the elements listed in 29 U.S.C.S. § 626(f)(1)(A)-(H) of the OWBPA, were invalid and because employers were required to comply with the OWBPA upon their first notification to employees, their later correspondence could not cure the earlier deficiencies).

the EEOC has taken the position that the OWBPA protects employees from waiving rights by abridging their time to pursue their claims if they did not receive the proper disclosures:

> The ADEA does have one other arguably relevant provision with no analogue in Title VII: 29 U.S.C. § 626(f) . . ., which expressly governs waivers of "rights or claims under this chapter." However, § 626(f), read together with *Logan*'s holding that a statutory limitation period is a substantive right, only strengthens the argument against construing the ADEA's limitations period as prospectively waivable.

Thompson, EEOC Brief, 2020 WL 1160190, at *25. Because IBM did not provide OWBPA disclosures to Mr. Lohnn, he cannot have waived his statute of limitations rights under the piggybacking rule by signing the arbitration agreement.  To the extent the agreement purports or is held to waive that rule, that provision is invalid.

Tellingly, the Thompson court even pointed to the OWBPA as an indicator that the ADEA's limitations period was a substantive right that could not be waived:

> The ADEA's waiver provision further supports the conclusion that**, as a substantive right, its self-contained limitation period may not be prospectively waived.** It provides that "[a]n individual may not waive any right or claim under this chapter unless the waiver is knowing and voluntary." 29 U.S.C. § 626(f). A waiver may not be "knowing and voluntary" if it includes waiver of "rights or claims that may arise after the date the waiver is executed." *Id.* § 626(f)(C). The statute's strict limitations on waivers align with "the general rule in this circuit that an employee may not prospectively waive his or her rights under either Title VII or the ADEA." Adams v. Philip Morris, Inc., 67 F.3d 580, 584 (6th Cir. 1995).

Thompson, 985 F.3d at 521.[22]

---

[22]    Moreover, the arbitration agreement's purported waiver of the piggybacking rule also cannot be valid because the OWBPA requires that, in order for a waiver to be valid, it must be "a part of an agreement between the individual and the employer that is **calculated to be understood by such individual, or by the average individual eligible to participate.**" 29 U.S.C. § 626(f)(1(A) (emphasis added). The timing provision of the arbitration agreement is not only incoherent, but requires the reader to have the expertise of an employment discrimination lawyer and a thorough understanding of administration exhaustion to parse it.  To even attempt to understand the statute of limitations that applies to them, the IBM employees would have to understand: (1) the administrative and court statute of limitations under the ADEA; (2) which types of claims "must first be brought before a government agency"; and (3) the deadline for filing with the administrative agency in their state.  That is certainly more information than the average IBM employee has, and even by its own terms the language is ambiguous and confusing. The OWBPA's requirement that the language of the waiver be calculated to

Plaintiff expects that IBM will argue that the OWBPA protects only substantive rights and that the limitations period at issue here is procedural. But as Plaintiff has explained, the ADEA's timing scheme is a substantive right rather than a procedural right, just like in Title VII. See Thompson, 985 F.3d at 521; Logan, 939 F.3d at 829-33; Thompson, EEOC Brief, 2020 WL 1160190, at *19. Indeed, given the fact that the Second Circuit has taken such a strong and expansive position in favor of the piggybacking rule, it seems apparent that the Second Circuit would agree with the Sixth Circuit in Thompson.  As one court has described it, the Second Circuit has "aligned itself with the 'broadest' interpretation" of the piggybacking rule.  Cronas, 2007 WL 2739769, at *5 (applying the piggybacking rule because the court should not "elevate form over substance" when ensuring that employees bringing discrimination claims can have their complaints heard) (citing Tolliver, 918 F.2d at 1057).

