**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

DENISE LOHNN,
Executor of the Estate of
Jorgen Lohnn, Deceased

        Plaintiff,

        v.

INTERNATIONAL BUSINESS
MACHINES CORP.

        Defendant.

Civil Action No. 1:21-cv-06379

**PLAINTIFF'S STATEMENT OF MATERIAL FACTS IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT**

## **TABLE OF CONTENTS**

BACKGROUND ........................................................................................................... 1

THE ARBITRATION AGREEMENT'S TIMING PROVISION AND ITS IMPACT
ON PLAINTIFF IN PURSUING MR. LOHNN'S AGE DISCRIMINATION CLAIM
AGAINST IBM IN ARBITRATION ................................................................................. 3

THE ARBITRATION AGREEMENT'S CONFIDENTIALITY PROVISION AND ITS
IMPACT ON EMPLOYEES WHO HAVE PURSUED ARBITRATION OF AGE
DISCRIMINATION CLAIMS AGAINST IBM ................................................................. 5

     HIGH LEVEL EXECUTIVE COMMUNICATIONS SHOWING AGE
     ANIMUS AND PLANS TO REDUCE IBM'S POPULATION OF OLDER
     WORKERS ........................................................................................................... 7

     STRATEGIC CORPORATE PLANNING DOCUMENTS .................................... 10

     DOCUMENTS PRODUCED TO THE EEOC AS PART OF ITS
     CLASSWIDE INVESTIGATION INTO IBM'S LAYOFF STRATEGY .................. 12

     TESTIMONY OF HIGH LEVEL EXECUTIVES .................................................. 13

     DEMOGRAPHIC DATA ...................................................................................... 18

     FINAL AWARDS ISSUED FINDING IBM ENGAGED IN AGE
     DISCRIMINATION .............................................................................................. 19

     FAVORABLE RULINGS OBTAINED IN ARBITRATION PROCEEDINGS ......... 22

     UNFAVORABLE RULINGS AND DISMISSALS OF ARBITRATION
     CASES WHERE THE EMPLOYEES WERE NOT PERMITTED TO
     SUBMIT ALL THE EVIDENCE (AND FAVORABLE RULINGS) THAT
     PLAINTIFF'S COUNSEL HAVE OBTAINED IN OTHER CASES ...................... 24

IBM SEEKS SANCTIONS AGAINST PLAINTIFF'S COUNSEL FOR EVEN
ATTEMPTING TO CHALLENGE THE CONFIDENTIALITY PROVISION IN
COURT .................................................................................................................... 26

Pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rule 56.1, Plaintiff submits the following statement of material facts as to which there is no genuine issue to be tried.

## BACKGROUND

1.      Plaintiff's deceased husband Jorgen Lohnn was formerly employed by Defendant International Business Machines Corporation (hereinafter "IBM").  See Compl. ¶ 1, 7.

2.      Defendant IBM is a New York corporation with its principal place of business in Armonk, New York.  IBM is a multinational technology company that offers a range of services and goods, including computing, cloud platforms, advanced analytics tools, and others.  See Compl. ¶ 4.

3.      Plaintiff alleges that Mr. Lohnn lost his job as the result of IBM's discriminatory efforts to systematically reduce its employment of older workers in order to build a younger workforce, pushing out thousands of older workers while hiring younger workers (which IBM often refers to as "Early Professional Hires" or "New Collar" workers), in order to better compete with younger technology companies, such as Google, Facebook, Amazon, and others. See Complaint at ¶¶ 8-10.  See also allegations set forth in Rusis v. International Business Machines Corp., Civ. Act. No. 1:18-cv-08434 (S.D.N.Y.), Second Amended Complaint (Dkt. 180), attached as Exhibit 1 to the Declaration of Shannon Liss-Riordan ("Liss-Riordan Decl.").

4.      In connection with his termination, Mr. Lohnn signed a "Separation Agreement," which is attached as Exhibit 2 to the Liss-Riordan Declaration.[1]

5.      The Separation Agreement released most legal claims, but it did not release federal claims for age discrimination under the Age Discrimination in Employment Act ("ADEA"), as amended, 29 U.S.C. § 621 *et seq.*  See Liss-Riordan Decl., Exhibit 2.[2]

6.      The Separation Agreement provided that if Mr. Lohnn chose to bring a claim under the ADEA, he would need to pursue the claim in individual arbitration, rather than in court or as part of a class action.  See Liss-Riordan Decl., Exhibit 2.

7.      [Paragraph Intentionally Omitted]

8.      [Paragraph Intentionally Omitted]

9.      [Paragraph Intentionally Omitted]

10.     Plaintiff opted in to the Rusis collective action, in which hundreds of employees have alleged that IBM discriminated against them and other older workers in separating them from their jobs in violation of the ADEA. See Rusis Second Amended Compl., Exhibit 1 to Liss-Riordan Decl.[3]  Plaintiff opted in to that case to seek a court ruling that IBM could not prevent her from pursuing Mr. Lohnn's ADEA claims in

---

[1]      Plaintiff received a modest severance payment in exchange for signing the agreement. See Compl. at ¶¶ 11-12.

[2]      The Agreement could not legally release claims under the ADEA because it did not include disclosures regarding the ages of employees selected for layoff and not selected for layoff, as required under the Older Workers' Benefits Protections Act ("OWBPA"), 29 U.S.C. § 626(f).  Mr. Lohnn did not receive these disclosures.  See Liss-Riordan Decl., Exhibit 2.

[3]      Hundreds of employees have opted in to Rusis.  See Rusis, Dkt. 8-10, 28-29, 32, 36-37, 45, 48, 82-96, 99, 102-104, 109-112, 117, 140, 146, 149, 151, 153, 155, 157. Currently, there are approximately 177 plaintiffs in Rusis.

arbitration that she could have pursued in court (had it not been for Mr. Lohnn having signed an arbitration agreement). <u>See</u> <u>Rusis</u> Plaintiffs' Brief at 10-21, <u>Rusis</u> Dkt. 136. The court ruled, however, that while the Plaintiff may seek such a court determination, she could not do so as part of a class action, since Mr. Lohnn waived his right to participate in a class action by signing IBM's Separation Agreement. <u>See</u> <u>Rusis</u>, 2021 WL 1164659 (S.D.N.Y. Mar. 26, 2021), at *4-7.

