**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

DENISE LOHNN,
Executor of the Estate of
Jorgen Lohnn, Deceased

        Plaintiff,

        v.

INTERNATIONAL BUSINESS
MACHINES CORP.

        Defendant.

Civil Action No. 1:21-cv-06379

## PLAINTIFF'S REPLY IN SUPPORT OF HER MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO IBM'S CROSS-MOTION TO DISMISS

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.   ARGUMENT ..................................................................................................... 6

      A.    Legal Standard ..................................................................................... 6

      B.    The Court Should Enter a Declaration that the Timing Provision of
            IBM's Arbitration Agreement (That IBM Contends Waives the
            Piggybacking Rule) is Unenforceable ................................................ 6

            1.    The ADEA's timing scheme, including the piggybacking rule,
                  is a substantive right that cannot be waived be contract,
                  especially where IBM did not satisfy the requirements of the
                  Older Workers' Benefits Protection Act ............................................ 6

            2.    The piggybacking rule is a part of the law of the ADEA's
                  limitations period and is applicable in the arbitration context ......... 8

            3.    The ADEA's limitations period is a substantive right that
                  cannot be abridged by contract ..................................................... 11

      C.    Plaintiff Has Developed a Record that Forcefully Demonstrates that
            the Arbitration Agreement's Confidentiality Provision will Unlawfully
            Hinder Her Ability to Pursue Mr. Lohnn's ADEA Claims in
            Arbitration .......................................................................................... 15

            1.    IBM incorrectly argues that the Second Circuit has embraced
                  a *per se* rule that confidentiality provisions are enforceable in
                  arbitration agreements regardless of the circumstances ............... 15

            2.    The Court can strike unenforceable terms from the
                  arbitration agreement without a showing of procedural
                  unconscionability ........................................................................... 23

            3.    New York state law does not embrace a per se rule that
                  contractual confidentiality provisions must be enforced ............... 24

            4.    The FAA would not preempt a finding that IBM's
                  confidentiality provision is unenforceable ..................................... 31

III.  CONCLUSION ................................................................................................ 35

## TABLE OF AUTHORITIES

**Cases**

14 Penn Plaza LLC v. Pyett,
   556 U.S. 247 (2009) ...................................................................... 13, 14, 31

Am. Express Co. v. Italian Colors Rest.,
   570 U.S. 228 (2013) .............................................................................. 6, 31

American Family Life Assurance Co. of New York v. Baker,
   778 Fed. App'x 24 (2d Cir. 2019) ......................................................passim

Ashland Mgmt. Inc. v. Altair Invs. NA, LLC,
   59 A.D.3d 97 (N.Y. Sup. Ct. App. Div. 2008) ........................................... 32

AT&T v. Concepcion,
   563 U.S. 333 (2011) .................................................................... 28, 31, 33

Balan v. Tesla Motors Inc.,
   2019 WL 2635903 (W.D. Wash. June 27, 2019) ................................. 5, 34

Bettencourt v. Brookdale Senior Living Communities, Inc.,
   2010 WL 274331 (D. Or. Jan. 14, 2010) ................................................. 34

Billie v. Coverall N. Am., Inc.,
   444 F. Supp. 3d 332 (D. Conn. 2020) .............................................. 28, 29

Brady v. Williams Capital Group, L.P.,
   878 N.Y.S.2d 693 (N.Y. Sup. Ct. 2009) ................................................... 23

Brooklyn Savs. Bank v. O'Neil,
   324 U.S. 697 (1945) ............................................................................... 14

Browning v. AT&T Paradyne,
   120 F.3d 222 (11th Cir. 1997) ............................................................... 13

Castellanos v. Raymours Furniture Co.,
   291 F. Supp. 3d 294 (E.D.N.Y. 2018) ........................................... 4, 12, 24

Cheeks v. Freeport Pancake House, Inc.,
   796 F.3d 199 (2d Cir. 2015) ................................................................... 30

Chung Chang v. Warner Bros. Entertainment, Inc.,
   2019 WL 5304144 (S.D.N.Y. Oct. 21, 2019) ....................................... 4, 24

CompuCredit Corp. v. Greenwood,
   565 U.S. 95 (2012) ........................................................................... 3, 15

Cronas v. Willis Group Holdings Ltd.,
  2007 WL 2739769 (S.D.N.Y. Sept. 17, 2007) ........................................................ 9

Damato v. Time Warner Cable, Inc.,
  2013 WL 3968765 (E.D.N.Y. July 31, 2013) ...................................................... 28

Davis v. Mills,
  194 U.S. 451 (1904) ........................................................................................ 14

Davis v. O'Melveny & Myers,
  485 F.3d 1066 (9th Cir. 2007) .................................................................. 5, 34

DeGraff v. Perkins Coie LLP,
  2012 WL 3074982 (N.D. Cal. July 30, 2012) ........................................... 5, 34

Denson v. Donald J. Trump for President, Inc.,
  180 A.D.3d 446 (N.Y. Sup. Ct. App. Div. 2020) ................................. passim

DiFolco v. MSNBC Cable L.L.C.,
  622 F.3d 104 (2d Cir. 2010) .......................................................................... 6

Donzo v. City of New York,
  2021 WL 5507027 (S.D.N.Y. Nov. 23, 2021) .............................................. 6

EEOC v. Comm. Office Prods. Co.,
  486 U.S. 107 (1988) ............................................................................... 2, 13

Ellis v. Costco Wholesale Corp.,
  2015 WL 2453158 (N.D. Cal. May 22, 2015) ............................................ 10

Estle v. International Business Machines Corp.,
  2020 WL 5633154 (S.D.N.Y. Sept. 21, 2020) ........................................... 15

Estle v. International Business Machines Corp.,
  No. 20-3372 (2d Cir.) .................................................................................. 15

Foran v. Cawley,
  354 N.Y.S.2d 757 (Sup. Ct. 1973) .............................................................. 24

Garda USA, Inc. v. Sun Cap. Partners, Inc.,
  194 A.D.3d 545 (N.Y. App. Div. 2021) ...................................................... 32

Garfield v. J.C. Nichols Real Estate,
  57 F.3d 662 (8th Cir. 1995) ........................................................................ 13

Gillman v. Chase Manhattan Bank N.A.,
  534 N.E.2d 824 (N.Y. 1988) ....................................................................... 23

Gilmer v. Interstate/Johnson Lane Corp.,
  500 U.S. 20 (1991) ................................................................................ 11, 17

Gitlitz v. Compagnie Nationale Air France,
    129 F.3d 554 (11th Cir. 1997) .................................................................. 10

Graham Oil Co. v. ARCO Prods. Co.,
    43 F.3d 1244 (9th Cir. 1994) ................................................................... 12

Guaranty Trust Co. v. York,
    326 U.S. 99 (1945) .................................................................................. 12

Guyden v. Aetna, Inc.,
    544 F.3d 376 (2d Cir. 2008) ............................................................... passim

Henderson v. Watson,
    2015 WL 2092073 (Nev. April 29, 2015) ............................................. 4, 26

Holowecki v. Federal Exp. Corp.,
    440 F.3d 558 (2d Cir. 2006) ............................................................ 7, 9, 10

Hoober v. Movement Mortgage, LLC,
    382 F. Supp. 3d 1148 (W.D. Wash. 2019) .......................................... 5, 34

In re A2P SMS Antitrust Litig.,
    2014 WL 2445756 (S.D.N.Y. 2014) ......................................................... 33

In re: Second Wave IBM Arbitration Litig.,
    Civ. Act. No. 1:21-cv-09574-JMF .......................................................... 22

JPay, Inc. v. Kobel,
    904 F.3d 923 (11th Cir. 2018) ................................................................. 33

Kaplan v. Lebanese Canadian Bank, SAL,
    999 F.3d 842 (2d Cir. 2021) ...................................................................... 6

King v. Marsh & McLennan Agency, LLC,
    126 N.Y.S.3d 312 (N.Y. Sup. Ct. 2020) .................................................. 32

Kinkel v. Cingular Wireless LLC,
    223 Ill.2d 1 (Ill. 2006) .......................................................................... 4, 26

Kopple v. Stonebrook Fund Management, LLC,
    875 N.Y.S.2d 821 (Sup. Ct. 2004) .......................................................... 30

Larsen v. Citibank FSB,
    871 F.3d 1295 (11th Cir. 2017) .................................................... 5, 23, 33

Levy v. United States Gen. Acct'g Office,
    175 F.3d 254 (2d Cir. 1999) .................................................................... 10

Livingston v. City of Chicago,
    2019 WL 194848 (N.D. Ill. Jan. 14, 2019) ................................................ 7

Logan v. MGM Grand Detroit Casino,
     939 F.3d 824 (6th Cir. 2019) ................................................................ 2, 14

Longnecker v. American Exp. Co.,
     23 F. Supp. 3d 1099 (D. Ariz., May 28, 2014) ..................................... 4, 26

Luna v. Household Finance Corp. III,
     236 F. Supp. 2d 1166 (W.D. Wash. 2002) ........................................... 5, 34

Matter of Anonymous v. Bd. Of Educ. Mexico Cent. School Dist.,
     162 Misc. 2d 300, 616 N.Y.S.2d 867 (Sup. Ct. 1994) .............................. 24

Mehulic v. New York Downtown Hosp.,
     979 N.Y.S.2d 320 (2014) .......................................................................... 32

Morrison v. Circuit City Stores, Inc.,
     317 F.3d 646 (6th Cir. 2003) .................................................................... 14

Moton v. Maplebear Inc.,
     2016 WL 616343 (S.D.N.Y. Feb. 9, 2016) ............................................... 34

Narayan v. The Ritz-Carlton Development Co., Inc.,
     140 Hawai'i 343 (2017) ......................................................................... 4, 26

Opalinski v. Robert Half Int'l Inc.,
     2015 WL 7306420 (D.N.J. Nov. 18, 2015) ............................................... 33

Oubre v. Entergy Operations, Inc.,
     522 U.S. 422 (1998) ........................................................................ 2, 8, 15

Penz v. Superintendent Leroy Fields,
     2021 WL 5507249 (S.D.N.Y. Nov. 23, 2021) ............................................. 6

Placos v. Cosmair, Inc.,
     517 F. Supp. 1287 (S.D.N.Y. 1981) ..................................................... 4, 24

Pokorny v. Quixtar, Inc.,
     601 F.3d 987 (9th Cir. 2010) .......................................................... 5, 29, 34

Post v. Procare Automotive Serv. Solutions,
     2007 WL 1290091 (Ohio Ct. App. May 3, 2007) ................................... 4, 26

Poublon v. C.H. Robinson Co.,
     846 F.3d 1251 (9th Cir. 2017) ............................................................ 28, 29

Primavera Familienstifung v. Askin,
     139 F. Supp. 2d 567 (S.D.N.Y. May 7, 2001) .......................................... 27

Ragone v. Atlantic Video at Manhattan Ctr.,
     595 F.3d 115 (2d Cir. 2010) ......................................................... 3, 12, 23

Ramos v. Superior Court,
    28 Cal. App. 5th 1042 (2018) ................................................... 4, 26, 28, 29