Even if the piggybacking rule was a procedural right, the express language of the OWBPA does not distinguish between procedural and substantive rights, stating that "[a]n individual may not waive **any right or claim**" without first receiving the OWBPA disclosures. 29 U.S.C. § 626(f)(1).  See Hammaker v. Brown & Brown, Inc., 214 F. Supp. 2d 575, 578-81 (E.D. Va. 2002) (holding the OWBPA to apply to procedural rights and substantive rights under the ADEA and noting that the OWBPA must be interpreted broadly in furtherance of "the OWBPA's purpose to protect the rights and benefits of

be understood by the employee has been strictly construed by numerous courts, including against IBM.  See Syverson v. International Business Machines Corp.,472 F.3d 1072, 1082-87 (9th Cir. 2007) (invalidating a waiver that contained both a release and a covenant not to sue because average individuals might be confused and think that they could still bring an action under the ADEA); Thomforde v. International Business Machines Corp., 406 F.3d 500, 503-05 (8th Cir. 2005) (same); Bogacz v. MTD Products, Inc., 694 F. Supp. 2d 400, 404-11 (W.D. Pa. 2010) (invalidating a release that contained both a waiver and covenant not to as confusing, since the language of the agreement suggested that employees could not bring suit, even to test validity of waiver); Rupert v. PPG Industries, Inc., 2009 WL 596014, at *38-49 (W.D. Pa. Feb. 26, 2009) (recommending invalidation of release that contained both a waiver and covenant not to sue, since it was confusing); see also 29 C.F.R. § 1625.22(b)(3) (2005) (the comprehensibility requirement "usually will require the limitation or elimination of technical jargon and of long, complex sentences.").

older workers"); <u>Thiele v. Merrill Lynch, Pierce, Fenner & Smith</u>, 59 F. Supp. 3d 1060, 1064-65 (S.D. Cal. 1999) (examining the legislative purpose of the OWBPA and concluding that the OWBPA was intended to substantive rights and procedural rights under the ADEA equally).[23]  In sum, because the enforcement of the piggybacking waiver in IBM's arbitration agreement would abridge Mr. Lohnn's rights altogether to pursue his claims under the ADEA, the Court must hold the waiver to be invalid.

### C.  The Confidentiality Provision within IBM's Arbitration Agreement is Also Unenforceable

The Court should also issue a declaration that the confidentiality provision in IBM's arbitration agreement is invalid.  IBM has aggressively used that provision to impede its former employees from advancing their claims in arbitration under the ADEA. Particularly in a case such as this, that relies heavily on pattern and practice evidence, employees must be able to build their cases using common evidence adduced by other employees with similar claims. <u>See</u> <u>Hollander</u>, 895 F.2d at 84-85.

The Second Circuit has held that where arbitration proceedings have demonstrated that a confidentiality provision is an undue hindrance to advancing the claim, "the parties are free to contest the enforceability of the confidentiality provision . . . ." <u>American Family Life Assurance Co. of New York v. Baker</u>, 778 Fed. App'x 24, 27-28 (2d Cir. 2019).[24] Indeed, courts have invalidated confidentiality provisions that

---

[23]       While another court in this district recently held that the OWBPA did not protect the procedural right of proceeding as a collective action under the ADEA, <u>see</u> <u>Estle v. International Business Machines Corp.</u>, 2020 WL 5633154, at *3-7 (S.D.N.Y. Sept. 21, 2020), that case did not address the question at issue here. (In <u>Estle</u>, Plaintiffs sought to invalidate the class action waiver in IBM's arbitration agreement.  In contrast, here, these Plaintiffs are not trying to avoid arbitration or the impact of the class action waiver. Instead, they seek to avoid a result in which their ability to proceed on their ADEA claims is precluded altogether.)  Moreover, the plaintiffs in <u>Estle</u> have appealed that court's decision to the Second Circuit, and that appeal was recently argued on September 29, 2021. <u>See</u> <u>Estle v. International Business Machines Corp.</u>, No. 20-3372 (2d Cir.).