11. Thereafter, Plaintiff filed an individual case seeking a declaration that IBM could not prevent her from pursuing Mr. Lohnn's ADEA claims in arbitration that she could have pursued in court (had it not been for Mr. Lohnn having signed the arbitration agreement). <u>See</u> Compl. at ¶¶ 21-23.

12. [Paragraph Intentionally Omitted.]

**<u>THE ARBITRATION AGREEMENT'S TIMING PROVISION AND ITS IMPACT ON PLAINTIFF IN PURSUING MR. LOHNN'S AGE DISCRIMINATION CLAIM AGAINST IBM IN ARBITRATION</u>**

13. IBM's arbitration agreement includes the following timing provision:

> To initiate arbitration, you must submit a written demand for arbitration to the IBM Arbitration Coordinator no later than the expiration of the statute of limitations (deadline for filing) that the law prescribes for the claim that you are making or, if the claim is one which must first be brought before a government agency, no later than the deadline for the filing of such a claim. If the demand for arbitration is not timely submitted, the claim shall be deemed waived. The filing of a charge or complaint with a government agency or the presentation of a concern though the IBM Open Door Program shall not substitute for or extend the time for submitting a demand for arbitration.

Liss-Riordan Decl., Exhibit 2 (Separation Agreement).

14. If Plaintiff could pursue Mr. Lohnn's claims in court, they would be timely under the "piggybacking" doctrine, under which discrimination plaintiffs are excused from exhausting administrative remedies (i.e. first filing a charge of discrimination with

the EEOC) and tolls the statute of limitations for such plaintiffs, if a prior similar

administrative charge has been filed that sets forth a classwide allegation of

discrimination under which the plaintiff's claim would fall.[4]

15.     Although Plaintiff would be timely to pursue Mr. Lohnn's claims in court,

the arbitrators in a number of other cases have determined that this timing provision of

IBM's Separation Agreement does not allow a claimant to invoke the "piggybacking"

---

[4]     Edvin Rusis (the lead plaintiff in the <u>Rusis</u> lawsuit) filed a class EEOC charge. That charge, which he filed on May 10, 2018, states:

> IBM is discriminating against its older workers, both by laying them off disproportionately to younger workers and not hiring them for open positions. Indeed, over the last several years, IBM has been in the process of systematically laying off its older employees in order to build a younger workforce. IBM has laid off at least 20,000 employees over the age of forty in the last five years. I am 59 years old, and I am being laid off by IBM effective June 27, 2018. Since receiving notice of my layoff, I have applied for several other open positions within IBM, for which I am eminently qualified, but I have not been hired for any of these positions, despite my lengthy service and successful experience as an employee for IBM. I believe that I and thousands of other employees have been discriminated against by IBM on the basis of age.

Rusis EEOC Charge, Liss-Riordan Decl., Exhibit 5.  Other <u>Rusis</u> plaintiffs subsequently filed class charges with similar language on July 2, 2018.  <u>See</u> Henry Gerrits EEOC Charge, Liss-Riordan Decl., Exhibit 6.; Phil McGonegal EEOC Charge, Liss-Riordan Decl., Exhibit 7.
        Also, on July 22, 2021, the <u>Rusis</u> plaintiffs submitted a second amended complaint, adding Sally Gehring (and various others) as additional named plaintiffs. <u>See</u> <u>Rusis</u> Dkt. 188.  Ms. Gehring filed a classwide EEOC charge back November 14, 2016.  <u>See</u> Gehring EEOC Charge, Liss-Riordan Decl., Exhibit 8. Ms. Gehring's charge states:

> I was forced to train a new employee who was outside my protected statuses. I was subjected to a hostile work environment when training others to do my job duties. Particularly, I trained workers who were male, under age of 40, non American national origin and a different race to do my duties. After which, I was terminated and my job duties were taken over by workers outside all of my protected statuses. Many employees in my protected statuses have been terminated and are not being hired.

Gehring EEOC Charge, Liss-Riordan Decl., Exhibit 8. Mr. Lohnn was terminated after January 19, 2016, <u>see</u> Plaintiff's complaint at ¶ 7, which is 300 days before Sally Gehring submitted her charge.

doctrine in arbitration that would have applied in court. See Collected Arbitration

Decisions, filed in In Re: IBM Arbitration Agreement Litigation, C.A. No. 21-CV-6296

(JMF) Dkt. 29-4 (S.D.N.Y.).[5]


**THE ARBITRATION AGREEMENT'S CONFIDENTIALITY PROVISION AND ITS
IMPACT ON EMPLOYEES WHO HAVE PURSUED ARBITRATION OF AGE
DISCRIMINATION CLAIMS AGAINST IBM**

16.    IBM's arbitration agreement also includes the following confidentiality

provision:

> Privacy and confidentiality are important aspects of arbitration. Only
> parties, their representatives, witnesses and necessary administrative staff
> of the arbitration forum may attend the arbitration hearing. The arbitrator
> may exclude any non-party from any part of a hearing.
>
> To protect the confidentiality of proprietary information, trade secrets or
> other sensitive information, the parties shall maintain the confidential
> nature of the arbitration proceeding and the award. The parties agree that
> any information related to the proceeding, such as documents produced,
> filings, witness statements or testimony, expert reports and hearing
> transcripts is confidential information which shall not be disclosed, except
> as may be necessary to prepare for or conduct the arbitration hearing on
> the merits, or except as may be necessary in connection with a court
> application for a preliminary remedy, a judicial challenge to an award or its
> enforcement, or unless otherwise required by law or judicial decision by
> reason of this paragraph.

Liss-Riordan Decl., Exhibit 2.