Reed Elsevier, Inc. ex rel. LexisNexis Div. v. Crockett,
    734 F.3d 594 (6th Cir. 2018) ..................................................... 33

Rosenberg v. MetLife, Inc.,
    8 N.Y.3d 359 (N.Y. 2007) ........................................................ 25

Rusis v. International Business Machines Corp.,
    2021 WL 1164659 (S.D.N.Y. March 26, 2021) ...................................... 8, 11

Sanchez v. CarMax Auto Superstores Cal. LLC,
    224 Cal. App. 4th 398 (2014) ..................................................... 28, 29

Schnuerle v. Insight Commc'ns Co., L.P.,
    376 S.W.3d 561 (Ky. 2012) ....................................................... 4, 26

Snell v. Suffolk County,
    782 F.2d 1094 (2d Cir. 1986) ..................................................... 7, 9

Spira v. J.P. Morgan Chase & Co.,
    466 F. App'x 20 (2d Cir. 2012) .................................................... 13

Sprague v. Houseld Intern.,
    473 F. Supp. 2d 966 (W.D. Mo. 2005) .............................................. 5, 26

Sun Oil Co. v. Wortman,
    486 U.S. 717 (1988) .............................................................. 12

Suquin Zhu v. Hakkasan NYC LLC,
    291 F. Supp. 3d 378 (S.D.N.Y. 2017) .............................................. 30, 31

Taylor v. Ash Grove Cement Co.,
    2004 WL 1382726 (D. Or. Feb. 25, 2004) ........................................... 5, 26

Thompson v. Fresh Products, LLC,
    985 F.3d 509 (6th Cir. 2021) ..................................................... passim

Those Certain Underwriters at Lloyds, London v. Occidental Gems, Inc.,
    41 A.D.3d 362 (N.Y. Sup. Ct. App. Div. 2007) ...................................... 29

Ting v. AT&T,
    319 F.3d 1126 (9th Cir. 2003) .................................................... 5, 33

Tolliver v. Xerox Corp.,
    918 F.2d 1052 (2d Cir. 1990) ..................................................... 1, 7, 9

Valle v. ATM Nat., LLC,
    2015 WL 413449 (S.D.N.Y. Jan. 30, 2015) .......................................... 4, 23

Vernon v. Cassadaga Valley Cent. School Dist.,
    49 F.3d 886 (2d Cir. 1995) ........................................................ 2, 11, 12, 13

Village of Brockport v. Calandra,
    745 N.Y.S.2d 662 (Sup. Ct. June 14, 2002) ................................. 4, 24, 32

Wong v. CKX, Inc.,
    890 F. Supp. 2d 411 (S.D.N.Y. 2012) ...................................... 17

Woo Jung Cho v. Cinereach Ltd.,
    2020 WL 1330655 (S.D.N.Y. March 23, 2020) ..................................... 4, 23

Zuver v. Airtouch Communications, Inc.,
    153 Wash. 2d 293 (2004) ........................................................ 5, 26

**Statutes**

28 U.S.C. § 1292(b) ........................................................................... 27

29 U.S.C. § 626(d) ............................................................................. 7

29 U.S.C. § 633(b) ............................................................................. 7

9 U.S.C. § 2 ....................................................................................... 31

Age Discrimination in Employment Act ("ADEA"),
    29 U.S.C. § 621 *et seq.* ..................................................................passim

Fair Labor Standards ("FLSA"),
    29 U.S.C. §§ 201 *et seq.* ............................................................ 12, 34

N.Y. Exec. Law § 296(1)(A) .............................................................. 24

Older Workers' Benefits Protection Act ("OWBPA"),
    29 U.S.C. § 626(f) ........................................................... 2, 3, 14, 15

Sarbanes-Oxley Act ("SOX"),
    18 U.S.C.A. § 1514A ....................................................... 17, 18

Title VII,
    42 U.S.C.A. § 2000e-5 ................................................... 2, 7, 14, 15

**Other Authorities**

Thompson v. Fresh Products, LLC, EEOC Brief,
    2020 WL 1160190 (2d Cir. March 2, 2020) ..................................... 2, 13

**Rules**

Fed. R. Civ. P. 12(b)(6) ................................................................................................ 6

## I.   INTRODUCTION

As Plaintiff demonstrated in her motion, the timeliness and confidentiality provisions contained in IBM's arbitration agreement undermine or extinguish Plaintiff's ability to pursue her deceased husband's claims against IBM under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.* As such, this Court should issue a declaratory judgment finding those provisions unenforceable, so that Plaintiff can pursue these claims in arbitration without being inappropriately encumbered by those provisions.

IBM's arguments are baseless. First, the arbitration agreement's timeliness provision is unenforceable, to the extent (as IBM has argued and convinced many arbitrators)[1] that it waives the piggybacking rule, which has the effect of impermissibly abridging the ADEA's limitations period. Contrary to the express language of the Second Circuit, IBM argues that the piggybacking rule has nothing to do with the time in which an employee may file an ADEA claim and instead concerns only administrative exhaustion. The Second Circuit, however, has acknowledged that the piggybacking rule impacts the time to file, explaining that: "The charge filing requirement of section 7(d) [of the ADEA] sets a time limit, not for the purpose of limiting time for suit, but for the purpose of affording a prompt opportunity to attempt conciliation." Tolliver v. Xerox Corp., 918 F.2d 1052, 1057-59 (2d Cir. 1990). IBM insists that Plaintiff cannot pursue Mr. Lohnn's ADEA claims at all, despite the fact that she would still be timely to do so in court (absent the arbitration agreement) if she could make use of the piggybacking rule.

---

[1]      In this case, Plaintiff has not yet attempted to arbitrate Mr. Lohnn's claim. Instead she seeks a declaratory judgment from this Court that IBM's timeliness provision is invalid to the extent that it would preclude Plaintiff from pursuing the claim in arbitration.
      Plaintiff's counsel also represent hundreds of additional individuals whom IBM contends are untimely to pursue their age discrimination claims in arbitration because of its contention that these individuals could not rely on the piggybacking rule. Plaintiff's counsel is requesting, however, that these arbitrations be stayed pending this Court's consideration (and the consideration of the other courts considering this issue) of Plaintiff's challenge here to provisions of IBM's agreement.

In effect, the purported waiver of the piggybacking rule has severely limited the time that she has to pursue Mr. Lohnn's ADEA claims.

Furthermore, heeding the EEOC's interpretation of the ADEA, the 6th Circuit recently held that the ADEA's timing scheme is a substantive right that cannot be waived by contract. See Thompson v. Fresh Products, LLC, 985 F.3d 509, 521 (6th Cir. 2021); Thompson v. Fresh Products, LLC, EEOC Brief, 2020 WL 1160190, at *19-23 (2d Cir. March 2, 2020). Citing Vernon v. Cassadaga Valley Cent. School Dist., 49 F.3d 886, 890 (2d Cir. 1995), IBM points out that the Second Circuit has held that the ADEA limitations period is procedural rather than substantive. In fact, Vernon specifically addressed the context of whether a limitations period is procedural for the purposes of determining whether a legislative change to the period applies retroactively. Id. As Judge Cabranes explained in his Vernon concurrence, limitations period are on the cusp of the procedural versus substantive rights distinctions, and can be procedural for some purposes but substantive for others. Id. at 892 (Cabranes, J.). The EEOC's interpretation that the ADEA timing scheme is substantive is owed deference. See Thompson, EEOC Brief, 2020 WL 1160190, at *19-23; see also EEOC v. Comm. Office Prods. Co., 486 U.S. 107, 115 (1988).

IBM also argues that Thompson relied on Logan v. MGM Grand Detroit Casino, 939 F.3d 824, 838 (6th Cir. 2019), which held that the Title VII, 42 U.S.C.A. § 2000e-5, limitations period was substantive but limited its holding to court cases, and not arbitration, as a means of achieving a balance with the liberal policies of the FAA, meaning that Thompson should likewise be limited to court cases and not arbitration. However, there is a critical distinction between Title VII and ADEA that is fatal to IBM's argument.  Unlike Title VII, the ADEA includes strict requirements set forth in the Older Workers' Benefits Protection Act ("OWBPA"), 29 U.S.C. § 626(f), that an employer must meet to obtain an effective waiver of any right or claim under the ADEA. See Oubre v. Entergy Operations, Inc., 522 U.S. 422, 427 (1998). These requirements include

providing disclosures to its terminated employees regarding the ages of individuals who are being laid off, and those who are being retained, which IBM did not do. See 29 U.S.C. § 626(f); SOF ¶ 5 n.2, Dkt. 15. Given that the ADEA's timing scheme is a substantive right, and that the arbitration agreement's purported waiver of the piggybacking rule abridges the ADEA's timing scheme for Mr. Lohnn, there can be no question that IBM's failure to meet the OWBPA's requirements renders the waiver unenforceable. See CompuCredit Corp. v. Greenwood, 565 U.S. 95, 97 (2012).

Second, the arbitration agreement's confidentiality provision is unenforceable, because, as the summary judgment record demonstrates, IBM has used it to severely hamper its former employees' ability to pursue their ADEA claims in arbitration. IBM contends that confidentiality is intrinsic to arbitration, citing to Guyden v. Aetna, Inc., 544 F.3d 376, 384-85 (2d Cir. 2008), and thus that there is no basis to hold the confidentiality provision unenforceable. But IBM takes Guyden too far – all Guyden stands for is the proposition that, without a well-developed record showing how a confidentiality provision is being used to impede parties' ability to pursue claims in arbitration, the mere inclusion of a confidentiality provision in an arbitration agreement does not in itself make the agreement substantively unconscionable. Id. at 384-87. As the Second Circuit explained in American Family Life Assurance Co. of New York v. Baker, 778 Fed. App'x 24, 27 (2d Cir. 2019), parties can challenge the enforceability of confidentiality provisions where arbitration proceedings have unfolded, showing the ways the provision is unduly hindering the claimants' ability to pursue their cases.

While IBM argues that Plaintiff has not demonstrated that the confidentiality provision is procedurally unconscionable, it is routine for courts to excise substantively unconscionable provisions from arbitration agreements (so that the rest of the arbitration agreement can be enforced) without a finding of procedural unconscionability. See, e.g., Ragone v. Atlantic Video at Manhattan Ctr., 595 F.3d 115, 124-25 (2d Cir. 2010); Woo Jung Cho v. Cinereach Ltd., 2020 WL 1330655, at *5

(S.D.N.Y. March 23, 2020); Chung Chang v. Warner Bros. Entertainment, Inc., 2019 WL
5304144, at *3-4 (S.D.N.Y. Oct. 21, 2019); Castellanos v. Raymours Furniture Co., 291
F. Supp. 3d 294, 300-02 (E.D.N.Y. 2018); Valle v. ATM Nat., LLC, 2015 WL 413449, at
*6 (S.D.N.Y. Jan. 30, 2015).