[24]       As noted earlier, IBM has taken the position, and the arbitrators in these arbitration cases have generally held, that IBM employees may only challenge the

unfairly prevent plaintiffs from investigating and prosecuting their claims.  For example, in Larsen, 871 F.3d at 1319, the Eleventh Circuit invalidated a confidentiality provision in an arbitration agreement where, the court recognized, confidentiality gave the defendant an "obvious informational advantage." In reaching this decision, the Larsen court cited a case that is on all fours with this case, Zuver, 153 Wash. 2d at 312-15, an employment discrimination case where the Washington Supreme Court struck a confidentiality provision in an arbitration agreement that operated to keep the entire arbitral process shrouded in secrecy. Zuver found the confidentiality provision unconscionable, concluding that "[a]s written, the provision hampers an employee's ability to prove a pattern of discrimination or to take advantage of findings in past arbitrations." Id. at 315; see also DeGraff v. Perkins Coie LLP, 2012 WL 3074982, at *4 (N.D. Cal. July 30, 2012) ("However, with respect to the confidentiality provision, Plaintiff has made a showing that this provision unfairly benefits Perkins Coie. Perkins Coie has institutional knowledge of prior arbitrations. In contrast, individual litigants, such as Plaintiff, are deprived from obtaining information regarding any prior arbitrations. Thus, Perkins Coie is the only party who would obtain any benefit from this provision without receiving any negative impact in return. Accordingly, the Court finds that the confidentiality provision is substantively unconscionable.").[25]

Indeed, courts have recognized that arbitrators may rely on other relevant

---

enforceability of provisions of the agreement in court and that the arbitrators do not have the power to strike portions of the agreement. (Collected Arbitration Decisions, filed in In Re: IBM Arbitration Agreement Litigation, Dkt. 29-4.)  And when employees have asked arbitrators to strike the confidentiality provision, they too have said that would be up to a court to decide.  (SOF ¶ 15 n.5.)

[25]     See also Ramos v. Superior Ct., 28 Cal. App. 5th 1042, 1066 (2018), as modified (Nov. 28, 2018) (finding confidentiality provision unconscionable, and noting that "[b]ecause it requires [Plaintiff] to keep "all aspects of the arbitration" secret, she would be in violation if she attempted to informally contact or interview any witnesses outside the formal discovery process" and "such a limitation would not only increase [Plaintiff's] costs unnecessarily by requiring her to conduct depositions rather than informal interviews, it also defeats the purpose of using arbitration as a simpler, more time-effective forum for resolving disputes").

arbitration awards, and employers cannot hamper employees' abilities to establish their cases by hiding the outcomes of other cases.  These concerns are particularly salient where, as here, the corporate defendant is benefitted by the institutional knowledge gained by being a repeat player in the ADR process such that confidentiality is no real burden to the defendant, while each individual plaintiff/claimant must re-invent the proverbial wheel each time.  See, e.g., McKee v. AT & T Corp., 164 Wash. 2d 372, 398, 191 P.3d 845, 858 (2008), abrogated on other grounds by AT & T Mobility LLC v. Concepcion, 563 U.S. 333 (2011) (finding confidentiality clause to be unconscionable, explaining that "[c]onfidentiality unreasonably favors repeat players such as AT & T" and "secrecy conceals any patterns of illegal or abusive practices" and "hampers plaintiffs in learning about potentially meritorious claims and serves no purpose other than to tilt the scales in favor of AT & T" while "[m]eanwhile, consumers are prevented from sharing discovery, fact patterns, or even work product, such as briefing, forcing them to reinvent the wheel in each and every claim, no matter how similar") (internal citations and quotation marks omitted)); see also, e.g., Schnuerle v. Insight Commc'ns Co., L.P., 376 S.W.3d 561, 578 (Ky. 2012) (observing that while "it is well-established that confidentially agreements may be enforceable to protect, for example, personal information or trade secrets; in situations like here, where such concerns are not present, the provision is wholly one-sided, protecting only the company that prepared the contract with no reciprocal benefit to the consumers"); Sprague v. Houseld Intern., 473 F. Supp. 2d 966, 975 (W.D. Mo. 2005) (finding confidentiality provision in an arbitration agreement unconscionable, because "[a]lthough it appears that [defendant] has had related disputes with consumers in the past, the Plaintiffs will not have access to the details of those proceedings – for example, to see how fees and waiver requests have been handled or to determine whether an agreement to arbitrate is even wise, given the track record of [defendant's] success during arbitration"); Luna v. Household Finance Corp. III, 236 F. Supp. 2d 1166, 1180 (W.D. Wash. 2002) ("a lack of public