---

[5]    IBM has consistently cited a provision in its arbitration agreement that it contends
requires that any challenges to the enforceability of any portions of its arbitration
agreement be heard by a court, rather than an arbitrator:

> ***Any issue concerning the validity or enforceability of this Agreement***,
> including the class action or collective action waivers contained in this section,
> ***shall be decided only by a court of competent jurisdiction.*** Any issue
> concerning the arbitrability of a particular issue or claim pursuant to this section
> (except for issues concerning the enforceability of the class action or collective
> action waivers) must be resolved by an arbitrator and not a court.

Arbitration Agreement, at p. 25, Exhibit 2 to Liss-Riordan Decl. (emphasis added).

17.     Plaintiff's counsel currently represents hundreds of individuals who are pursuing or have pursued ADEA claims against IBM in individual arbitration, alleging that they, like Plaintiff, fell victim to IBM's years-long companywide discriminatory scheme implemented by IBM's top management to build a younger workforce, by reducing its population of older workers in order to make room for the hiring of younger workers.  See Liss-Riordan Decl., at ¶2.

18.     In these arbitrations, Plaintiff's counsel have obtained, on behalf of some former IBM employees, critical evidence that IBM was engaged in a systemic companywide scheme over a period of years to decrease the number of older workers at the company and increase the proportion of younger workers.  Some of this evidence is described below.  See Liss-Riordan Decl., at ¶3.

19.     However, IBM has sought to block former employees from using this evidence that their counsel obtained in other arbitration cases, even though it would be relevant to their own claims, citing the confidentiality provision in the arbitration agreement.  See Liss-Riordan Decl., at ¶4.

20.     Plaintiff's counsel have challenged the confidentiality provision in a number of arbitrations but IBM has argued that any challenges to provisions in the agreement must be addressed by a court, not the arbitrator.  See, e.g., Liss-Riordan Decl., Exhibits 30 (Stafford Confidentiality Order) & 31 (Reineri Confidentiality Order).

21.     IBM has often succeeded in preventing these employees from using this evidence amassed in other employees' arbitration cases.  As a result, and as described further below, a number of employees pursuing ADEA claims against IBM in arbitration have had their claims dismissed on summary judgment or have not prevailed at hearing,

having not been able to use all this common evidence obtained in other cases regarding IBM's top-down scheme to oust older employees from its workforce in order to increase its proportion of younger employees.  See Liss-Riordan Decl., at ¶5.

**HIGH LEVEL EXECUTIVE COMMUNICATIONS SHOWING AGE ANIMUS AND PLANS TO REDUCE IBM'S POPULATION OF OLDER WORKERS**

22.     In arbitration, Plaintiff's counsel have obtained evidence showing high level executive communications demonstrating highly incriminating animus against older workers by IBM's former ████████████, as well as the ████████████ ████ at IBM, ████████████.  See Liss-Riordan Decl., Exhibit 10 (Executive Emails).

23.     ████████████ was the ████ of IBM from 2012 to 2020.  See https://www.ibm.com/about/████/.

24.     ████████████ was the ████████████████ at IBM from 2013 to 2020. See Liss-Riordan Decl., Exhibit 13 (████████ Testimony), at 533:10-18.

25.     The evidence obtained reflects age animus from IBM's highest ranks.  See Liss-Riordan Decl., Exhibit 10 (Executive Emails).

26.     For example, the evidence shows emails between ████████████ and ████ ████████ in which ████████████ makes clear that she wants to see the percentage of "millennials" employed at IBM increased.  See id.

27.     In one email chain, ████████████ expresses frustration that IBM's proportion of millennials employees is much lower than at a competitor firm.  She forwards an article to ████████████, which she points out "says 72% of ACN ee's are millenials [sic]."  ████████████ responds, stating "Last year, millennials made up 42% of our workforce and 81% of new hires . . . . we can refresh the numbers for YTD 2016-

7

and see what makes sense to use in future opps." ███████ replies: "42 is a far cry

from 72." See id. at IBM-EVANS003512-3.

28.     These emails show ███████ making clear ███████ concerns to

her Human Resources team, noting to her team: "at the last OT we discussed the fact

that our millennial population trails competitors.  The data below is very sensitive – not

to be shared – but wanted to make sure you have it.  You will see that while Accenture

is 72% millennial we are at 42% with a wide range and many units falling well below that

average.  Speaks to the need to hire early professionals – and to avoid using

downbanding of existing employees as a way to fill jobs.  Honestly I think we should

stop this practice – it means over-paying, creates blockers and inhibits bringing in new

thinking from the outside." Id. at IBM-EVANS003520.

29.     The emails show that ███████ was particularly focused on an analysis

of the percentage of millennials in each business unit at IBM.  Id. at IBMEVANS003531-

32.

30.     The analysis includes a chart which shows the percentage of employees

in various generational cohorts in each business unit.  These cohorts identify the

proportion of employees who are "millennial", "Gen X", "baby boomers", and

"traditionalists".  Id.

31.     ███████ reported to ███████ that the GBS Business Unit "is the

highest, at 54%, a full 18 points lower than ACN [Accenture].  GTS is 42% millennials.

Between them, they represent 55% of our 158k millennials."  Id. at IBM-EVANS003525.

32.     In another communication, ███████ applauds the use of the

disparaging term "Dinobabies" to describe the older IBM employees and a ███████

8

██████'s plan to oust them from IBM's workforce; he describes his plan to "accelerate change by inviting the 'dinobabies' (new species) to leave" and make them an "Extinct species."  Id. at IBM-EVANS003510.

33.     In another email, ██████ describes IBM's "***dated*** maternal ***workforce*** – ***this is what must change***.  They really don't understand social or engagement.  Not digital natives.  ***A real threat for us***."  Id. at IBM-EVANS003535 (emphasis added).

34.     In one email, ██████ warns her team: "I'm sure you all know this but as a reminder, keep data on age very limited and when in doubt check with legal."  Id. at IBMEVANS003521.

35.     These emails evidence a top-down plan to retain younger workers in an effort to improve IBM's demographic makeup.  In one email, ██████ explains a "mandatory" rule that "no EPH [Early Professional Hire] is eligible for RA ["resource action" – IBM's term for mass layoff] in first 12 months of hire.  We are not making the progress we need to make demographically, and we are squandering our investment in talent acquisition and training."  Id. at IBMEVANS003515.