IBM also argues that New York law supports the enforcement of confidentiality
provisions and thus does not a support finding of unenforceability. However, IBM is
wrong to assert that New York law always supports enforcing confidentiality provisions
regardless of the circumstances. New York courts do not enforce confidentiality clauses
where doing so would subvert public policy, and New York has a strong public policy in
favor of redressing age discrimination. See Village of Brockport v. Calandra, 745
N.Y.S.2d 662, 668 (Sup. Ct. June 14, 2002); Placos v. Cosmair, Inc., 517 F. Supp.
1287, 1289 (S.D.N.Y. 1981). For example, a New York appeals court refused to enforce
a confidentiality provision where it was being used to punish the plaintiff for making
statements in federal court as a part of a challenge to a non-disclosure agreement. See
Denson v. Donald J. Trump for President, Inc., 180 A.D.3d 446, 454 (N.Y. Sup. Ct. App.
Div. 2020).

Contrary to IBM's assertion, it appears that New York courts would follow the
majority of states to address this issue directly, which have routinely held that
confidentiality clauses in arbitration agreements that are used to impede the pursuit of
civil rights claims or claims under other remedial statutes are unenforceable. See, e.g.,
Ramos v. Superior Court, 28 Cal. App. 5th 1042, 1065-66 (2018); Narayan v. The Ritz-
Carlton Development Co., Inc., 140 Hawai'i 343, 355 (2017); Henderson v. Watson,
2015 WL 2092073, at *3 and n.3 (Nev. April 29, 2015); Longnecker v. American Exp.
Co., 23 F. Supp. 3d 1099, 1111 (D. Ariz., May 28, 2014); Schnuerle v. Insight
Commc'ns Co., L.P., 376 S.W.3d 561, 578 (Ky. 2012); Post v. Procare Automotive
Serv. Solutions, 2007 WL 1290091, at *3 (Ohio Ct. App. May 3, 2007); Kinkel v.
Cingular Wireless LLC, 223 Ill.2d 1, 42 (Ill. 2006); Sprague v. Houseld Intern., 473 F.

4

Supp. 2d 966, 975 (W.D. Mo. 2005); Zuver v. Airtouch Communications, Inc., 153

Wash. 2d 293, 312-21 (2004); Taylor v. Ash Grove Cement Co., 2004 WL 1382726, at

*9 (D. Or. Feb. 25, 2004). And as explained below, the cases that IBM relies on are all

easily distinguishable from the circumstances in this case.

      Finally, IBM argues that to the extent that New York law would hold the

confidentiality provision to be unenforceable, it is preempted by the FAA, because such

a holding would discriminate against arbitration, and because confidentiality is an

intrinsic aspect of arbitration. Plaintiff's argument in no way discriminates against

arbitration contracts. Instead, Plaintiff argues that, under certain circumstances, like

where a confidentiality provision may subvert New York public policy, such contracts will

not be enforced – regardless of whether they are arbitration contracts or non-arbitration

contracts. Likewise, IBM is incorrect that confidentiality is so intrinsic to arbitration that a

decision severing an impermissible confidentiality clause would be preempted by the

FAA. Numerous federal courts have excised confidentiality provisions from arbitration

agreements without holding that the FAA preempted such a decision. See, e.g., Larsen

v. Citibank FSB, 871 F.3d 1295, 1319 (11th Cir. 2017); Pokorny v. Quixtar, Inc., 601

F.3d 987, 1002 (9th Cir. 2010); Davis v. O'Melveny & Myers, 485 F.3d 1066, 1079 (9th

Cir. 2007); Ting v. AT&T, 319 F.3d 1126, 1152 (9th Cir. 2003); Balan v. Tesla Motors

Inc., 2019 WL 2635903, at *3-4 (W.D. Wash. June 27, 2019); Hoober v. Movement

Mortgage, LLC, 382 F. Supp. 3d 1148, 1160-61 (W.D. Wash. 2019); DeGraff v. Perkins

Coie LLP, 2012 WL 3074982, at *4 (N.D. Cal. July 30, 2012); Luna v. Household

Finance Corp. III, 236 F. Supp. 2d 1166, 1173, 1180-81 (W.D. Wash. 2002).

      As will be explained further below, IBM's Motion to Dismiss must be denied, and

instead the Court should grant summary judgment in favor of Plaintiff and enter a

declaratory judgment holding that the arbitration agreement's timing provision and

confidentiality provision are unenforceable.

## II.     ARGUMENT

### A.     Legal Standard

Plaintiff has already set forth the summary judgment standard in her Motion for Summary Judgment (Dkt. 14 at 10-11). With respect to IBM's Cross-Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the Court must "construe the complaint in the light most favorable to the nonmoving party . . . ." Donzo v. City of New York, 2021 WL 5507027, at *2 (S.D.N.Y. Nov. 23, 2021). In order to "withstand a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Id. (quoting Kaplan v. Lebanese Canadian Bank, SAL, 999 F.3d 842, 854 (2d Cir. 2021)) (additional citations omitted). "In considering a motion to dismiss, 'a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." Penz v. Superintendent Leroy Fields, 2021 WL 5507249, at *3 (S.D.N.Y. Nov. 23, 2021) (quoting DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010)).

### B.     The Court Should Enter a Declaration that the Timing Provision of IBM's Arbitration Agreement (That IBM Contends Waives the Piggybacking Rule) is Unenforceable

#### 1.     The ADEA's timing scheme, including the piggybacking rule, is a substantive right that cannot be waived be contract, especially where IBM did not satisfy the requirements of the Older Workers' Benefits Protection Act

IBM begins its argument regarding the validity of its argument with the unintentionally ironic proposition that "[c]ourts must 'rigorously enforce' arbitration agreements according to their terms," and that the agreement gave the Plaintiff 300 days to file her arbitration demand. IBM's Brief at 7, Dkt. 26 (quoting Am. Express Co. v. Italian Colors Rest., 570 U.S. 228, 233 (2013). Conveniently, IBM ignores the fact that that is not what the arbitration agreement actually says. The timing provision does not state that Plaintiff has 300 days to file a claim – it states that "if the claim is one which must first be brought before a government agency," arbitration must be initiated "no later

6

than the filing deadline of such a claim." (SOF ¶ 13, Dkt. 14.) The arbitration agreement does not clarify whether it means "the filing of such a claim" with the EEOC (which would have a 180 or 300 day deadline, see 42 U.S.C. § 2000e-5(e)(1); 29 U.S.C. §§ 626(d), 633(b)), or "the filing of such a claim" in court (which can take place from 60 days after a charge has been filed with the EEOC to 90 days after the aggrieved employee receives a letter from the EEOC informing the individual that the EEOC completed its investigation, see 29 U.S.C. §§ 626(d)(1) and (e)) – or can be much later if the same or similar claim was previously filed by another employee (pursuant to the "piggybacking" rule).

In any event, IBM has argued that the time limit is 180 or 300 days, and that its arbitration agreement does not allow for such "piggybacking," effectively truncating the ADEA limitations period. (SOF ¶¶ 9, 13, 15 n.5, Dkt. 14.) As explained more fully in Plaintiff's Motion for Summary Judgment, the piggybacking rule establishes that plaintiffs may file claims of discrimination years after they suffered discrimination by "piggybacking" onto earlier-filed claims, which put the company on notice of allegations that it engaged in illegal discrimination that affected a broad class of workers. See Tolliver, 918 F.2d at 1057-59; Holowecki v. Federal Exp. Corp., 440 F.3d 558, 565-70 (2d Cir. 2006). "According to the piggybacking rule, 'where one plaintiff has filed a timely EEOC complaint, other non-filing plaintiffs may join in the action if their individual claims aris[e] out of similar discriminatory treatment in the same time frame." Holowecki, 440 F.3d at 564 (quoting Snell v. Suffolk County, 782 F.2d 1094, 1100 (2d Cir. 1986)); see also Livingston v. City of Chicago, 2019 WL 194848, *3 (N.D. Ill. Jan. 14, 2019). Here, IBM's interpretation of the arbitration agreement's timing provision as waiving the piggybacking, which the arbitrator adopted, means that Plaintiff cannot advance Mr. Lohnn's claim **at all** in arbitration despite the fact that she would unquestionably be timely to pursue the claim in court absent the arbitration agreement by virtue of piggybacking off of the named plaintiffs in Rusis. The Sixth Circuit, following the

reasonable interpretation of the EEOC, has recently held that the ADEA limitations provision creates a substantive right that cannot be waived by contract, meaning that to the extent that the arbitration agreement purports to have shortened the limitations period for Plaintiff in the manner IBM asserts, it is unenforceable. See Thompson, 985 F.3d at 521. Even worse, IBM obtained this waiver without providing the disclosures to Plaintiff that are mandated by the Older Workers' Benefits Protection Act ("OWBPA"), 29 U.S.C. § 626(f), in order to obtain a valid waiver from an employee of "any right or claim" under the ADEA. See Oubre, 522 U.S. at 427; 29 C.F.R. § 1625.22(f). This Court must therefore hold the purported piggybacking waiver in IBM's arbitration agreement to be invalid.[2]

### 2. The piggybacking rule is a part of the law of the ADEA's limitations period and is applicable in the arbitration context

IBM, however, asserts that the piggybacking rule cannot be utilized in this case, because "the piggybacking rule has nothing to do with making sure plaintiffs have enough time to file a claim." (IBM's Brief at 15, Dkt. 24.) Instead, IBM argues, the piggybacking rule is an exhaustion rule, excusing an individual's failure to file a claim before the EEOC. Citing to dicta in the Rusis decision declining to rule on Plaintiff's argument in light of the arbitration agreement's class action waiver, see Rusis v. International Business Machines Corp., 2021 WL 1164659, at *6 n.4 (S.D.N.Y. March 26, 2021), IBM argues that the piggybacking rule is not part of the statute of limitations law.

While Judge Caproni expressed skepticism of Plaintiff's piggybacking argument, Plaintiff respectfully maintains that she was incorrect.[3] The Court would have to willfully

---

[2]     Otherwise, the arbitration agreements themselves are invalid, and Plaintiff would then be able to pursue Mr. Lohnn's claim in court.

[3]     IBM argues that the timeliness provision waiving the ability to piggyback is not the reason for the inability of IBM's former employees to arbitrate their claims, because they could have demanded arbitration during the 300/180 day window. Aside from the fact that the arbitration agreement is actually not explicit as to what the deadline actually is for arbitration demands, see supra at p. 6-7, these former employees were not generally initially aware that IBM had discriminated against them at the time of their

blind itself to the practical implications of the piggybacking rule in order to view it as being divorced from ADEA's timing scheme. The fact of the matter is that in ADEA court cases, the piggybacking rule means that individuals who would otherwise be required to initiate their charges before the EEOC within 300 or 180 days from the date they were discriminated against can ultimately choose to pursue their claims in court long after that period had expired (potentially even years later), so long as the individual can piggyback on a timely filed EEOC charge. See Tolliver, 918 F.2d at 1057-59. Indeed, the Second Circuit and courts within this District have acknowledged the nexus between the piggybacking rule and the limitations period. In Tolliver, the Second Circuit acknowledged that the piggybacking rule would extend the time limit for ADEA claims, explaining that "[t]he charge filing requirement of section 7(d) [of the ADEA] sets a time limit, not for the purpose of limiting time for suit, but for the purpose of affording a prompt opportunity to attempt conciliation." Id. at 1059. In Cronas v. Willis Group Holdings Ltd., 2007 WL 2739769, at *3 (S.D.N.Y. Sept. 17, 2007), for example, the court explained that "[u]nder the single-filing rule, plaintiffs in class action discrimination suits have been allowed to 'piggyback' their **otherwise untimely claims** on to those of timely filed named plaintiffs." Id. (emphasis added) (citing Snell v. Suffolk County, 782 F.2d 1094, 1101-02 (2d Cir. 1986)).