23

disclosure may systematically favor companies over individuals" and "the unavailability of arbitral decisions also may prevent potential plaintiffs from locating the information necessary to build a case of intentional misconduct or to establish a pattern or practice of discrimination by particular companies") (internal quotations omitted).[26]

As the Zuver court observed, overly burdensome confidentiality restrictions "undermine[] an employee's confidence in the fairness and honesty of the arbitration process, and thus potentially discourages pursuing a valid discrimination claim."  Zuver, 153 Wash.2d at 299 (severing arbitration agreement where the confidentiality provision "hampers an employee's ability to prove a pattern of discrimination or to take advantage of findings in past arbitrations").  See also Ramos, 28 Cal. App. 5th at 1067-68 (explaining that "requiring discrimination cases be kept secret unreasonably favors the employer to the detriment of employees seeking to vindicate unwaivable statutory rights and may discourage potential plaintiffs from filing cases").[27]

IBM may cite to Guyden v. Aetna, Inc., 544 F.3d 376, 385 (2d Cir. 2008), which

---

[26]     See also Balan v. Tesla Motors Inc., 2019 WL 2635903, at *3-4 (W.D. Wash. June 27, 2019) (following McKee and severing a confidentiality provision in an arbitration agreement); Hoober v. Movement Mortgage, LLC, 382 F. Supp. 3d 1148, 1160-61 (W.D. Wash. 2019) (following McKee and holding the confidentiality provision to be substantively unconscionable); Narayan v. The Ritz-Carolton Development Co., Inc., 140 Hawai'i 343, 355 (2017) (finding that a confidentiality provision in an arbitration agreement was unconscionable, because "[i]n addition to detrimentally affecting the plaintiffs' ability to investigate their claims, the confidentiality provision insulates the defendants from potential liability"); Kinkel v. Cingular Wireless LLC, 223 Ill.2d 1, 42 (Ill. 2006) (finding that confidentiality provision  "burden's an individual's ability to vindicate statutory claims" explaining, "the strict confidentiality clause that prohibits Cingular, the claimant, and the arbitrator from disclosing 'the existence, content, or results of any arbitration,' means that even if an individual claimant recovers on the illegal-penalty claim, neither that claimant nor her attorney can share that information with other potential claimants," and "Cingular, however, can accumulate experience defending these claims").

[27]     There are many employees who may have been subject to IBM's scheme to oust older workers, who may not realize the strength of their claims based upon IBM's shielding evidenced that some employees have amassed in arbitration through its confidentiality provision.  Thus, the confidentiality provision is also likely deterring many other former employees from bringing what they do not even realize are meritorious claims.