36.     In another email, ██████ explains to ██████ that the percentage of millennials at IBM will increase once certain of IBM's "resource action" (layoff) programs are complete: "███ – more on this issue of % millennials.  The math will improve when Saturn/Solitaire employees move on, and when we bring onboard our early professionals and interns in the summer . . .."  Id. at IBMEVANS003525.

**STRATEGIC CORPORATE PLANNING DOCUMENTS**

37.    In arbitration, Plaintiff's counsel have also obtained evidence showing IBM corporate planning documents that support the claim that IBM was systematically attempting to reduce its population of older workers in order to increase the population of younger workers.  See Liss-Riordan Decl., Exhibit 11 (corporate planning documents).

38.    These documents discuss IBM hiring goals and workforce composition, including a focus on hiring "Early Professional Hires" and "maintain[ing] attrition to offset hiring" and "fund[ing] an influx of EPs [early professionals] to correct seniority mix." See id.

39.    The documents also describe efforts to "Shift headcount mix towards greater % of Early Professional hires" and "Increase Top Talent from Investment Universities." In one slide entitled "Talent: Transforming to Next Generation Digital Talent," IBM lists under "Expected Outcomes" that IBM should have "55% Early Professional Hires in 2020", as well as "10% annual talent refresh."  See id.

40.    In another example, these corporate planning documents explain that "A new focus on Early Professional Hires supports the future talent system to rebuild, rejuvenate, and gain momentum . . ." and lays out "A case for change: IBM's emphasis on experienced level hiring is out of step with competitors resulting in higher costs and a weaker pipeline for future leaders." The document goes on to state "We must shift our focus to early professional hiring, and accelerate the development of core skills for the future. See id.

41.    These documents discuss IBM hiring goals and workforce composition, including a focus on hiring "Early Professional Hires" and "maintain[ing] attrition to offset

hiring" and "fund[ing] an influx of EPs [early professionals] to correct seniority mix." They describe efforts to "Shift headcount mix towards greater % of Early Professional hires" and "Increase Top Talent from Investment Universities." In one slide entitled in a slide entitled "Talent: Transforming to Next Generation Digital Talent," IBM lists under "Expected Outcomes," that IBM should have "55% Early Professional Hires in 2020" as well as "10% annual talent refresh." See id.

42.     As yet another example, corporate planning documents from 2016 explains that "A new focus on Early Professional Hires supports the future talent system to rebuild, rejuvenate, and gain momentum . . ." and lays out "A case for change: IBM's emphasis on experienced level hiring is out of step with competitors resulting in higher costs and a weaker pipeline for future leaders." The document goes on to state "We must shift our focus to early professional hiring, and accelerate the development of core skills for the future. See id.

43.     One method by which IBM is alleged to have ousted a number of older workers is by requiring employees (who have long been permitted to work from home) to relocate to a different part of the country and work out of an IBM office.

44.     Plaintiff's counsel have obtained evidence that this strategy was adopted with the specific goal of ensuring that older employees will resign from the company. See Liss-Riordan Decl., Exhibit 12 (relocation emails).

45.     For example, an email describes the involvement of ██████████ and ██ ████████████ (the current ██████ of IBM) – in ordering a relocation program to require employees to begin reporting in person to an office in Austin, Texas.  The email states in part: "In early September 2019 ██████ and ██████ told the SIH US to undergo a

targeted Austin co-location exercise and currently has approximately 7 team members on site with a target to get to approximately 25." See id.

46.    The email shows that IBM was specifically aware that acceptance of the relocation offer would be low.  It states: "Typical relo accept rate is 8-10%."  See id.

47.    Indeed, the email acknowledges that IBM would need to "find" work for the few who actually accept the relocation offer (thus supporting the theory that there was not an actual corporate need for employees to be working in person out of the Austin office).  See id.

48.    The email also shows that the relocation offer was made to employees who would have been subject to a "resource action" (IBM's term for a mass layoff). However, rather than laying off the employees, the relocation strategy allowed it to appear that the employees voluntarily chose to end their employment at IBM. See id.

### DOCUMENTS PRODUCED TO THE EEOC AS PART OF ITS CLASSWIDE INVESTIGATION INTO IBM'S LAYOFF STRATEGY

49.    The Equal Employment Opportunity Commission ("EEOC") has engaged in a wide-ranging multi-year investigation of IBM for age discrimination.  See Liss-Riordan Decl., Exhibit 9 (EEOC Determination Letter).

50.    As part of that investigation, the EEOC consolidated claims of age discrimination brought by 58 former employees who alleged they were separated from the company because of their age.  See id.

51.    Plaintiff's counsel represents Sally Gehring, a lead plaintiff in the Rusis matter, as well as Robert Gasiorowski, Mark Johnson, and Andrew Peavy, who have opted into the Rusis matter, all of whom were charging parties in the EEOC investigation of IBM that led to its August 31, 2020, determination that found reasonable

12

cause to believe that IBM engaged in classwide age discrimination.  See Liss-Riordan

Decl., at ¶7.

52.     The EEOC analyzed companywide data pertaining to IBM's mass layoffs

("resource actions"), and it interviewed dozens of witnesses.  See Liss-Riordan Decl.,

Exhibit 9 (EEOC Determination Letter).

53.     Last year, the EEOC's investigation resulted in a determination finding

reasonable cause to believe that IBM discriminated against older employees during the

period 2013 to 2018.  See id.

54.     In its determination letter, the EEOC stated:

The Commission's investigation … uncovered top-down messaging from
Respondent's highest ranks directing managers to engage in an
aggressive approach to significantly reduce the headcount of older
workers to make room for Early Professional Hires. Analysis shows it was
primarily older workers (85.85%) in the total potential pool of those
considered for layoff. Evidence uncovered older employees who were laid
off and told that their skills were out of date, only to be brought back as
contract workers, at a lower rate of pay with fewer benefits. EEOC
received corroborating testimony from dozens of witnesses nationwide
supporting a discriminatory animus based on age.

Id.