IBM pushes the fiction that the piggybacking rule has nothing to do with the ADEA's timing provision by misrepresenting the holding of Holowecki v. Fed. Exp. Corp., 440 F.3d 558, 564 (2d Cir. 2006). IBM argues that the decision in Holowecki

---

separations, because IBM had informed them that they were separated for legitimate reasons. Indeed, this is the reason that Congress enacted the OWBPA, which would allow laid off employees to evaluate whether their terminations may be due to age discrimination. Because IBM did not provide those disclosures to its former employees, they lacked information to know that they may have a viable age discrimination claim, until later when they learned of allegations that IBM was engaged in a companywide systemic effort to oust older workers.  This is also the reason behind the piggybacking rule; employees may not realize they have a discrimination claim at the time of their termination, but later when they find out that a class charge of discrimination has been filed, they may join it. These considerations are especially poignant here, given the fact that Plaintiff's husband passed away after his termination, making it even more difficult to timely pursue a claim.

supports its position that the piggybacking rule does not concern the limitations period, because it supposedly held that piggybacking is not available to plaintiffs who file their own untimely charges of discrimination, even if they otherwise would be eligible for piggybacking based on the timely-filed charge of a different plaintiff. (IBM's Brief at 17, Dkt. 48.) While Holowecki indicates that the piggybacking rule is not boundless, it does not stand for the proposition that IBM asserts and does not support IBM's position.

 The Second Circuit noted in dicta in Holowecki that where an individual has filed an EEOC charge alleging age discrimination, received a right to sue letter that triggers a 90 day deadline to file the claim in court, and failed to timely file the case within that 90 day period, that individual cannot be permitted to use the piggybacking rule to circumvent the limitations period. See Holowecki, 440 F.3d at 564-65. Contrary to IBM's contention, Holowecki does not stand for the proposition that any individual who even attempts to file an EEOC charge (even if that charge is invalid and untimely) is categorically banned from utilizing the piggybacking rule. As the court explained in Ellis v. Costco Wholesale Corp., 2015 WL 2453158, at *2 (N.D. Cal. May 22, 2015), the Holowecki court framed its discussion by citing the concern that the Second Circuit considered in Levy v. United States Gen. Acct'g Office, 175 F.3d 254, 255 (2d Cir. 1999), where individuals who had received a right to sue notice on their claims but did not file suit in the 90-day window attempted to use the piggybacking rule to escape the consequences of their failure to timely file. Similarly, Holowecki cites to Gitlitz v. Compagnie Nationale Air France, 129 F.3d 554, 557-58 (11th Cir. 1997), where an individual filed an ADEA EEOC charge, failed to file suit within the 90-day limitations period after receiving a right to sue letter, and then attempted to piggyback on another individual's charge. Thus, while Holowecki sought to curb misuse of the piggybacking rule as an end-run around the 90-day limit (once an employee receives their own right-to-sue letter), it did not preclude piggybacking in every instance where an individual had

previously filed an EEOC charge, and certainly does not stand for the proposition that piggybacking does not permit otherwise untimely claims to proceed.

Further, again relying on dicta in the Rusis decision, IBM argues that the piggybacking rule is wholly inapplicable in the arbitration context, since Mr. Lohnn here was not required to file an EEOC charge to pursue his claim. (IBM Brief at 13, Dkt. 26) (citing Rusis, 2021 WL 1164659, at *4 n.4)). The Supreme Court, however, made clear in Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 28 (1991), that even though a statutory claim (there, an ADEA claim) may be subject to arbitration generally, "the prospective litigant [must be able to] effectively . . . vindicate his or her statutory cause of action in the [specific] arbitral forum." Here, IBM insists that Plaintiff cannot pursue Mr. Lohnn's ADEA claim **at all** in arbitration, even though, absent the arbitration agreement, there is no question that she could pursue the claim in court, or in Rusis, by relying on the piggybacking rule. In other words, regardless of the fact that the arbitration agreement did not require Plaintiff to submit an EEOC charge to administratively exhaust Mr. Lohnn's claim prior to arbitration, Plaintiff must still be permitted to piggyback off of the Rusis plaintiffs' charges for the purposes of the timing of the claim.

### 3. The ADEA's limitations period is a substantive right that cannot be abridged by contract

Given the fact that the piggybacking rule is undeniably a part of the law of the ADEA's statute of limitations, the arbitration agreement's provision purporting to waive the Plaintiff's right to rely on the piggybacking rule is unenforceable. The Sixth Circuit's decision in Thompson, 985 F.3d at 521, makes abundantly clear, relying on the EEOC's interpretive expertise, that the timing provisions contained in the ADEA "are part of the **substantive law** of the cause of action created by the ADEA" and that "the limitations period[] in the . . . ADEA give[s] rise to substantive, non-waivable rights." Id. (emphasis added). IBM, on the other hand, relies on a dated Second Circuit case, Vernon, 49 F.3d

at 890, for the proposition that the ADEA limitations period is substantive, and not procedural. Vernon, however, is distinguishable.

Vernon addressed whether ADEA's limitations period was procedural or substantive for the purposes of determining whether a legislative change to its limitations period would apply retroactively or prospectively, concluding that for that purpose the limitations period was procedural (meaning its application would be applicable retroactively). Id. Vernon did not address the question at issue in this case, whether the limitations period created the kind of substantive right that cannot be abridged by contract. As Judge Cabranes noted in his concurrence in Vernon, "statutes of limitations . . . govern whether an individual can vindicate a right" and thus "lie on the cusp of the procedural substantive distinction." Vernon 49 F.3d at 892 (Cabranes, J. concurring). As such he noted that statutes of limitations are treated as "procedural" for some purposes, such as for choice-of-law purposes, see Guaranty Trust Co. v. York, 326 U.S. 99 (1945), and as "substantive" for the purposes of the Erie doctrine, see Sun Oil Co. v. Wortman, 486 U.S. 717, 727 (1988). See Vernon 49 F.3d at 892 (Cabranes, J. concurring).[4]

---

[4]     In her Motion for Summary Judgment (Dkt. 13 at 18), Plaintiff cited a dozen other cases that had refused to enforce contracts that purported to shorten the limitations periods for various federal employment law claims. IBM attempted to distinguish three of those cases.
    First, Plaintiff cited Castellanos v. Raymours Furniture Co., 291 F. Supp. 3d 294, 300-02 (E.D.N.Y. 2018), which struck an arbitration agreement's shortening of the limitations period for a claim under the Fair Labor Standards ("FLSA"), 29 U.S.C. §§ 201 et seq. IBM contends the rationale of this case is distinguishable, because shortening the limitations period of an FLSA claim would lessen the amount of damages that could be recovered under a timely claim, making it a unique statutory feature. However, the Thompson court likewise founded its conclusion on the unique statutory features of the ADEA meant to effectuate its purpose: "Altering the time limitations surrounding these processes risks undermining the statute's uniform application and frustrating efforts to foster employer cooperation." Thompson, 985 F.3d at 521.
    Second, IBM criticizes Plaintiff's reliance on Graham Oil Co. v. ARCO Prods. Co., 43 F.3d 1244, 1247-48 (9th Cir. 1994), because that case concerned the Petroleum Marketing Practices Act ("PMPA"), and the court held that a one-year limitations period could not be reduced to 90 days. But Graham Oil Co. represents an analogous situation as here, where a court refused to truncate the limitations period of a statute with a remedial purpose (in that case, to protect consumers).
    Third, Plaintiff cited to Ragone v. Atlantic Video at Manhattan Ctr., 595 F.3d at 125-26, where the Second Circuit indicated that if the employer had not waived a

Here, the ADEA limitations period may be procedural for the purposes of determining a legislative change's retroactive applicability, but for the purposes of determining whether the limitations period can be abridged by contract, it must be considered substantive. Indeed, the EEOC took that position in <u>Thompson</u>, explaining "the ADEA's statutory limitations period is a substantive right and prospective waivers of its limitations period are unenforceable." <u>Thompson</u>, EEOC Brief, 2020 WL 1160190, at *19-23. The EEOC's reasonable interpretation of the ADEA is entitled to deference. <u>See</u> <u>Comm. Office Prods. Co.</u>, 486 U.S. at 115 ("[I]t is axiomatic that the EEOC's interpretation of [the ADEA], for which it has primary enforcement responsibility, need . . . only be reasonable to be entitled to deference."). This conclusion does not contradict the holding in <u>Vernon</u>, which was limited to the context of determining whether a legislative change is retroactive and did not address the question in this case.  <u>Vernon</u> 49 F.3d at 892.[5]

IBM's reliance on <u>14 Penn Plaza LLC v. Pyett</u>, 556 U.S. 247, 265 (2009) is likewise misplaced. <u>Penn Plaza</u> had nothing to say with respect to the issue of whether the ADEA's timing scheme was a substantive right – it merely held that the right to a judicial forum was not a substantive right, and that the plaintiff could pursue ADEA

shortened statute of limitations for a Title VII claim, the court may well have invalidated the arbitration agreement in question. IBM points out that the Second Circuit did not hold that the limitations period was a non-waivable substantive right, but instead implicated the effective vindication doctrine. But here too, if the arbitration agreement's waiver of the piggybacking provision is upheld, it will result in Plaintiff's inability to pursue Mr. Lohnn's claim in any forum, despite the fact that she could still do so in court absent the arbitration agreement. She would not be able to effectively vindicate Mr. Lohnn's ADEA claim.

[5]     Nor do the other Circuit Court cases that IBM cites contradict this conclusion. IBM cites <u>Spira v. J.P. Morgan Chase & Co.</u>, 466 F. App'x 20, 22-23 (2d Cir. 2012), but that case has nothing to do with the ADEA limitations period. IBM merely cites it for the proposition that "limitations periods generally do not modify underlying substantive rights." But in the context of the ADEA, the EEOC has argued otherwise, and this Court must pay appropriate deference. <u>See Thompson</u>, EEOC Brief, 2020 WL 1160190, at *19-23. IBM also cites <u>Browning v. AT&T Paradyne</u>, 120 F.3d 222, 225 (11th Cir. 1997), and <u>Garfield v. J.C. Nichols Real Estate</u>, 57 F.3d 662, 665 (8th Cir. 1995), but like <u>Vernon</u>, these cases concerned the retroactively applicability of a legislative change to ADEA's limitation period. Given the EEOC's more recent position, these out-of-circuit cases are unpersuasive.

claims in an arbitral forum. See id. at 268-72. Indeed, the Sixth Circuit explained in Logan, 939 F.3d at 829, that the "Supreme Court has told us that where statutes that create rights and remedies contain their own limitation periods, the limitation period should be treated as a substantive right" that "generally is not waivable in advance by employees." (citing Davis v. Mills, 194 U.S. 451, 454 (1904); Brooklyn Savs. Bank v. O'Neil, 324 U.S. 697, 704 (1945)).