stated that "confidentiality clauses are so common in the arbitration context that [the plaintiff's] 'attack on the confidentiality provision is, in part, an attack on the character of arbitration itself.'" (internal citation omitted). However, in Guyden, the court grounded this conclusion on the fact that the Supreme Court in Gilmer warned against "generalized attacks on arbitration" that are rested on "suspicion of arbitration as a method of weakening the protections afforded in the substantive law to would-be complainants." See Guyden, 544 F.3d at 385 (quoting Gilmer, 500 U.S. at 30). Here, Plaintiff's argument is not simply founded on "generalized attacks on arbitration." See id. Instead, it is based on a well-developed record amassed from *dozens* of arbitration proceedings in which Plaintiff's counsel represents former IBM employees advancing ADEA claims against IBM, demonstrating that IBM has aggressively wielded a profoundly unfair advantage over the claimants in those arbitrations by making them each rebuild the wheel each time (and frequently not be able to use critical evidence obtained in other similar cases) as the result of its arbitration agreement's confidentiality provision. Indeed, the Second Circuit contemplated this scenario in American Family Life Assurance Co., 778 Fed. Appx. at 27.  Although the court acknowledged that the mere inclusion of a confidentiality provision in an arbitration agreement could not "render the entire Agreement substantively unconscionable," the court was careful to note that "[i]f arbitration proceedings ultimately unfold, the parties are free to contest the enforceability of the confidentiality provision as applied to them . . . ." Id.

Here, extensive arbitration proceedings have unfolded which demonstrate how severely prejudiced IBM's former employees are by IBM's wielding of the confidentiality provision to prevent former employees in arbitration from obtaining and using essential pattern and practice evidence, as well from benefiting from decisions obtained in other similar arbitrations.  As the Second Circuit has explained, "[b]ecause employers rarely leave a paper trail – or 'smoking gun' – attesting to a discriminatory intent, disparate treatment plaintiffs must often build their cases from pieces of circumstantial evidence,"

which includes "[e]vidence relating to company-wide practices." See Hollander, 895 F.2d at 84-85.  The torrent of evidence that Plaintiff's counsel have amassed in arbitrations against IBM weaves a stark tapestry demonstrating IBM's discriminatory companywide scheme to oust older workers.  However, it is extremely difficult, if not impossible, to paint the full picture in any one arbitration, where IBM's confidentiality provision has been used to block the production or admission of much of this evidence.

In Plaintiff's Statement of Material Facts ¶¶ 16-99, they have laid out the myriad ways in which former employees who have pursued ADEA claims against IBM in arbitration have been so limited. For example, Plaintiff's counsel have obtained much globally relevant evidence in some cases but IBM has challenged their use – and frequently succeeded – in preventing them from using that evidence in other cases.[28] This evidence includes shockingly incriminating communications between the former ██████ of IBM █████████████ and the ████████████████████████████████, in which █████████ expresses ██ displeasure with the relatively low proportion of millennial employees at IBM, as compared with a competitor; █████████ assures ██ █████████ that the proportion of millennials will get higher after various mass layoffs have occurred; █████████ then engages in communications with other Human Resources personnel and high level managers, describing plans for how to increase the proportion of millennials.  The evidence also shows █████████ curiously focused on the percentage of millennial employees in each of the broad areas of the company and a chart that she and █████████ discuss which cites the percentage of employees across various business units who are in different generational cohorts ("millennials", "Gen X", "baby boomers", and "traditionalists").  Plaintiff's counsel have also obtained evidence showing █████████ applauding a ██████████████'s use of the

---

[28]     Although they have sparingly convinced some arbitrators to allow some of the global evidence to be used, it is a fight in each case, and many arbitrators have rejected allowing the employees to obtain or use much, if any, of such evidence.

disparaging term "Dinobabies" to describe older IBM employees, as well as his plan for how to oust them from IBM's workforce, stating his intent to "accelerate change by inviting the 'dinobabies' (new species) to leave" and make them an "Extinct Species.'" (SOF ¶ 32) These communications also include emails between ███████ and ███ ████ explicitly discussing the use of "resource actions" (IBM's term for mass layoffs) to improve the percentage of "millennials" employed by IBM at the expense of older workers. (SOF ¶¶ 22-36.) While this smoking gun evidence of animus by the ███ of IBM should clearly be usable by all former employees pursuing age discrimination claims against IBM,[29] IBM has been citing the confidentiality provision in its arbitration agreement to block the introduction of such evidence across cases.  (SOF ¶¶ 16-99.)