55.     In arbitration, Plaintiff's counsel have obtained documents that IBM

produced to the EEOC in connection with its investigation, as well as the statistical data

that IBM produced to the EEOC.  See Liss-Riordan Decl., at ¶6.[6]

**TESTIMONY OF HIGH LEVEL EXECUTIVES**

56.     In arbitration, Plaintiff's counsel have obtained testimony from high level

executive witnesses, supporting the contention that IBM was engaged in a systematic

---

[6]     Plaintiff's counsel also requested these documents from the EEOC investigation
through public records requests but have not as of yet obtained the full file of the
EEOC's investigation.  See Liss-Riordan Decl., at ¶8.

scheme to reduce the number of older workers at the company in favor of younger

workers.  See Liss-Riordan Decl., at ¶10.

57.    For example, Plaintiff's counsel have obtained testimony from former

███████████████████████████████████████.  See Liss-Riordan Decl., Exhibit 13

(████████Hearing Testimony).

58.    In this testimony, ████████████ discussed the initiatives and technologies

that she worked on related to "reskilling" IBM's workforce.  Id. at 538.

59.    ████████████ testified that she "spent quite a bit of energy" on "digitally

transforming the human resources function", id. at 534, including by using "a number of

IBM technologies" to accomplish "reskilling" of the workforce. Such technologies were

intended to "nudge" managers to make decisions that they otherwise might not have.

Id. at 577.

60.    ████████████ testimony also addresses IBM's focus on attracting

millennials and so-called "Early Professional Hires" – a term that is nearly synonymous

at IBM with recent college graduates, as ████████████ confirmed that the "the majority"

of Early Professional Hires are "kids" coming out of university.  See id. at 632.

61.    ████████████ testified that she was familiar with the IBM goal of "attaining

55% Early Professional Hires by 2020."  See id. at 592.

62.    Plaintiff's counsel have also obtained testimony from ████████████, the former

████████████ of ████████████████████.  See Liss-Riordan Decl., Exhibit 14 (████

Deposition Excerpts).

63.    ██████ testimony highlighted, among other things, IBM's efforts to attract and retain younger workers in order to compete with hipper competitors in Silicon Valley (Google, Amazon, and Facebook).  Id.

64.    ██████ testified that "[t]here was a lot of work to attract people into IBM who saw IBM as an old fuddy-duddy organization and saw Amazon as cool trendy organizations," that had a "very mature low focus on external hiring," and that IBM was "desperately in need of different perspectives." Id.

65.    Plaintiff's counsel have also obtained testimony from ██████████, the Manager of ████████████████████████, regarding the ease with which IBM could produce data regarding age demographic information for every "resource action" that IBM has implemented.  See Liss-Riordan Decl., Exhibit 15 (██████ Dep.).[7]

66.    ██████████ testified that she manages a team of employees who are involved in ensuring compliance with Resource Action policies, data management, and record keeping.  Id. at 19-20, 105-06.

67.    ██████████ testified that her team compiles information for adverse impact analyses based on demographic information of those in the "population" of a

---

[7]    This evidence is significant because IBM has routinely claimed across arbitrations that it would be too burdensome to obtain and produce statistical evidence that Plaintiff's counsel have requested regarding the ages of employees who were selected and were not selected for termination in various "resource actions". See Liss-Riordan Decl., at ¶9.

particular "resource action", and that IBM has done this for every "resource action" since at least 2016. Id. at 19-20, 71, 105-06.[8]

68.    ███████████ testified that her team has data concerning who was and was not selected for any given "resource action" and that a report of such individuals (including their ages) can be generated through running a simple query.  Id. at 68, 71, 110, 130-31.

69.    Plaintiff's counsel have also obtained testimony from IBM's ████████ ███████ supporting ███████████, ███████████.  See Liss-Riordan Decl., Exhibit 16 (██████ Dep.).

70.    ███████████ testified that that she believes that IBM's ████ (then ████ ████████) and IBM's ███████████████ are involved in the discussions planning resource actions.  See id. at 48-49.[9]

71.    ██████len also testified that she wrote a "rules of the road" email describing the policies that managers had to follow in the "resource action" IBM was then carrying out, dubbed "Project Concord." These "rules of the road" included a major disincentive to permitting people who had been selected for layoff to be placed into



---

[8]    This evidence is significant because Plaintiff's counsel have requested throughout its arbitration cases any statistical analyses IBM has conducted of the impact the "resource actions" have had on older workers (or at least the underlying data used).  IBM has frequently denied that such analyses have been conducted or has offered up witnesses who claim not to know whether any such analyses have been conducted.  See Liss-Riordan Decl., at ¶11.

[9]    This evidence is significant because IBM has argued across all arbitrations that the only pertinent decision makers for all resource actions have been the employees' lower level managers.  IBM has resisted discovery regarding any upper level involvement in decisionmaking around "resource actions" and has persuaded most arbitrators to limit discovery to those lower level managers. See Liss-Riordan Decl., at ¶11.

other open positions at IBM – if these individuals were hired to other positions at IBM, they would not be counted toward the layoff target numbers, meaning that the managers would have to select someone else to layoff instead.  See id. at 76-78; Exhibit 17 (███████ Dep. Exhibit 1).

72.    These "rules of the road" set up an additional roadblock to the ability of individuals selected for layoff to obtain other open positions at IBM – hiring such an individual would require an additional layer of approval from corporate headquarters: "[a]ll exceptions to the above must be approved by the Concord [Project Management Office], including placements, which will require additional approval from the global Unit CFO/HR and [Corporate Headquarters] Finance if unit target is not being achieved." See Liss-Riordan Decl., Exhibit 16 (███████ Dep.) at 76-78; Exhibit 17 (███████ Dep. Exhibit 1).[10]

73.    ███████ elaborated that, when an IBM hiring manager wished to hire someone who was on a "resource action" list, that hire had to undergo additional review by a PEW ("Placements, Expenses, and Withdrawals") Board, which consisted of finance and HR employees, and if a manager wanted to hire someone off of a "resource action" list, they first had to obtain approval from the PEW Board to do so.  See Liss-Riordan Decl., Exhibit 16 (███████ Dep.) at 76-78; Exhibit 17 (███████ Dep. Exhibit 1).