IBM next makes the argument that the Sixth Circuit's decisions in Thompson and Logan were only applicable to the court litigation context and not to arbitration. IBM points out that the Logan court distinguished an earlier decision, Morrison v. Circuit City Stores, Inc., 317 F.3d 646 (6th Cir. 2003), which found that an arbitration provision abridging the limitations period for a Title VII claim was enforceable, because it did not unduly burden the effective vindication of the plaintiff's Title VII claim in arbitration.[6] See Logan, 939 F.3d at 837-38. The Logan court pointed out that resolving the question in Morrison "required carefully balancing the 'liberal policy favoring arbitration and the important goals of federal anti-discrimination statutes.'" Logan, 939 F.3d at 838. However, there is a key distinction between the ADEA and Title VII that alters this balance.  Unlike Title VII, the ADEA includes the requirements of the OWBPA, which protects employees from waiving "any right or claim" without the employer first meeting several strict conditions including submitting disclosures to employees that would permit them to scrutinize whether they had been discriminated against on the basis of age.[7]

---

[6]     Notably, in Morrison, there was no indication that the plaintiff had been burdened at all by the limitations provision of the arbitration agreement, because in fact the plaintiff had been able to actually arbitrate her claim on the merits to a final award. Morrison, 317 F.3d at 655. Here, despite the fact that Plaintiff would have been timely to pursue Mr. Lohnn's claim in court absent the arbitration agreement, the arbitrators' finding that the agreement waived the piggybacking rule has quashed her ability to pursue the claim in the arbitral forum.

[7]     As Plaintiff explained in her Motion for Summary Judgment (Dkt. 14 at 19 n.22), the OWBPA also requires that in order for a waiver to be valid, it must be "a part of an agreement between the individual and the employer that calculated to be understood by such individual, or by the average individual eligible to participate." 29 U.S.C § 626(f)(1)(A). This requirement was likewise not met because the timing provision was

See Oubre, 522 U.S. at 427. Given the fact that the ADEA timing provision is a substantive right, IBM simply cannot deny that its purported waiver of the piggybacking rule in the arbitration agreement violated the OWBPA, because IBM did not provide the required disclosures to Mr. Lohnn in connection with the arbitration agreement. (SOF ¶ 5 n.2, Dkt. 14.) Thus, the EEOC's position that the ADEA's timing scheme is a substantive right (a position adopted by the Sixth Circuit in Thompson), indicates that the waiver of the piggybacking rule cannot be enforced due to IBM's failure to satisfy the requirements of the OWBPA.[8] Because this waiver was unlawful under the OWBPA, the FAA's liberal policy of enforcing the terms of arbitration agreement is, in this case, "overridden by a contrary congressional command." See CompuCredit Corp., 565 U.S. at 97.

### C. Plaintiff Has Developed a Record that Forcefully Demonstrates that the Arbitration Agreement's Confidentiality Provision will Unlawfully Hinder Her Ability to Pursue Mr. Lohnn's ADEA Claims in Arbitration

#### 1. IBM incorrectly argues that the Second Circuit has embraced a *per se* rule that confidentiality provisions are enforceable in arbitration agreements regardless of the circumstances

Relying primarily on the Second Circuit's decision in Guyden, 544 F.3d at 384-85, IBM argues that the Court should not declare the confidentiality provision in IBM's

---

ambiguous and required the employees to have a thorough understanding of employment discrimination law and administrative exhaustion to parse what it meant.

[8]     Tellingly, IBM does not address this distinction between Title VII and the ADEA, addressing the OWBPA only in a brief footnote asserting that the OWBPA protects only substantive rights, and that the limitations period was not a substantive right. Notably, the language of the OWBPA does not make a distinction from between procedural and substantive rights: "[a]n individual may not waive **any right or claim**" without first receiving the OWBPA disclosures. 29 U.S.C. § 626(f)(1). Moreover, IBM cites Estle v. International Business Machines Corp., 2020 WL 5633154, at *3-7 (S.D.N.Y. Sept. 21, 2020), in support of this proposition, but the plaintiffs in Estle have appealed that court's decision to the Second Circuit, and that appeal was recently argued on September 29, 2021. See Estle v. International Business Machines Corp., No. 20-3372 (2d Cir.). And in any event, Estle did not concern the fact that IBM truncated the ADEA limitations period (which is a substantive right unquestionably protected by the OWBPA). Instead, Estle concerned the validity of the class action waiver in the arbitration agreement. See Estle, 2020 WL 5633154, at *3-7.

arbitration agreement to be unenforceable, because "confidentiality is a paradigmatic aspect of arbitration . . . ." Id. Ironically, while IBM accuses Plaintiff of taking a position that would mean that arbitration agreements' confidentiality provisions are never enforceable in the employment context, it is in fact IBM that advances a wildly overbroad proposition – that confidentiality provisions in arbitration agreements are *always* enforceable, no matter the factual circumstances.

The Second Circuit rejected that proposition in American Family Life Assurance Co., 778 Fed. App'x at 27. In that case, the plaintiff sought an order compelling the defendants to arbitration and for a declaration that the arbitration agreement was enforceable. See id. at 26. Defendants argued that the arbitration agreement as a whole was unenforceable, because it was procedurally and substantively unconscionable, and they asserted that one aspect of its substantive unconscionability was the confidentiality provision it contained. See id. at 26-28. Citing to Guyden, the court in American Family Life Assurance Co. held that the mere presence of a confidentiality provision in the arbitration agreement did not mean that such a term was substantially unconscionable. See id. at 27-28. Importantly however, the court held that "[i]f arbitration proceedings ultimately unfold, the parties are free to contest the enforceability of the confidentiality provision as applied to them, but that matter is distinct from the enforceability of the Agreement." Id. In other words, contrary to IBM's assertion, there is no *per se* rule that confidentiality provisions in arbitration agreements are always enforceable.

Cases like Guyden merely stand for the proposition that, without a developed record demonstrating the ways in which a confidentiality provision is being used to hinder a party's ability to pursue a claim in arbitration, courts will generally not find that confidentiality provisions in arbitration agreements are substantively unconscionable. In Guyden, the plaintiff was attempting to avoid arbitration altogether (before any arbitration proceedings had taken place) by arguing that the arbitration agreement's confidentiality provision and its various restrictions on discovery rendered arbitration an

inappropriate forum. See Guyden, 544 F.3d at 384-87. The Guyden court refused to conclude that the confidentiality provision – at least at that stage – impacted the enforceability of the arbitration agreement, reasoning that the "Supreme Court has warned against '[s]uch generalized attacks on arbitration,' because they 'rest on suspicion of arbitration as a method of weakening the protections afforded in the substantive law to would-be complainants' and consequently are 'far out of step with our current strong endorsement of the federal statutes favoring this method of resolving disputes.'" Id. at 385 (quoting Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 30 (1991)).  What the Guyden court did not say, however, is that confidentiality provisions are *always* enforceable, no matter the circumstances. See id. at 384-85.[9]

Guyden **did not** address the circumstances currently before the Court, where a record has been developed demonstrating how a party is using a confidentiality provision to seriously hinder the ability of employees attempting to effectively vindicate their rights in arbitration.  In other words, these cases are not the kind of "generalized attack[] on arbitration" based on mere "suspicion of arbitration as a method of weakening the protections afforded in the substantive law" that Gilmer warned against. Guyden, 544 F.3d at 385. Indeed, later in the Guyden decision, the court addressed the plaintiff's challenge to various discovery limitations the arbitration agreement imposed

---

[9]     Guyden is also distinguishable in that the plaintiff argued that her whistleblower claim brought under the Sarbanes-Oxley Act ("SOX"), 18 U.S.C.A. § 1514A was not arbitrable, because Congress intended SOX whistleblower claims to bring public accountability by submitting information about corporate fraud to the public through the courts (as opposed to be the claim being disposed of secretly in arbitration). See Guyden, 544 F.3d at 383. First, it bears noting that Congress itself disagreed with Guyden's conclusion and amended SOX to forbid arbitration of whistleblower claims. See Wong v. CKX, Inc., 890 F. Supp. 2d 411, 421 (S.D.N.Y. 2012) (citing 18 U.S.C. § 1514A(e)(2)). Second, even aside from Congress's subsequent amendment, Guyden is distinguishable because it addressed a general challenge to the notion that SOX claims could be addressed out of the public eye in arbitration. See Guyden, 544 at 385. Because the court held that it could SOX claims could be addressed in arbitration, the court also concluded that there was nothing intrinsically wrong with including a confidentiality provision in the arbitration agreement for SOX claims. Here, on the other hand, Plaintiff is not asserting that confidentiality is intrinsically at odds with the ADEA. Instead, she asserts that IBM has wielded its confidentiality clause in a manner to unfairly inhibit its employees' ability to litigate their ADEA claims, and under such circumstances, the confidentiality provision is unenforceable.

and noted that if those limitations were strictly enforced, it might well render the agreement unenforceable "because it would not, under those circumstances, allow Guyden a meaningful opportunity to present her claim." Id. at 386. Like the confidentiality provision, Guyden had described the plaintiff's attack on the discovery limitations, as "an attack on the character of arbitration itself . . . ." Id. (internal citation omitted). Nevertheless, Guyden made room for the fact that the discovery limitations provision could ultimately hinder effective vindication of the SOX claims and that the parties to the arbitration could then later challenge those limitations if that indeed happened. See id. As the court explained, "Guyden has introduced no evidence that her fears are well-founded, and we must enforce the Agreement unless and until the record proves otherwise." Id. at 387.

Then, following Guyden, the Second Circuit applied this reasoning to challenges to confidentiality provisions in arbitration agreements in American Family Life Assurance Co., 778 Fed. App'x at 27. In other words, while challenges to confidentiality provisions in arbitration agreements may not be viable in the abstract with no evidence that they are actually undermining the effective vindication of statutory claims, litigants are certainly not precluded from making such challenges with a well-developed record as in this case. See id. IBM's request for the Court to ignore the documentary evidence that Plaintiff has submitted is telling.[10] IBM wants this case to look just like the circumstances addressed in Guyden, when in fact they are completely dissimilar.