Plaintiff's counsel have also obtained a number of IBM corporate planning documents which contain highly relevant discussions of IBM's hiring goals and workforce composition, which show that IBM was focused on hiring "Early Professional Hires" (a term IBM frequently uses for young employees fresh out of college or high school), "correcting seniority mix", and other similar terms evidencing strategies to replace older employees with younger employees. (SOF ¶¶ 37-42.)

---

[29]     In Travers v. FSS, 737 F.3d 144, 147 (1st Cir. 2013), the First Circuit reversed the district court's grant of summary judgment to an employer where the plaintiff alleged he had been fired because of unlawful retaliatory animus harbored by the CEO against the plaintiff for filing a lawsuit alleging a violation of the Fair Labor Standards Act.  The district court had held that there was no causal connection between the CEO's retaliatory animus and the supervisor who actually terminated the plaintiff, since the supervisor had justified the plaintiff's termination based on another reason (a customer complaint).  See id. at 146-47.  The First Circuit acknowledged that "the retaliatory animus resided at the apex of the organizational hierarchy" and reversed summary judgment against the plaintiff, recognizing that since "[a] CEO sets the tone and mission for his subordinates, many of whom presumably consider it an important part of their jobs to figure out and deliver what the CEO wants."  Id. at 147. As the court noted, "**strongly held and repeatedly voiced wishes of the king . . . likely [become] well known  to those courtiers who might rid him of a bothersome underling.**" Id. (emphasis added). Thus, evidence of the discriminatory animus held by the CEO of a company is relevant to age discrimination claims brought by employees across the company, despite IBM's attempt to paint every termination decision as made by a lower level manager (a defense tactic that the EEOC expressly rejected in its letter of determination, SOF ¶¶ 49-55).

Plaintiff's counsel have also obtained the documents that IBM produced to the EEOC that led to the EEOC's letter of determination finding reasonable cause to believe that IBM had engaged in age discrimination on a classwide basis, as well as data produced to the EEOC regarding a number of resource actions. (SOF ¶¶ 49-55.)[30] They have obtained useful testimony from high level management including ███████████, ███████ (another former ████████████ executive), ████████████ (manager of IBM's ████████████████████████ team), and ████████████.[31]  (SOF ¶ 56-74.)  They have obtained broadly relevant emails discussing directions from ████ ████ and IBM's current ████████████████ to carry out a "relocation" program, in which older workers are asked to relocate or leave the company, with the expectation that they will leave. (SOF ¶¶ 43-48.)[32]  Employees pursuing age discrimination claims against IBM would clearly benefit from being able to use such broadly applicable evidence.  However, IBM has wielded its confidentiality provision aggressively to block employees from obtaining and using this incriminating evidence against IBM.

In addition to not being able to use this evidence that has been amassed by other employees, former IBM employees pursuing age discrimination claims have also not been able to cite to arbitrators the successful decisions that some employees have obtained finding that IBM discriminated against them in violation of the ADEA and awarding them significant damages. (SOF ¶¶ 81-87.) They have likewise not been able

---

[30]     Plaintiff's counsel have made a public records request to the EEOC for its full file on IBM but have not yet received these documents. (SOF ¶ 55, n.6.)

[31]     ████████████ and ████████████'s testimony reveal how easy it is for IBM to produce demographic data related to the ages of employees terminated (and not terminated) in "resource actions."  (SOF ¶ 65-74.) This evidence would be extremely helpful in other cases because IBM has consistently argued in arbitration that it would be unduly burdensome to produce data that employees have requested regarding the ages of employees selected and not selected for layoff in the "resource actions" in which they were terminated.