74.    ███████'s email reflects another IBM policy putting an employee identified for layoff in a "resource action" at a competitive disadvantage when applying

---

[10]    This evidence is significant because employees bringing age discrimination claims against IBM have contended (as alleged in the Rusis complaint) that IBM not only terminated older workers, but then ensured that the terminations would "stick" by preventing them from being hired into other open positions.  See Liss-Riordan Decl., at ¶13.

to other positions at IBM, in that the identified employee "generally will be considered ineligible [to] be placed in the same kind of role from which they are being separated (e.g., identified employees in sales incentive roles cannot be placed in different sales incentive role[s] either in the same or different business units.)" <u>See</u> Liss-Riordan Decl., Exhibit 16 (██████ Dep.) at 76-78; Exhibit 17 (██████ Dep. Exhibit 1).

75.     Plaintiff's counsel have obtained evidence that, while IBM has encouraged older employees who are selected for layoff in a "resource action" to apply for other jobs within IBM, using IBM's internal job posting and hiring platform, human resources staff have at times not even forwarded applications by such workers to the relevant hiring managers.  <u>See</u> Liss-Riordan Decl., at ¶14; Exhibit 37 (██████ testimony).

## DEMOGRAPHIC DATA

76.     In some arbitrations, Plaintiff's counsel have obtained demographic data regarding the ages of employees selected and not selected for layoff in various "resource actions".  <u>See</u> Liss-Riordan Decl., at ¶15.

77.     For example, in one arbitration, IBM was ordered to produce data regarding "resource actions" affecting employees across the GBS business unit, a unit comprising approximately 13,000 employees. <u>See</u> Liss-Riordan Decl., Exhibit 18 (<u>Conte</u> Order).

78.     Plaintiff's counsel engaged an expert to analyze this data, and the expert determined that employees age 50 or older were more than twice as likely to be selected for termination as part of a "resource action" than employees under age 50. The expert found this difference to be highly statistically significant, with a 1 in 10,000

chance of that difference occurring randomly.  See Liss-Riordan Decl., Exhibit 19 (Conte Expert Report).

79.     In other cases as well, Plaintiff's counsel have obtained demographic data showing statistically significant disparities between older employees and younger employees in the chances of them being selected for layoff.  See Liss-Riordan Decl., ¶¶15-17; Exhibit 20 (Stafford Expert Report).

80.     In a number of cases, this demographic data would be specifically relevant to the work groups of other employees who are also pursuing age discrimination claims in arbitration proceedings against IBM.  See Liss-Riordan Decl., at ¶17. For example, in one arbitration, IBM was ordered to produce data regarding "resource actions" affecting employees across the GTS business unit, which comprises approximately 18,000 employees – Plaintiff's counsel represents numerous former IBM employees in arbitrations who worked in GTS at the time of their terminations. See Liss-Riordan Decl., ¶64; Exhibit 38 (Chen Order).  This information would likewise be very useful for other former employees pursuing this claim.

## FINAL AWARDS ISSUED FINDING IBM ENGAGED IN AGE DISCRIMINATION

81.     In arbitration, Plaintiff's counsel have obtained awards finding that IBM engaged in age discrimination in violation of the ADEA.  See Liss-Riordan Decl., ¶¶18-19.

82.     These awards include one of in favor of Elizabeth Stafford, who was terminated from IBM in a "resource action" in 2018 at the age of 52.  See Liss-Riordan Decl., Exhibit 21 (Stafford Award).

83.     The arbitrator awarded Ms. Stafford  in total, including

████████ for back pay, ████████ for liquidated damages, ████████ for interest, and

████████ for attorneys' fees.  See id. at 11.

84.     While IBM attempted to show that Ms. Stafford's termination was a result

solely of decisions made by her immediate first and second-line managers, the

arbitrator ruled in her favor, citing evidence supporting her argument that her

termination was actually the result of a top-down strategy by IBM to oust older

employees from its workforce.  In the award, the arbitrator found that:

> At the age of 52, Ms. Stafford was terminated in 2018 by IBM in a "resource action" after a 29-year career with the company.  Id. at 4, 9.

> The arbitrator concluded that "[t]he evidence showed that there was considerable effort within IBM to hire so-called 'Early Professional Hires,' which was a group consisting of recent college graduates and Millennials."  Id. at 7.

> The arbitrator noted that ████████'s testimony "revealed that IBM had a goal of attaining 55% Early Professional Hires by 2020."  Id. at 7-8.

> The arbitrator noted the determination by the EEOC that found reasonable cause to believe that IBM had engaged in classwide age discrimination.  Id.

> The arbitrator concluded that "there is considerable evidence to suggest that the many Resources Actions since 2013 have been designed to have the cumulative effect of systematically reducing the percentage of older workers and refreshing its workforce with younger, Millennial-age workers."  Id. at 8.

> An expert witness who evaluated data regarding ages of employees who were and were not laid off concluded that employees over age 40 were three times more likely to be laid off in a resource action than those under age 40 and that this disparity was statistically significant.  Id. at 6, 9.  The arbitrator decided that "[w]hen coupled [with] the other evidence described above", this conclusion "supports a finding of liability here."  Id. at 9.

> The arbitrator indicated in the award that the statements of senior executives contributed to his conclusion that IBM's discrimination against Ms. Stafford was willful and thus justified an award of liquidated damages.  Id. at 11.

85.     In another case, an arbitrator likewise found in favor of Robert Reineri, who was terminated from IBM in 2018 at the age of 59.  See Liss-Riordan Decl. Exhibit 22 (Reineri Award) at 22, 47-48.

86.     The arbitrator awarded Mr. Reineri ███████████ (including ███████████ in back pay, ████████ in front pay, and ████████ for liquidated damages, prejudgment interest of ████████, attorneys' fees of ████████, and costs of ████████). See id.

87.     In the award, the arbitrator found that:

Mr. Reineri "fell casualty to IBM's broad-based scheme to reduce its employment of older workers".  Id. at 3.