_____

[10]    IBM fashions the vast majority of its response as simply a Motion to Dismiss and makes no real effort to address the documentary record that Plaintiff has put forth before the Court. IBM only devotes a little more than two pages to addressing the summary judgment aspect of its argument (Dkt. 24 at 32-35), asserting that the only reason that Plaintiff attached confidential materials was to use the public-access doctrine to improperly destroy confidentiality (with respect to the particular documents included with their motion). That assertion is both an inappropriate attack on Plaintiff's counsel and simply untrue. Plaintiff followed the path set forth in American Family Life Assurance Co., 778 Fed. Appx. at 27, and has included in her motion a specific factual record showing how IBM has abused its confidentiality provision in arbitration.  It was important to the Plaintiff that she be able to support her arguments showing concretely the harm that has been inflicted by IBM's overbearing use of its confidentiality provision in arbitration. It is disingenuous for IBM to assert that the Court will not need to consider these documents in order to decide Plaintiff's summary judgment motion. Had Plaintiff

Here, unlike in Guyden, Plaintiff has submitted dozens of exhibits from a number of arbitration cases that her counsel have pursued, representing claimants bringing ADEA claims against IBM (SOF ¶¶ 16-99, Dkt. 15).  These exhibits amply demonstrate the undue burden that IBM's confidentiality provision has placed on their ability to advance their claims.  As explained in Plaintiff's Memorandum in Support of her Motion for Summary Judgment (Dkt. 14 at 25-30), the confidentiality provision has put IBM at an unfair advantage in the dozens of arbitrations that are ongoing between IBM and its former employees that Plaintiff's counsel represent by preventing the employees from sharing globally relevant evidence.[11]

To briefly reiterate, this evidence includes: (1) shocking, "smoking gun" emails between IBM's former ███████████████ , former ████████████████



███████████ , and other IBM executives expressing overt animus toward older workers and planning regarding how to oust older workers and increase the percentage of younger "Millennial" workers throughout the company; (2) emails between ███ ███████████ and current ████████████████ regarding a re-location program aimed at older workers with the expectation that older workers would leave the company; (3) IBM corporate planning documents explicitly discussing IBM's focus on increasing strategies to replace older employees with younger employees; (4) documents that IBM produced to the EEOC that ultimately led to the classwide EEOC Letter of Determination finding

---

not provided such a record, IBM would certainly argue that Plaintiff had provided no justification for why the confidentiality provision should be held unenforceable in this case.

[11]    IBM has even gone so far as to *move for sanctions* against Plaintiff's counsel in several arbitrations for filing documents or orders from those arbitrations in support of their motion for summary judgment in this case. (Liss-Riordan Reply Decl. ¶ 9.) IBM has sought these sanctions even though it has argued that its arbitration agreement requires such challenges to be made in court rather than in arbitration. (SOF ¶ 15 n.5, Dkt. 15.) Clearly, a challenge to a confidentiality provision would be difficult if not impossible without a record, as provided here and in those cases, demonstrating the prejudice caused by the enforcement of the confidentiality provision. See American Family Life Assurance Co., 778 Fed. Appx. at 27. IBM believes that the confidentiality provision insulates itself even from a challenge to the confidentiality provision (a circular *non sequitur*).

that IBM had engaged in age discrimination through its resource actions; and (5) useful testimony from several IBM executives. (SOF ¶¶ 16-99, Dkt. 15.) Additionally, former IBM employees pursuing age discrimination claims have also not been able to cite to arbitrators the successful decisions that some employees have obtained finding that IBM discriminated against them in violation of the ADEA and awarding them significant damages. (SOF ¶¶ 81-87, Dkt. 15.)

The additional developments that have taken place in these arbitrations since Plaintiff filed her motion for summary judgment only serve to reinforce the point that IBM has been taking unfair advantage of its confidentiality provision to block employees from building their cases based on evidence obtained in other cases. For example, in Barlas v. IBM, JAMS Ref. No. 1310024185, Plaintiff's counsel obtained deposition testimony of ███████, a ███████████ of ███ for IBM, in which she explained that when an IBM hiring manager wishes to hire an individual off of a resource action list, a special review is required by a board consisting of business unit leaders such as the business unit CFO, HR Representatives, and a lawyer. (Liss-Riordan Reply Decl. ¶ 4.) She also testified that approximately 80% of the individuals in IBM's Global Markets business unit who sought approval to get hired off a resource action list in 2018 did not receive such approval. (Liss-Riordan Reply Decl. ¶ 4.)  This information would help any of the former IBM employees who had applied for other internal positions at IBM make their cases that they were effectively blacklisted in order to further IBM's goal of ousting older workers (by making sure that layoffs through resource actions "stuck"), and yet IBM is using its confidentiality clause to block employees from using this testimony cannot be used across cases.

In addition, throughout these cases, IBM is claiming that decisions of which employees would be laid off were made in a decentralized way by lower-level managers who had no knowledge of any alleged plan to oust older workers. However, Plaintiff's counsel has uncovered evidence showing that the decisions were in fact made much

higher up in IBM's hierarchy, supporting Plaintiff's claim that the layoffs were planned by higher level managers who were aware of and implemented the ███ and ███ ███ ███'s strategies to eliminate older workers. For example, in <u>Foucher v. IBM</u>, JAMS Reference No. 1310025361, Plaintiff's counsel obtained an "Executive Headcount" presentation for the Watson Health business unit that was sent from ███ ███ to former ███, which identified the employees in IBM's Marketing unit who would be selected for the 2020 resource action. (Liss-Riordan Reply Decl. ¶ 6.) Egregiously, these documents revealed that IBM made significant misrepresentations in another former employee's arbitration – specifically, IBM had produced documents that supposedly showed that that employee was selected for layoff in approximately November 2020 by his first-line manager, but the documents produced in <u>Foucher</u> showed that he was actually selected more than six months earlier, in April 2020, and that ███ was apparently involved in his selection. (Liss-Riordan Reply Decl. ¶ 6.) In these arbitrations, IBM has been fighting tooth and nail to block the former employees from obtaining such evidence, and now that Plaintiff's counsel have obtained it, IBM is blocking the former employees from using it in other cases – even though several of the former employees who Plaintiff's counsel represent in other cases appear on the layoff list that they have obtained in Mr. Foucher's case – that shows that they were actually identified for layoff months before their lower level managers supposedly picked them for layoff (as IBM has claimed). (Liss-Riordan Reply Decl. ¶¶ 6-7.)

In nearly all of the more than 100 arbitration cases Plaintiff's counsel have been advancing, IBM has argued strenuously that discovery must be limited to the lowest possible level of IBM's hierarchy, and that the scope of discovery that Plaintiff's counsel has sought is not proportional to that individual case. (Liss-Riordan Reply Decl. ¶ 8.) By making this argument in every case, IBM is attempting to keep the former employees from obtaining globally-relevant high-level discovery, which is crucial for each and every

case in this type of pattern and practice discrimination case. There can be no doubt that if the former employees were in court, Plaintiff's counsel could use globally relevant high-level discovery across cases, and proportionality arguments would have no traction. Here, on the other hand, the arbitration claimants are being prejudiced simply based on whether IBM manages to convince the arbitrator in a particular case to keep the scope of discovery overly narrow.

In its opposition, IBM does not even really dispute the ways in which the arbitration agreement's confidentiality provision has burdened the former employees' ability to make their cases – as indeed it cannot.  It well knows that it is using the confidentiality provision as a way of block employees from using valuable evidence that has been uncovered in other cases. Instead, IBM argues that Plaintiff is not in the position to claim that the confidentiality provision has deprived her of the information needed to litigate her claim, and thus she cannot yet contest confidentiality under American Family Life Assurance Co., 778 F. App'x at 27-28. However, the extensive record that Plaintiff's counsel has submitted demonstrates that, across the board, IBM has aggressively used its confidentiality to prevent to the greatest extent possible the former employees from being able to advance their claims. (SOF ¶¶ 16-99, Dkt. 15.) There is no reason to think that Plaintiff in this case would fare any differently, as IBM has given every indication that it will continue to aggressively enforce its confidentiality provision across all of the ADEA arbitrations filed against it.[12]

---

[12]     Plaintiff has not even been able to begin her arbitration or engage in discovery because of the timeliness issue in her case.  However, the plaintiffs in the second wave of cases that counsel have filed before Judge Jesse M. Furman (In re: Second Wave IBM Arbitration Litig., Civ. Act. No. 1:21-cv-09574-JMF) have claims that IBM does not dispute are timely.  They have filed a challenge to the confidentiality provision in court (and are requesting that their arbitrations be stayed) so that the court can decide this issue before they must go through what the earlier rounds of claimants have had to do in arbitration, which is fight tooth and nail to attempt to obtain this common evidence, which IBM has blocked them from obtaining at every turn by citing its confidentiality provision.

2.    **The Court can strike unenforceable terms from the arbitration agreement without a showing of procedural unconscionability**

Peculiarly, IBM argues that Plaintiff's argument fails because she argued only substantive unconscionability and not procedural unconscionability. This argument is misplaced. Plaintiff does not dispute that if she were challenging the enforceability of the arbitration agreement as a whole on unconscionability grounds, she would have to demonstrate both procedural and substantive unconscionability.[13] But where, as here, Plaintiff is merely asking the Court to excise certain substantively unconscionable provisions, no showing of procedural unconscionability is required. See Ragone, 595 F.3d at 124-25. In Ragone, upon which IBM relies, the Second Circuit explained that "'the appropriate remedy' when a court is faced with a plainly unconscionable provision of an arbitration agreement – one which by itself would actually preclude a plaintiff from pursuing her statutory rights – 'is to sever the improper provision of the arbitration agreement, rather than void the entire agreement.'" Id. (quoting Brady v. Williams Capital Group, L.P., 878 N.Y.S.2d 693, 701 (N.Y. Sup. Ct. 2009)); see also Valle, 2015 WL 413449, at *6 (holding that although there was no procedural unconscionability, "[a]s the 'loser pays' provision is substantively unconscionable, the 'appropriate remedy is to sever the improper provision of the arbitration agreement' and not to invalidate the entire Arbitration Provision.'") (internal citation omitted).  Likewise, in Larsen, 871 F.3d at 1313, 1318-19, the Eleventh Circuit held that an arbitration agreement was not procedurally unconscionable but nevertheless excised a substantively unconscionable confidentiality provision.

Indeed, it is commonplace for courts to sever substantively unconscionable or otherwise unenforceable provisions from arbitration agreements regardless of procedural unconscionability. See Woo Jung Cho, 2020 WL 1330655, at *5 (Moreover,

---

[13]    IBM admits, however, that in some cases courts have declined to enforce an arbitration agreement "on the ground of substantive unconscionability alone," where the unconscionability is severe. Gillman v. Chase Manhattan Bank N.A., 534 N.E.2d 824, 829 (N.Y. 1988).

to the extent that the unilateral modification provisions of the Personnel Policy were invalid, they would be severed from the arbitration provision"); <u>Chung Chang</u>, 2019 WL 5304144, at *3-4 (where the court found no procedural unconscionability, it went on to explain that "even if the Court were to deem the limitation clause unconscionable, the 'appropriate remedy' would be 'to sever the [limitation] provision . . . rather than void the entire agreement," in which case Chang would still be required to submit his claims to arbitration, albeit with a modified limitations period"); <u>Castellanos</u>, 291 F. Supp. 3d at 301 ("Having determined that the [arbitration agreement's] limitations provision is unenforceable, the Court concludes that the appropriate remedy is to sever that provision.").