[32]     In these arbitrations, evidence has come out that IBM has used requests for employees to relocate in a targeted manner designed to oust older workers. (SOF ¶ 43-48.)

to cite to various other helpful orders from arbitrators, including discovery orders, orders denying summary judgment, and evidentiary rulings. (SOF ¶¶ 88-94.)  Abundant caselaw supports arbitrators relying on, or at least considering, decisions issued by other arbitrators in similar cases.  See, e.g., Spell v. United Parcel Service, WL 2012 4447385 *2 (E.D.N.Y. 2012) (finding that an arbitrator's decision on factual issues was "highly probative" in a subsequent discrimination proceeding notwithstanding that the plaintiff did not even raise the issue of discrimination in the prior arbitration) (citing Collins v. New York City Transit Authority, 305 F.3d 113, 119 (2d. Cir. 2002)).

Not being able to use much of the evidence (and rulings) obtained by other employees in their arbitrations against IBM, a number of employees have lost their cases in arbitration, either on summary judgment or after hearing. (SOF ¶ 95-99.)   It is apparent from those arbitrators' rulings that they had not viewed or examined much if any of the evidence (or rulings) that Plaintiff's counsel obtained in other cases.

IBM has attempted to deter and punish Plaintiff's counsel for even challenging IBM's confidentiality provision at all, in the In Re: IBM Arbitration Litigation and Chandler cases. See note 3, supra. IBM has moved for sanctions against Plaintiff's counsel in five (5) arbitrations for filing documents or orders from those arbitrations **under seal** in support of their motions for summary judgment in In Re: IBM Arbitration Litigation and Chandler. (SOF ¶¶ 100-101.) IBM has sought these sanctions even though it has argued that its arbitration agreement requires such challenges to be made in court rather than in arbitration. (SOF ¶ 15 n.5).  Clearly, a challenge to a confidentiality provision would be difficult if not impossible without a record, as provided here and in those cases, demonstrating the prejudice caused by the enforcement of the confidentiality provision. See American Family Life Assurance Co., 778 Fed. Appx. at 27. IBM believes that the confidentiality provision insulates itself even from a challenge to the confidentiality provision (a circular *non sequitur*).

Plaintiff thus asks this Court to declare IBM's confidentiality provision

unenforceable.  It is clear from the record set forth here that Plaintiff too stands to be equally prejudiced in her arbitrations by her likely inability to benefit from the evidence obtained by others pursuing similar claims, as well as decisions obtained in other similar arbitrations, unduly hampering her ability to arbitrate her claim.[33]

## IV.    CONCLUSION

For the reasons discussed herein, the Court should grant summary judgment for Plaintiff and enter a declaratory judgment holding unenforceable the provision of IBM's arbitration agreement that purports to waive Plaintiff's ability to utilize the piggybacking rule in arbitration.  Likewise, the Court should enter a declaratory judgment holding that the confidentiality provision of IBM's arbitration agreement is also unenforceable, as IBM has used this provision to severely hamper the ability of former employees to pursue claims against it under the ADEA.

---

[33]    At the very least, the provision should not be permitted to block employees from using, in their own cases, evidence obtained in other similar discrimination cases. Again, the question of whether the confidentiality provision should be declared unenforceable with respect to public disclosure of this evidence is a separate issue. Others would certainly have an interest in viewing the evidence and rulings obtained by employees who have pursued age discrimination claims against IBM (including other employees who may be considering whether to bring similar claims, as well as the public).  The concern of Plaintiff, however, is the ability to use this evidence to pursue Mr. Lohnn's claim of discrimination.

Respectfully submitted,

PLAINTIFF DENISE LOHNN, Executor of the
Estate of Jorgen Lohnn, Deceased,

By her attorneys,


/s/ Shannon Liss-Riordan
Shannon Liss-Riordan (NY Bar No. 2971927)
Zachary Rubin (NY Bar No. 5442025)
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
(617) 994-5800
Email:  sliss@llrlaw.com, zrubin@llrlaw.com



## CERTIFICATE OF SERVICE

I hereby certify that on October 28, 2021, a true and accurate copy of the
foregoing motion was filed via this Court's CM/ECF system.


/s/ Shannon Liss-Riordan
Shannon Liss-Riordan

31