The arbitrator relied on testimony submitted from ████████████████, and Cathy Rodgers to find that: "[s]ince 2012, IBM has focused intensely on combatting an image of IBM has an 'old fuddy-duddy' company with 'mature' workers.  At the direction of IBM's (now former) ████████████, IBM engaged in a campaign, both publicly and internally, to bring in 25,000 younger employees referred to as 'Early Professional Hires' or 'New Collar' hires. At the same time, IBM sought to maintain or reduce its overall headcount, meaning that it had to terminate tens of thousands of older employees to make room for the new younger ones. In order to significantly reduce its population of older workers, IBM has conducted a series of reduction-in-force actions, or 'Resource Actions' ('RA'), which were designed to systemically targeted the older employees." Id. at 3.

He concluded that "[t]he evidence shows that his layoff was a direct result of ████████████ and other top leaders' age animus." He relied on Ms. Rodgers' testimony that "RAs are initiated by the top-most managers at IBM who decide what groups to target and how many employees to layoff and 'cascade' those decisions down to the lower-level managers." Id. at 5.

He concluded that "IBM was driven by a broader strategy to oust older workers and build a younger Millennial-friendly image of the company". Id. at 7.

The arbitrator relied on testimony submitted from ████████████ that: "IBM uses artificial intelligence (AI) to guide decision making in Human Resources."  He noted that ████████ testified that during her time at IBM, she "spent quite a bit of energy on" digitally transforming the human resources function" including by using "a number of IBM technologies" to accomplish "reskilling" of the

21

workforce. "Such technologies were intended to nudge managers to make decisions that they otherwise might not have."  Id. at 8 (citations omitted).

He also relied on testimony from Cathy Rodgers to conclude that: "In 2012, IBM began a campaign to "put the 'cool' back in big blue', in order to compete with its hipper competitors in Silicon Valley (Google, Amazon, and Facebook)."  He noted that ███████ testified that "[t]here was a lot of work to attract people into IBM who saw IBM as an old fuddy-duddy organization and saw Amazon as cool trendy organizations," that had a "very mature low focus on external hiring," and that IBM was "desperately in need of different perspectives".  Id. at 8.

He noted that ███████ has testified that "she was familiar with the IBM goal of attaining 55% Early Professional Hires by 2020."  Id. at 9.

He also relied on ███████ and Cathy Rodgers' testimony to note that: "Despite IBM's substantial hiring of younger workers throughout the company, overall headcount between 2013 and 2020 remained 'pretty much the same' as IBM was simultaneously 'cutting head-count.'  A comparable number of older, non-Millennial workers needed to be let go through RAs 'to make room' to hire 25,000 younger employees."  Id. at 9 (citations omitted).

He also relied on the corporate planning documents, and Cathy Rodgers' discussion of them, that "reflect[ed] strategies to replace older workers with younger ones" and included terms like "continuous talent refresh", goals for early professional hiring rates, and "maintain[ing] steady attrition to offset…hiring".  Id. at 11.

He also noted the EEOC's Letter of Determination in which it concluded that IBM engaged in unlawful age discrimination under the ADEA, based in part on "top-down messaging".  Id. at 14.  He found the EEOC determination to be "probative, persuasive and relevant."  Id. at 31.

## FAVORABLE RULINGS OBTAINED IN ARBITRATION PROCEEDINGS

88.     In addition to the final awards described above, Plaintiff's counsel have

obtained a number of other favorable rulings from some arbitrators presiding over age

discrimination claims against IBM.  See Liss-Riordan Decl., at ¶18.

89.     For example, Plaintiff's counsel have obtained some rulings rejecting

IBM's attempts to limit discovery in the arbitration to the employee's immediate lower

22

level managers.  See Liss-Riordan Decl., at ¶20; Exhibit 23 (Bohannon Order); Exhibit 18 (Conte Order); Exhibit 38 (Chen Order).

90.     In some cases, Plaintiff's counsel have obtained rulings requiring IBM to produce certain amounts of data regarding the ages of employees selected for layoff in various areas of the company.  See Liss-Riordan Decl., at ¶21.

91.     In some cases, Plaintiff's counsel have obtained evidentiary rulings, for example, allowing the admission of the EEOC letter of determination finding reasonable cause to believe that IBM engaged in classwide discrimination.  See Liss-Riordan Decl., at ¶22; Exhibit 24 (Reineri Motion in Limine Order & Claimant's Witness List)

92.     In some cases, Plaintiff's counsel have obtained evidentiary rulings allowing the submission of testimony obtained in other cases (for example, by ████ ████ and ████████). See Liss-Riordan Decl., at ¶23; Exhibit 24 (Reineri Motion in Limine Order & Claimant's Witness List).

93.     In some cases, Plaintiff's counsel have obtained evidentiary rulings allowing testimony by a former high level executive at IBM, Catherine Rodgers, who has described her observations of IBM's scheme to oust older workers from the company and her involvement in high level discussions among other top management and Human Resources personnel regarding these strategies. See Liss-Riordan Decl., at ¶24; Exhibit 25 (Rodgers Transcript).

94.     In a number of cases, Plaintiff's counsel have obtained decisions from arbitrators denying IBM's motion for summary judgment, allowing the employees' claims to proceed to hearing.   See Liss-Riordan Decl., at ¶25; Exhibit 26 (Arbitrator's decision denying IBM's Motion for Summary Judgment in Brohl v. IBM); Exhibit 27 (Arbitrator's

decision denying IBM's Motion for Summary Judgment in <u>Donnelly v. IBM</u>); Exhibit 28

(Arbitrator's decision denying IBM's Motion for Summary Judgment in <u>Reineri v. IBM);</u>

Exhibit 29 (Arbitrator's decision denying IBM's Motion for Summary Judgment in

<u>Rodriguez v. IBM</u>).