### 3. New York state law does not embrace a per se rule that contractual confidentiality provisions must be enforced

IBM asserts that regardless of the record that Plaintiff developed, Plaintiff cannot find support for her argument under New York law – IBM is wrong. Indeed, IBM's assertion that New York law unqualifiedly supports enforcement of confidentiality provisions is untrue. For example, where "a confidentiality clause subverts public policy, it is unenforceable." <u>Village of Brockport</u>, 745 N.Y.S.2d at 668 (citing <u>Matter of Anonymous v. Bd. Of Educ. Mexico Cent. School Dist.</u>, 162 Misc. 2d 300, 616 N.Y.S.2d 867 (Sup. Ct. 1994)). IBM cannot dispute that New York has a strong public policy in favor of redressing age discrimination in employment. <u>See</u> <u>Placos</u>, 517 F. Supp. at 1289 ("[D]iscrimination in employment because of age is against the public policy of New York . . . .") (citing <u>Foran v. Cawley</u>, 354 N.Y.S.2d 757, 812 (Sup. Ct. 1973); N.Y. Exec. Law § 296(1)(A)). This Court can and should find that where the strict enforcement of the arbitration agreement's confidentiality provision stands to unduly impede the Plaintiff's ability to advance her age discrimination claim, the confidentiality provision subverts New York public policy and cannot stand.

The New York Supreme Court Appellate Division came to a similar conclusion in <u>Denson</u>, 180 A.D.3d at 454. In that case, the plaintiff had brought sexual harassment

and sex discrimination claims in state court. See id. The defendant then demanded arbitration alleging that by filing suit, plaintiff had violated a non-disclosure agreement that she had signed in connection with her employment. See id. at 446. Following the commencement of arbitration, the plaintiff brought an action in federal court seeking a declaration that the non-disclosure agreement was void as against federal policy. See id. at 448. Defendant then successfully moved to compel arbitration in the federal action. See id. The arbitrator issued an award holding that the non-disclosure agreement was valid, and that the plaintiff had breached it by filing confidential information in the federal action. See id. The plaintiff then petitioned in state court to vacate the arbitration agreement, which the trial court denied. See id. The plaintiff then appealed, and the Supreme Court, Appellate Division held that the arbitrator's award violated public policy:

> Plaintiff's negative statements about defendant, for which the arbitrator made an award, were made in the context of the federal action in which she sought a declaration that the NDA was unenforceable (*Rosenberg v. MetLife, Inc.*, 8 N.Y.3d at 365–366, 834 N.Y.S.2d 494, 866 N.E.2d 439). By concluding that the allegations in the federal action are tantamount to disclosure of confidential information violative of the NDA, the arbitrator improperly punished plaintiff for availing herself of a judicial forum. Defendant is hard-pressed to explain how plaintiff could have pursued her rights without setting forth necessary factual statements for the federal court to consider.

Id. at 454. In other words, the court held that confidentiality could not be used in a manner to quash the plaintiff's ability to advance her claim in court, because using confidentiality in that manner would violate New York public policy. Denson is closely analogous to the argument Plaintiff makes in this case – that IBM cannot use its confidentiality provision to hobble Plaintiff's ability to pursue Mr. Lohnn's claim in arbitration. As such, where IBM asserts that New York law supports enforcement of the confidentiality provision in arbitration, that is just not the case.

The majority of states (and federal courts addressing state laws) that have addressed this issue head on have rejected the use of confidentiality clauses that are used to impede the pursuit of civil rights claims, or claims under other remedial statutes

such as wage and hour or consumer protection claims. See, e.g., Ramos, 28 Cal. App. 5th at 1065-66 (finding confidentiality provision unconscionable under California law, and noting that "[b]ecause it requires [Plaintiff] to keep "all aspects of the arbitration" secret, she would be in violation if she attempted to informally contact or interview any witnesses outside the formal discovery process" and "such a limitation would not only increase [Plaintiff's] costs unnecessarily by requiring her to conduct depositions rather than informal interviews, it also defeats the purpose of using arbitration as a simpler, more time-effective forum for resolving disputes"); Narayan, 140 Hawai'i at 355 (finding that a confidentiality provision in an arbitration agreement was unconscionable, in the context of a consumer protection/housing case); Henderson, 2015 WL 2092073, at *3 and n.3 (holding under Nevada law in a wrongful termination case that a confidentiality provision in an arbitration agreement was unconscionable and could be severed); Longnecker, 23 F. Supp. 3d at 1111 (severing confidentiality provision from arbitration agreement under Arizona law in the context of a FLSA case); Schnuerle, 376 S.W.3d at 578 (holding under Kentucky law that a confidentiality provision was unconscionable in the context of a consumer protection arbitration); Post, 2007 WL 1290091, at *3 (finding under Ohio law that a confidentiality provision an arbitration agreement was unconscionable in the context of an age discrimination claim); Kinkel, 223 Ill.2d at 42 (finding that confidentiality provision in an arbitration agreement was unenforceable in the context of a consumer protection case); Sprague, 473 F. Supp. 2d at 975 (holding under Missouri law that a confidentiality provision was unconscionable in a consumer protection/housing case); Zuver, 153 Wash. 2d at 312-21 (holding under Washington law that a confidentiality provision was unconscionable in the context of an employment discrimination arbitration); Taylor, 2004 WL 1382726, at *9 (holding under Oregon law that a confidentiality provision an arbitration agreement was unconscionable in the context of a claim of sex discrimination).

New York's approach is in accord with other states that have recognized the serious disadvantages that confidentiality provisions can bring in similar contexts. IBM argues that there are no New York state cases that have specifically struck down confidentiality provisions in arbitration, but there is no reason for this Court to assume that the New York Court of Appeals would decline to do so.[14] Cases such as Denson suggest that where there has been a showing confidentiality would unfairly hinder Plaintiff's ability to advance Mr. Lohnn's claim (such as, through providing IBM an informational advantage that it can wield as a weapon), New York courts would strike it down. Bafflingly, IBM goes so far as to suggest that there is no repeat-player advantage at issue at all in these cases. As a matter of common sense, IBM is incorrect. IBM asserts that, because these former employees all have the same counsel, they like IBM, are also repeat players, so there is no undue advantage to IBM. What IBM neglects to point out is that it holds all of the relevant information in its possession – the former employees, in contrast, must in every case fight tooth in nail to get the same discovery that has already been produced in some of the other arbitrations, and IBM has been able to refine its arguments based on what has worked in other arbitrations to convince arbitrators to keep discovery as narrow as possible and not produce the types of globally relevant documents that these employees ought to be able to share among themselves.

The only case that IBM cites in support of its proposition that the Court should not consider IBM's repeat player advantage is Billie v. Coverall N. Am., Inc., 444 F.

---

[14]     While the New York Court of Appeals has not addressed the specific scenario posed here, the Court should make its best effort to determine how that court would rule, not simply reject the argument because it has not been presented.  Indeed, this question may ultimately need to be addressed by the New York Court of Appeals, which only the Second Circuit could certify to that Court.  If the Court believes the caselaw does not indicate how the Court of Appeals would address this issue, the Court could certify its order for interlocutory appeal pursuant to 28 U.S.C. § 1292(b), with the suggestion that the Second Circuit may certify the question to the New York Court of Appeals. See Primavera Familienstifung v. Askin, 139 F. Supp. 2d 567, 571 (S.D.N.Y. May 7, 2001) ("If a district court certifies an order for interlocutory appeal, and if the circuit court accepts certification . . . , then the circuit court may certify questions of state law to the New York Court of Appeals.").

Supp. 3d 332, 354 (D. Conn. 2020), which addressed Connecticut law. Notably, the circumstances in Billie were very different in this case – the plaintiffs in Billie argued that the arbitration agreement was unconscionable on the whole, and only spent two sentences on why the confidentiality provision contributed to the overall substantive unconscionability of the agreement.  See id. Moreover, the cases that Billie relied on are easily distinguishable from this case or are otherwise inapposite. For example, IBM relies on Damato v. Time Warner Cable, Inc., 2013 WL 3968765, at *12 (E.D.N.Y. July 31, 2013), which explained that the Supreme Court's decision in AT&T v. Concepcion, 563 U.S. 333, 345 (2011), meant that "the writing is on the wall: the confidentiality of proceedings does not, by itself, render an agreement to arbitrate unconscionable." Damato, 2013 WL 3968765, at *12. But again, Plaintiff is not arguing that the arbitration agreement's inclusion of a confidentiality provision in and of itself renders the entire agreement to arbitrate unconscionable. Instead, Plaintiff argues that the way in which the arbitrations have unfolded demonstrate that IBM has enjoyed a profound unfair advantage that stands in the way of the effective vindication of the former employees' ADEA claims.

Billie also cites to the Ninth Circuit's decision in Poublon v. C.H. Robinson Co., 846 F.3d 1251, 1266 (9th Cir. 2017), which held that "the California Court of Appeals 'had rejected the same policy argument that [plaintiffs] make[] here, namely that such confidentiality provisions 'inhibit employees from discovering evidence from each other.'" Poublon, 846 F.3d at 1266. But Poublon reached its conclusion based on a California Court of Appeal decision Sanchez v. CarMax Auto Superstores Cal. LLC, 224 Cal. App. 4th 398, 408 (2014), and Poublon noted that "In the absence of any decision on this issue from the California Supreme Court, we are bound by *CarMax*, as the ruling of the highest state court issued to date." Poublon, 846 at 1266. More recently, however, another California Court of Appeal has disavowed CarMax. In Ramos, 28 Cal. App. 5th at 1065-66, the court observed that CarMax did not address the plaintiff's

28

"argument that a confidentiality clause like the one at issue in this case would impair her ability to engage in informal discovery in pursuit of litigation claims." The court went on:

> Although *Sanchez* noted in passing that the trial court found the confidentiality provision at issue was unconscionable because it would " 'inhibit employees from discovering evidence from each other,' " it did not discuss why the trial court's reasoning was erroneous and relied only on a citation to *Woodside,* which was not an employment case and did not address whether such clauses unfairly restrict an employee's ability to engage in informal discovery. (*Sanchez, supra,* 224 Cal. App. 4th at p. 408, 168 Cal. Rptr. 3d 473.) To the extent *Sanchez* contradicts our holding, we decline to follow it.

Ramos, 28 Cal. App. 5th at 1066 n.11. In light of CarMax, the Ninth Circuit felt compelled to depart from its earlier decision in Pokorny, 601 F.3d at 1002, which held that the confidentiality provision in that case "unfairly favors [defendant] because it prevents Plaintiffs from discussing their claims with other potential plaintiffs and from discovering relevant claims." But following Ramos, it is clear that Poublon had an incorrect understanding of California law. Courts like Billie may assert that confidentiality provisions do not provide defendants like IBM an inherent informational advantage, but Plaintiff in this case has submitted ample evidence demonstrating that that is just not true in this case.

Furthermore, although IBM points to several cases that supposedly demonstrate that New York law allows for confidentiality provisions in arbitration without limitations, these cases are ultimately unhelpful to IBM's argument. For example, IBM argues that New York state courts have held that "there is an important public interest in protecting the rights of parties who submit to confidential arbitration," citing Those Certain Underwriters at Lloyds, London v. Occidental Gems, Inc., 41 A.D.3d 362, 365 (N.Y. Sup. Ct. App. Div. 2007). However, in that case the court simply affirmed a decision by the lower court not to compel the plaintiff to produce documents and testimony from an arbitration in Belgium to which the defendant was not a party. See id. That case had nothing to do with the effective vindication of a federal statutory claim – the plaintiff simply sought a declaration that certain claimed losses were not "fortuitous" for the purposes of insurance coverage. See id. at 363.