**UNFAVORABLE RULINGS AND DISMISSALS OF ARBITRATION
CASES WHERE THE EMPLOYEES WERE NOT PERMITTED TO
SUBMIT ALL THE EVIDENCE (AND FAVORABLE RULINGS) THAT
PLAINTIFF'S COUNSEL HAVE OBTAINED IN OTHER CASES**

95.     In a number of age discrimination cases that Plaintiffs' counsel have

pursued in arbitration against IBM, the employees lost their cases, not having been

permitted to submit all this evidence obtained in other cases, described above (as well

as favorable rulings obtained in other cases).  <u>See</u> Liss-Riordan Decl., at ¶26

96.     For example, arbitrators dismissed the following cases on summary

judgment: <u>Howell v. International Business Machines Corp.</u>, (Liss-Riordan, Decl. Exhibit

32); <u>Laudig v. International Business Machines Corp.</u>, JAMS Ref. No. 1440006094

(Liss-Riordan, Decl. Exhibit 33); <u>Lawson v. International Business Machines Corp.</u>,

JAMS Ref. No. 1440006631 (Liss-Riordan, Decl. Exhibit 34); <u>Richards v. International

Business Machines Corp.</u>, JAMS Ref. No. 1310024197 (Liss-Riordan Decl. Exhibit 35).

97.     In these cases that were dismissed on summary judgment, the arbitrators

did not have evidence before them of the incriminating age-discriminatory statements

made by IBM's ████████████ and █████████████████

████.  They also generally did not have demographic data showing the ages of

employees who were selected for layoff and not selected for layoff.  Most did not have

testimony from the high level officials described above regarding IBM's strategies

regarding its shifting demographics, nor did they have the full breadth corporate

24

planning documents showing IBM's strategies regarding increasing the percentages of "early professional hires" and reducing the number of older workers ("correcting seniority mix").  They also did not have the benefit of favorable decisions that Plaintiffs' counsel obtained from other arbitrators, including favorable discovery rulings, evidentiary rulings, summary judgment rulings, and final awards from employees who succeeded in their age discrimination claims against IBM.

98.     In <u>Rodriguez v. International Business Machines</u>, the claimant lost his case after hearing. <u>See</u> Liss-Riordan Decl., Exhibit 36. Likewise, in that case, the arbitrator did not have evidence before her of the incriminating age-discriminatory statements made by ████████ and ████████ (indeed, she found ████████'s testimony denying that there was any top-down discriminatory scheme "credible"); demographic data showing the ages of employees who were selected for layoff and not selected for layoff; and the corporate planning documents showing IBM's strategies regarding increasing the percentages of "early professional hires" and reducing the number of older workers ("correcting seniority mix").  She also did not have the benefit of favorable decisions that Plaintiffs' counsel obtained from other arbitrators, including favorable discovery rulings.

99.     In <u>Landsman v. International Business Machines Corp.</u>, JAMS Ref. No. 1440007138, the arbitrator recently issued an order denying the Claimant access to the incriminating executive communications described above in ¶¶ 22-36 above, the strategic planning documents described above in ¶¶ 37-48, and the documents IBM produced to the EEOC as a part of its investigation as described in ¶¶ 49-55 above, in part because these documents were protected by confidentiality orders in other

arbitrations. Liss-Riordan Decl., Exhibit 39. Additionally, despite the fact that Plaintiff's counsel will obtain demographic data for "resource actions" affecting all of the GTS business unit (approximately 18,000 employees), see ¶ 77, *supra*, the arbitrator in Landsman denied the Claimant there access to demographic data going beyond the Claimant's first and second level supervisors. Liss-Riordan Decl., Exhibit 39.

## **IBM SEEKS SANCTIONS AGAINST PLAINTIFF'S COUNSEL FOR EVEN ATTEMPTING TO CHALLENGE THE CONFIDENTIALITY PROVISION IN COURT**

100.    Plaintiff's counsel filed this same motion for summary judgment for twenty-five (25) individuals who are plaintiffs in consolidated cases before Judge Jesse M. Furman in In Re: IBM Arbitration Agreement Litigation, C.A. No. 21-cv-6296 (Dkt. 27), as well as for plaintiff William Chandler before Judge John G. Koeltl in Chandler v. International Business Machines Corp., C.A. No. 21-cv-06319 (Dkt. 14).

101.    IBM has moved for sanctions against Plaintiff's counsel in at least five (5) arbitrations, arguing that the very act of filing documents obtained in those arbitrations (even initially under seal)[11] – for the purpose of challenging IBM's confidentiality provision – constituted a violation of IBM's confidentiality provision by Plaintiff's counsel. The arbitrations in which IBM moved for sanctions are Bohannon v. International Business Machines Corp., 1410008650; Conte v. International Business Machines

---

[11]    Plaintiff's counsel filed the documents under seal but asked the Courts to unseal the documents, pursuant to their rules. See In Re: IBM Arbitration Agreement Litigation, C.A. No. 21-cv-6296 (Dkt. 33); Chandler, C.A. No. 21-cv-06319 (Dkt. 20). Citing to In re Gen. Motors LLC Ignition Switch Litig., 2015 WL 4750774, at *4 (S.D.N.Y. Aug. 11, 2015), both Judge Furman's Individual Practices Section Judge Section 7B and Judge Koeltl's Individual Practices Section VI state that "the parties' consent or the fact that information is subject to a confidentiality agreement between litigants is not, by itself, a valid basis to overcome the presumption in favor of public access to judicial documents." It is obviously within a federal court's prerogative to determine what documents are to be made public on its docket.

Corp., JAMS Ref. No. 1410008071; Donnelly v. International Business Machines Corp., JAMS Ref. No. 1440006094; Johnson v. International Business Machines Corp., JAMS Ref. No. 1440007076; Reineri v. International Business Machines Corp., JAMS Ref. No. 1460005373. See Liss-Riordan Decl., Exhibits 40-44.

Respectfully submitted,

PLAINTIFF DENISE LOHNN, Executor of the Estate of Jorgen Lohnn, Deceased,

By her attorneys,


/s/ Shannon Liss-Riordan
Shannon Liss-Riordan (NY Bar No. 2971927)
Zachary Rubin (NY Bar No. 5442025)
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
(617) 994-5800
Email:  sliss@llrlaw.com, zrubin@llrlaw.com


## CERTIFICATE OF SERVICE

I hereby certify that on October 28, 2021, a true and accurate copy of the foregoing was filed via this Court's CM/ECF system.


/s/ Shannon Liss-Riordan
Shannon Liss-Riordan