Likewise, IBM cites Kopple v. Stonebrook Fund Management, LLC, 875 N.Y.S.2d 821, at *3 (Sup. Ct. 2004), but that case involved a single arbitration where the plaintiff sought an order enjoining enforcement of the arbitration agreement with no record demonstrating the ways in which the confidentiality provision would undermine his ability to advance his claim. The plaintiff argued that the confidentiality provision would prohibit him from speaking with potential witnesses about the arbitration, but the court concluded that this concern was unfounded because the agreement "expressly acknowledges that the parties may engage in discovery," meaning that the confidentiality provision would not prevent the plaintiff from speaking with witnesses. Id. The Kopple plaintiff's argument was very different from that advanced by Plaintiff in this case, who has set forth extensive evidence that the strict enforcement of IBM's confidentiality provision has prevented arbitration claimants from using demographic data, incriminating communications between IBM's executives, and useful arbitral decisions, to build their cases. (SOF ¶¶ 16-99, Dkt. 14.) Kopple is simply inapposite.

IBM's reliance on Suquin Zhu v. Hakkasan NYC LLC, 291 F. Supp. 3d 378, 391-92 (S.D.N.Y. 2017), is similarly unavailing. In that case, the plaintiffs brought a claim under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 et seq., and argued that the arbitration agreement in that case was not enforceable in part because it contained a confidentiality provision. Id. at 382. The confidentiality provision, the plaintiff argued, violated the dictates of Cheeks v. Freeport Pancake House, Inc., 796 F.3d 199, 206 (2d Cir. 2015), which held that FLSA claims cannot be settled without the approval of a court or the Department of Labor and discouraged other employees from bringing claims. See Suquin Zhu, 291 F. Supp. at 392. While the court compelled the case to arbitration, it did not address the enforceability of the confidentiality provision – instead, the court held that it was for the arbitrator to decide whether or not it was enforceable. See id. at 395. Suquin Zhu thus stands in contrast to this case, where IBM has itself taken the position that its arbitration agreement delegates questions of validity or

enforceability of various provisions of the agreement to a court of competent jurisdiction. (SOF ¶ 15 n.5, Dkt. 15.) Indeed, the court left room for a finding that the confidentiality provision was invalid, and that it could potentially be severed from the arbitration agreement. Suquin Zhu, 291 F. Supp. at 395. The difference between this case and Suquin Zhu is that in this case, it is for the court to make such a determination rather than the arbitrator.

### 4. The FAA would not preempt a finding that IBM's confidentiality provision is unenforceable

Likely realizing that New York law does not inflexibly protect the enforceability of confidentiality provisions as IBM asserts, IBM also argues that if New York law renders the confidentiality provision unenforceable, it is preempted by the FAA. The FAA's saving clause "permits arbitration agreements to be declared unenforceable 'upon such grounds as exist at law or in equity for the revocation of any contract' . . . but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue" or that "interfere[] with fundamental attributes of arbitration and thus create[] a scheme inconsistent with the FAA." Concepcion, 563 U.S. at 339, 344 (quoting 9 U.S.C. § 2).

The Supreme Court has repeatedly directed that "[b]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum." Id.; see also 14 Penn Plaza LLC v. Pyett, 556 U.S. 247, 265 (2009) (agreement to arbitrate is not "a prospective waiver of the substantive right."); Italian Colors Rest., 570 U.S at 238-39 (the effective vindication exception "finds its origin in the desire to prevent 'prospective waiver of a party's *right to pursue* statutory remedies) (emphasis in original) (internal citation omitted).

IBM argues that a holding that the confidentiality provision is unenforceable under state law would discriminate against confidentiality in arbitration, even though New York law generally permits confidentiality in other respects. IBM simply cites some

cases wherein the courts held that confidentiality agreements were enforceable. See, e.g., Mehulic v. New York Downtown Hosp., 979 N.Y.S.2d 320, 322 (2014) (holding that plaintiff was estopped from challenging confidentiality agreement regarding discovery for over three years into litigation and nine months after the court informed the plaintiff of the need to make such a challenge); King v. Marsh & McLennan Agency, LLC, 126 N.Y.S.3d 312 (N.Y. Sup. Ct. 2020) (enforcing a confidentiality provision preventing former employee from disclosing sensitive business information and client lists); Garda USA, Inc. v. Sun Cap. Partners, Inc., 194 A.D.3d 545, 546-47 (N.Y. App. Div. 2021) (affirming a decision denying a motion to dismiss on claims alleging breach of a confidentiality agreement between two companies considering an acquisition). But it does not follow that New York law always allows for the enforcement of confidentiality in every instance. For example, as explained above, New York courts will not enforce confidentiality provisions where doing so would undermine public policy. See Village of Brockport, 745 N.Y.S.2d at 668 (Sup. Ct. June 14, 2002). Similarly, courts will not enforce restrictive covenants with confidentiality provisions in employment agreements where they are "unreasonably burdensome to the employee." Denson v. Donald J. Trump for President, Inc., 530 F. Supp. 3d 412, 432 (S.D.N.Y. March 30, 2021) (citing Ashland Mgmt. Inc. v. Altair Invs. NA, LLC, 59 A.D.3d 97, 102 (N.Y. Sup. Ct. App. Div. 2008) (additional citations omitted).

Plaintiff's argument **does not** treat arbitration contracts differently from non-arbitration contracts – it simply recognizes that, under certain circumstances, like where a confidentiality provision may subvert New York public policy, they will not be enforced (whether in an arbitration agreement or otherwise). For IBM to assert that New York law unqualifiedly supports the enforcement of confidentiality provisions outside the arbitration context is disingenuous and untrue, and in any event, Plaintiff's argument is not limited to arbitration. If IBM were trying to use its confidentiality provision in court in the same way, it would be equally impermissible under New York law. As such, IBM is

incorrect in its argument that such a determination would be singling out arbitration for disfavored treatment in a manner that would justify preemption. See Concepcion, 563 U.S. at 339, 344.

IBM also argues that the FAA preempts any conclusion that the confidentiality provision is unenforceable, because confidentiality is a fundamental attribute of arbitration. In support of this argument, IBM again cites to Guyden, 544 F.3d at 385, which for the reasons discussed *supra* at pp. 19-22, is not applicable to the circumstances of this case. Aside from Guyden, IBM relies only on In re A2P SMS Antitrust Litig., 2014 WL 2445756, at *6-7 (S.D.N.Y. 2014), JPay, Inc. v. Kobel, 904 F.3d 923, 933, 935-36 (11th Cir. 2018), Reed Elsevier, Inc. ex rel. LexisNexis Div. v. Crockett, 734 F.3d 594, 598 (6th Cir. 2018), and Opalinski v. Robert Half Int'l Inc., 2015 WL 7306420, at *3 (D.N.J. Nov. 18, 2015), for the proposition that confidentiality is fundamental to arbitration. But each of those cases concerned whether class arbitration was available where arbitration agreements did not explicitly permit or prohibit class arbitration. None of the cases discussed the issue in this case, whether a confidentiality prevents the effective vindication of a federal statutory claim. Tellingly, IBM does not and cannot cite to a single case that has held that a finding that a confidentiality provision was unenforceable was preempted by the FAA.

In fact, many federal courts have held such provisions to be unenforceable under state law regardless of the FAA (and well after the Supreme Court issued Concepcion). For example in Larsen, 871 F.3d at 1319, the Eleventh Circuit severed the confidentiality provision because it provided the defendant with an obvious informational advantage. The Ninth Circuit explicitly rejected the argument that a confidentiality provision in arbitration agreement under California law was preempted by the FAA in Ting, 319 F.3d at 1152, explaining "[i]f the district court indicated any hostility, it was not directed at arbitration, but at the manner in which it was forced upon consumers, the way in which AT&T avoided liability for willful misconduct, and the costs to consumers of

33

vindicating their rights." See also Pokorny, 601 F.3d at 1002 (holding confidentiality provision in arbitration agreement unenforceable under California law); Davis, 485 F.3d at 1079 (same); Balan, 2019 WL 2635903, at *3-4 (severing an arbitration agreement in a confidentiality provision based on Washington law); Hoober, 382 F. Supp. 3d at 1160-61 (same); DeGraff, 2012 WL 3074982, at *4 (severing a confidentiality provision in an arbitration agreement under California law where plaintiff had made a showing that the provision unfairly benefited defendant); Luna, 236 F. Supp. 2d at 1173, 1180-81 (acknowledging that "[s]tate laws applicable only to arbitration agreements that would invalidate such agreements are preempted by the FAA . . ." and nevertheless severing a confidentiality provision in an arbitration agreement under Washington law as a general state contract defense).

Furthermore, IBM is incorrect that Plaintiff does not assert that any exception to the FAA's enforcement mandate applies. As Plaintiff explained in her motion, IBM's confidentiality provision is an undue hindrance on the effective vindication of Mr. Lohnn's ADEA claim. (Dkt. 14 at pp. 21-30.) While IBM asserts that courts in this district have rejected the notion that enforcing arbitral confidentiality implicates effective vindication issues, the cases upon which IBM relies are unavailing. IBM cites Moton v. Maplebear Inc., 2016 WL 616343, at *9 (S.D.N.Y. Feb. 9, 2016), but there the court merely rejected the argument that a FLSA claim could not be arbitrated in light of the FLSA's rule that settlements had to be approved by a court: "To the extent that [JAMS] Rule 26's confidentiality provisions can be interpreted as requiring the details of any Award be kept confidential in contravention of FLSA policy, that issue is not currently before the Court and can be decided if and when it arises." Id. Likewise, although IBM cites Bettencourt v. Brookdale Senior Living Communities, Inc., 2010 WL 274331, at *8 (D. Or. Jan. 14, 2010), the plaintiff in that case made no effort to show the ways in which the confidentiality provision had impacted his ability to vindicate his statutory rights, only relying on an abstract theory that using a public judicial forum to vindicate

employees' rights would create a deterrent effect on businesses. In contrast, Plaintiff here has submitted an extensive and rather detailed record demonstrating just how IBM has used its confidentiality provision specifically to thwart its former employees' efforts to advance their claims in arbitration.

## III.    CONCLUSION

For the reasons discussed herein, and in Plaintiff's Motion for Summary Judgment, the Court should deny IBM's Motion to Dismiss and instead grant summary judgment for the Plaintiff. The Court should enter a declaratory judgment holding unenforceable the provision of IBM's arbitration agreement that purports to waive Plaintiff's ability to utilize the piggybacking rule in arbitration.  Likewise, the Court should enter a declaratory judgment holding that the confidentiality provision of IBM's arbitration agreement is also unenforceable, as IBM has used this provision to severely hamper the ability of former employees to pursue claims against it under the ADEA.

Respectfully submitted,
PLAINTIFF DENISE LOHNN, Executor of the
Estate of Jorgen Lohnn, Deceased,
By her attorneys,

/s/ Shannon Liss-Riordan
Shannon Liss-Riordan (NY Bar No. 2971927)
Zachary Rubin (NY Bar No. 5442025)
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
(617) 994-5800
Email:  sliss@llrlaw.com, zrubin@llrlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on December 9, 2021, a true and accurate copy of the foregoing document was filed via this Court's CM/ECF system.

/s/ Shannon Liss-Riordan
Shannon Liss-Riordan